Law Office of Peter D. Hoffman, P.C.
Hope Harris, *Pro Hac Vice*
Peter D. Hoffman (PH -8306)
Nikki D. Woods (NW -1380)
Attorneys for Plaintiffs
200 Katonah Avenue
Katonah, NY 10536
(914) 232-2242          phone
(914) 232-2245          facsimile
hh@pdhoffmanlaw.com     e-mail

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| M.P., Individually and On Behalf of K.P. [1], a minor under the age of 18 years,<br><br>                              Plaintiffs,<br>          - against -<br><br>CARMEL CENTRAL SCHOOL DISTRICT,<br><br>                              Defendant. | **15 Civ. 03432 (VLB)**<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' RULE 56.1 STATEMENT OF UNCONTROVERTED FACT**

---

[1]Plaintiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. 1232(g) and 34 C.F.R. 99 (hereinafter "FERPA"). All student parties and actors herein are listed by pseudonym. This is done to protect their privacy pursuant to and in the spirit of FERPA. Whereas this action will require the inspection of student records of all student parties herein, Plaintiffs herein seek to protect the identity of all listed student parties by using pseudonyms.

## I.   PROCEDURAL HISTORY

1.   Plaintiffs filed an Impartial Hearing Demand with exhibits with the Carmel Central
     School District (hereinafter "CCSD") on June 27, 2013, requesting compensatory
     education for the 2011-12 and 2012-13 school years and tuition reimbursement for the
     2012-13 and 2013-14 school years at Franklin Academy (hereinafter "Franklin") (D-1;
     FFD-7; SRO 1, 5-6);[1]

2.   Defendant answered the hearing demand on September 11, 2013 (D-2);

3.   Plaintiffs withdrew their compensatory education claim for the 2011-12 and 2012-13
     school years (IHO-7; SRO 6, fn 12; T: 1181);

4.   The sixteen-day hearing took place over the course of a year, from September of 2013
     through September of 2014 (FFD 1,7; SRO 6);

5.   CCSD submitted 143 exhibits (FFD 72-78);

6.   Plaintiffs submitted 37exhibits (FFD 72-78);

7.   The IHO submitted 20 exhibits (FFD 72-78);

8.   On November 22, 2014, the Impartial Hearing Officer (hereinafter, "IHO") Linda
     Agoston, Esq. rendered her Findings of Fact and Decision (*See* Exhibit "1," Findings of
     Fact and Decision, attached to Complaint, hereinafter referred to as "FFD");

9.   The FFD was in favor of the Defendant (*see* FDD);

10.  The IHO's FFD:

     a.   incorrectly held for no tuition reimbursement for the Plaintiffs for the 2012-13
          and 2013-14 school years (FFD 71);

---

[1] IHO-___ refers to IHO Exhibits, P-___ refers to Plaintiffs' Exhibits, D-___ refers to Defendant Exhibits, T:___ refers to page references in the Transcript; FFD-___ refers to page references in the Impartial Hearing Officer's Findings of Fact and Decision; SRO-___ refers to page references in the State Review Officer's Decision. This is in the record supplied to this Honorable Court by the New York State Department of Education.

     b.  incorrectly determined that the placement at FA in the 2012-13 and 2013-14 school years was not appropriate (FFD 68);

     c.  incorrectly determined that the equities do not favor the parent (FFD 71);

     d.  plaintiffs appealed the 2012-13 and 2013-14 ruling on tuition reimbursement to the State Review Officer (hereinafter, "SRO");

11.  Plaintiffs served their Notice of Intent to Appeal on Defendant on December 22, 2014 and copy was sent to the Office of State Review (hereinafter, "OSR") along with affidavit of service on December 26, 2014;

12.  The SRO reviewed the appeal and found that CCSD offered K.P. a FAPE in the 2012-13 and 2013-14 school years, but did not rule on whether the parents' unilateral placement at Franklin was appropriate for the 2012-13 and 2013-14 school years or whether the equitable considerations support the parent's claim for the 2012-13 and 2013-14 school years (*See* Exhibit "2," SRO Decision, attached to Complaint, hereinafter referred to as "SRO");

## II.  CCSD HISTORICALLY FAILED TO CLASSIFY K.P.

13.  K.P. was born in 1998 and is a resident of Patterson, New York within the geographical location consistent with that of the Defendant CCSD (D-1, p. 1; FFD 1);

14.  K.P. is and was a student with a disability (D-1, p. 2; FFD 8; SRO 3, fn 2);

15.  K.P. is classified as Other Health Impaired (hereinafter, "OHI") on his Individualized Education Program (hereinafter, "IEP") (D-12; FFD 8 SRO 3, fn 2);

16.  K.P. attended Mizzentop Day School, an independent day school in Pawling, New York during his kindergarten year (D-1, p. 2; FFD 8);

17. M.P. first noticed K.P.'s difficulties when he was in Kindergarten in the 2003-04 school year (T: 1198-99; FFD 33);

18. M.P. had K.P. evaluated by CCSD, who failed to classify him at that time (T: 1198-99);

19. K.P.'s kindergarten teacher, Karen DeGennaro, requested an occupational therapy ("OT") evaluation from CCSD, as she believed KP's fine motor skills were impacting his ability to write letters and numbers (D-1, p. 2);

20. Although KP's kindergarten teacher, Ms. DeGennaro, reported to CCSD that KP has made "limited handwriting progress this year despite using a systematic program ... [and] avoids table top activities," CCSD occupational therapist, Kathryn Ostie, did not recommend OT services (D-1, p. 2);

21. Despite all of this, CCSD failed to classify K.P. or even provide him with a 504 Plan at that time (D-1, p. 2);

22. M.P. had K.P. tested again in second grade in the 2005-06 school year because he was not making progress in school (T: 1200);

23. During K.P.'s first grade year, his teacher, Mrs. Szeghy, was concerned about KP's reading skills and recommended that KP receive tutoring for reading (D-1, p. 2-3);

24. Despite the concerns of M.P., K.P. still was not fully evaluated, and neither a 504 Plan nor an IEP were put into place (D-1, p. 3);

25. K.P. was referred to the CCSD Committee on Special Education (hereinafter, "CSE") during his second grade year, the 2005-06 school year, by his teacher, Lauren Olsen, because K.P. was still not making progress in school (T: 1200; D-1, p. 3);

26. Ms. Olsen emphasized on her teacher input form from CCSD that reading and writing continued to be an issue for K.P., his reading skills were below grade level, and he needed extra time to finish his class work (D-1, p. 3);

27. CCSD educator, Sally W. Coates, observed K.P. at Mizzentop for reading and concluded it was a difficult task for K.P. as he was not reading, but re-telling the story from his memory. When reading, he lost his place, and he had difficulty with writing and answering questions after the reading was completed (D-1, p. 3);

28. CCSD psychologist, Jaclyn Netrosio, concluded in K.P.'s Educational Evaluation that K.P.'s overall academic fluency was in the low average range. Ms. Netrosio noted that, compared with others his age, K.P.'s performance was low in reading, math calculation, and written language. Further, K.P. was in the 6th percentile (low range) for cognitive efficiency (D-1, p. 3-4; D-15);

29. Although the results of CCSD's testing (D-14; D-15; D-16) showed poor reading comprehension, low processing speed, and poor fluency, CCSD did not classify K.P. because he was not failing in terms of grades (T: 1200-1202);

30. In July of 2006, M.P. had a private Neuropsychological evaluation of K.P. performed by Marian Rissenberg, Ph.D. (D-1, p. 4; D-17; FFD 9);

31. Dr. Rissenberg's evaluation showed K.P. suffered from Attention Deficit Disorder, motor coordination disorder, social perception deficits and a spatial visual processing deficit (D-17; T: 1204);

32. According to Dr. Rissenberg, the testing of K.P.'s executive processing was "very strongly indicative of an attention deficit hyperactivity disorder" (D-17, p 4);

33. Dr. Rissenberg also indicated a social perception deficit, a motor coordination disorder and a visual spatial processing deficit (D-17, p. 6);

34. Based on Dr. Rissenberg's evaluation (D-17), it was concluded that K.P. qualified for a Section 504 plan (D-1, p. 5; T: 1206-07; FFD 9);

35. The CCSD CSE still did not classify K.P. (T: 1206-07) even though Dr. Rissenberg's evaluation (D-17) and CCSD's testing (D-14, D-15, D-16) showed that KP was below expectation (T: 1203, 1570);

36. Unfortunately, by the time the CSE determined KP was eligible for services, KP suffered from low academic self-esteem and his writing skills were in the 10th percentile for children his age (D-1, p, 5);

37. It was not until K.P. moved out of CCSD in fourth grade, the 2007-08 school year, that he finally received special education services based on Pawling Central School District's evaluations, which found KP was dyslexic, dysgraphic, had slow processing speed and had poor executive functioning (T: 1212-1213; D-1, p. 6; FFD 11);

38. K.P. attended Pawling Central School District for fifth grade, the 2008-09 school year (D-1, p. 6);

39. During fifth grade, the 2008-09 school year, K.P. was placed in a 5:1 Special Class for English/Reading, Math, Reading, Science, Social Studies and Study Lab pursuant to his IEP. K.P. was also receiving Counseling and OT at PCSD (D-1, p. 6; FFD 11);

40. As K.P. had difficulty interacting with others in a social setting, PCSD guided K.P.'s adult and peer relationships with reminders of social cues. During the 2008-09 school year, KP progressed in his relationships and needed less assistance with cues and social

concerns were resolved more easily (D-1, p. 6);

41. In sixth grade, the 2009-10 school year, K.P. was finally progressing academically but was still having a hard time with his peers, continually feeling isolated, bullied and unable to connect. M.P. believed that K.P. would benefit socially from a smaller setting. Accordingly, M.P. placed K.P. at the Wooster School in Danbury, Connecticut for the following year (D-1, p. 7);

42. In his second sixth grade year, the 2010-11 school year, K.P. attended the Wooster School, located within the Danbury Public School District (D-1, p. 7; FFD 12);

43. K.P. repeated the sixth grade during the 2010-11 school year at the Wooster School due to Wooster having a more advanced curriculum than Pawling Central School District's (D-1, p. 7; FDD 12);

44. A Psychological Evaluation was conducted in or around February, 2011 by Danbury Public School District Psychologist, Marita Repole, who stated that specific interventions, modifications and accommodations will be necessary to help K.P. function at a level more consistent with his measured potential (D-1, p. 8; D-32; FFD 12);

45.  K.P.'s academic skills were in the average range. Academic fluency was in the below average range. The application of these skills, as well as academic knowledge, were in the average range. However, K.P.'s academic performance was inconsistent. His ability to associate with his peers declined and his emotional state deteriorated (D-1, p. 8; D-32);

46. In seventh grade, the 2011-12 school year, K.P.'s grades declined, along with his social interactions with peers and his emotional state. Although K.P. was receiving Academic Enrichment and Support (hereinafter "AES"), a program that provides opportunities

during the school day to seek academic help from their teachers or to work on academic assignments and private counseling, he did not improve (D-1, p. 8);

47. Beginning in or around March 2012, K.P. was home schooled through Wise Learning, in Ridgefield, CT, while working to meet the requirements for his courses at Wooster (D-1, p. 8; FFD 34; SRO 2);

48. During this time, K.P. received private tutoring (FFD 34; SRO 2) in all core subject areas at M.P.'s expense, from special education teachers at Wise Learning. K.P. was emotionally incapable of participating in classes due to his continuing inability to deal with his peers (FFD 55; SRO 2);

49. K.P. was re-evaluated by Dr. Rissenberg in April of 2012 (D-36) (T: 1230; FFD 13; SRO 7);

50. Dr. Rissenberg's report (D-36), which M.P. provided to CCSD on May 4, 2012 (T: 1230), found K.P. prone to emotional dysregulation, which Dr. Rissenberg described as "mood instability" (D-36, p. 4; T: 1682). This means he misunderstands situations and feels interactions are directed at him in a hostile way (T: 1582), making him extremely upset and unable to function (T: 1582-83);

51. K.P. demonstrated deficits in visual spatial processing, motor coordination, executive function, and processing of social-emotional information. His academic skills were below expectation. He had a profile consistent with a mild autism spectrum disorder in the context of above average intellectual capacity with a learning disability in math, requiring increased academic support (T: 1577-1578; FFD 14);

## III.   2012-13 SCHOOL YEAR

52. Plaintiffs strongly disagree with the IHO's and SRO's decisions regarding tuition reimbursement for the 2012-13 school year (FFD 61-66; SRO 17);

53. The CCSD CSE held an annual review meeting on May 10, 2012 (D-8) to develop an IEP for the 2012-13 school year (T: 1232; FFD 14; SRO 3);

54. M.P. attended the meeting with Dr. Rissenberg (D-8; T: 1232), who explained K.P.'s educational, social, and emotional needs, including emotional dysregulation (T: 1233, 1697);

55. The CSE did not disagree with Dr. Rissenberg's findings (T: 257, 1589) nor did it request consent to conduct its own evaluations (T: 1249). Nonetheless, the CSE failed to take Dr. Rissenberg's evaluation or input into account in creating his 2012-13 IEP and, in fact, M.P. received no information on how the IEP would address K.P.'s emotional dysregulation (D-10 ; T: 1245-46);

56. At the May 2012 CSE, Lou Valesey, CSE Chairperson, offered to do a program search (T: 1512);

57. Even though the CSE discussed out-of-district placements, CCSD's Prior Written Notice letter states that no outside options were considered (D-63; T: 269);

58. At the June 2012 CSE, Mr. Valesey again said he would look into outside placements (T: 1246-1249), but never got back to M.P. about placement options (T: 1250-1251; SRO12);

59. Ultimately, the CSE never sent packets out to try to find an alternative placement for K.P. (T:272, 278, 310), causing an unreasonable delay;

60. As a result, M.P.'s only options were to continue to wait for the final IEP or find an appropriate placement on her own (T: 1270);

61. In fact, the final IEP was not ready by the beginning of the school year (T: 1274-75; D-10, D-77), a procedural violation;

62. M.P. received a letter from CCSD informing her that the Board of Education had approved the May 10, 2012 CSE recommendations (D-65). She also received the May 10, 2012 IEP (D-8) for review (T: 1254). This IEP was not the final 2012-13 IEP, as reflected in the comments section (D-8, p. 2);

63. M.P. sent an email (P-P) stating she wanted corrections made to the IEP (T: 1233, 1255);

64. M.P. expressed concerns about the IEP to Mr. Valesey (T: 273), who testified that the IEP continued to reflect the same program which had been in place earlier, thus showing it did not address Dr. Rissenberg's diagnosis of mild autism spectrum disorder or emotional dysregulation (T: 277);

65. M.P.'s requested corrections were never made and M.P. believes the corrections were not made because CCSD simply did not want to do it (T: 1283-85);

66. At the June 2012 CSE, M.P. distributed a document describing Non-Verbal Learning Disorder ("NVLD"), the profile of which K.P. fits perfectly (P-A; T: 1246-49; FFD 22);

67. M.P. and Dr. Dawn Gorlitsky, school psychologist discussed said document (T: 293-294). However, this is not mentioned anywhere in K.P.'s IEP from that meeting (D-9);

68. Further, the CSE did not discuss how to revise the IEP based on this document (T: 1250);

69. M.P. objected to the recommended placement, the class, and the goals discussed in the August 30, 2012 IEP (D-10), which was approved by the Board of Education on September 4, 2012 (D-77) and received by M.P. after the start of the 2012-13 school year (T: 1275);

70. M.P. marked up the May 10, 2012 IEP (D-8) with her objections and errors to be corrected (T: 1234-35);

71. These corrections were not made on the June 6, 2012 IEP (D-9; T: 1255);

72. M.P. followed up with Mr. Valesey in an email (P-P) requesting revisions be made to the IEP (T: 1255-56). The errors M.P. had identified in the May 2012 and June 2012 IEPs were expunged from this IEP (D-10);

73. Thus, there was no indication that there was to be a program search nor were the comments included from the previous meetings. The revisions were never made and all of the information that needed revisions in the comments section was removed (D-10; T: 1275-76);

74. The CSE did not request M.P.'s consent to perform testing at the May or June 2012 CSE's (T: 1249);

75. Mr. Valesey testified that, as of the August 2012 CSE meeting, it had relied on Danbury's 2011 evaluations in determining that George Fischer Middle School ("GFMS") was an appropriate placement for K.P. (T: 358);

76. CCSD only requested evaluations after learning M.P. was unilaterally placing K.P. at Franklin at the August 2012 CSE meeting, at which point it was too late to conduct evaluations and determine an appropriate placement prior to the start of the 2012-13 school year (T: 1277);

77. At the August, 2012 CSE, M.P. believed K.P. needed behavioral intervention in the large public school setting because his emotional dysregulation resulted in behavior that caused

him to stay escalated and prevented him from accessing his education, thus impeding his learning; (T: 1280-81);

78. Although Dr. Gorlitsky testified that a behavioral consultant would be available, this is not documented in the IEP (D-10, T: 647);

79. Although M.P. discussed K.P.'s need for a BIP at the CSE, one was not included in the IEP (D-10, p 4 of 11; T: 1280-1281);

80. Although the CSE comments recommend a Functional Behavioral Assessment ("FBA") and Behavioral Intervention Plan ("BIP") (D-10, comments section; SRO 4, fn 6), this is contradicted in the same IEP wherein the questions "Does the student need strategies, including positive behavioral interventions, supports and other strategies to address behaviors that impede the student's learning or that of others?" and "Does the student need a behavior intervention plan?" are both answered with the boxes checked "No" (D-10, p 4);

81. Accordingly, although the CSE recognized K.P.'s need for a FBA and BIP, it did not incorporate this need into his August 30, 2012 IEP as written (D-10);

82. Further, although the CSE recognized K.P.'s need for a FBA and BIP (D-10, comments section), it did not perform a FBA or BIP in direct contravention to K.P.'s needs;

83. M.P. requested a FBA from CCSD in the Fall of 2012, but was denied (T: 1281);

84. In a letter (P-C), CCSD informed M.P. that a FBA could not be conducted unless K.P. was enrolled in CCSD, but Mr. Valesey was unable to provide a law or regulation in support of said statement or explain the reasoning to M.P (FFD 64; SRO 4, fn 8);

85.  In fact, there is no reason, in either the laws and regulations or practically speaking, that CCSD could not perform a FBA at Franklin by performing appropriate observations of K.P. at Franklin over time;

86.  CCSD never visited Franklin to conduct a FBA and a CSE was not held to discuss adding a FBA (T: 1281-1282);

87.  At a CSE in February of 2013, the CSE did not recommend a BIP (D-11; T: 1301-02);

88.  Although CCSD started classes in early September, M.P. did not receive the final IEP (D-10) until the first or second week of September, after the start of the 2012-13 school year (T: 1291);

89.  There was no IEP in effect at the beginning of CCSD's school year (T: 1274-75);

90.  K.P. was not evaluated by CCSD until Thanksgiving break (T: 1291);

91.  M.P. had no choice but to reject the final 2012-13 IEP (D-10), as it was not appropriate to deal with K.P.'s social functioning and need for academic and emotional support (T: 1614-16) and thus was not reasonably calculated to confer educational benefit on K.P.;

92.  K.P. would be in a 12:1:2 self-contained classroom at GFMS. The May and June 2012 IEP's (D-8, D-9) stated K.P. would leave the class of Ms. Rosenbaum-Altman, teacher of the GFMS class, and go into larger mainstream classrooms (T:1012);

93.  This was a pilot program (D-108) developed by Dr. Gorlitsky for NVLD and autistic students (T: 486);

94.  Dr. Gorlitsky testified that, regarding her email on July 27, 2012 (P-M, p2), she was ready to create a prototype to individualize the GFMS program for K.P., evidence of the

fact that the program was not individualized to address K.P.'s unique needs at the time it was offered (P-M, p 2; T: 729);

95. At the May 2012 CSE, Dr. Rissenberg explained that K.P. had emotional dysregulation (T: 1233) and needed support with peer relationships, emotional regulation, understanding what people mean, interactions with peers, functioning and feeling calm in a classroom (T: 1697);

96. The CSE recommended M.P. and K.P. visit GFMS as a placement option for 2012-13 (T: 78-79);

97. M.P. and K.P. visited the self-contained 12:1:2 classroom at GFMS, recommended by CCSD, on June 5, 2012 (T: 1235; FFD 14);

98. Mr. Valesey told M.P. that he would inform Dr. Gorlitsky that M.P. was going to bring K.P. to meet her and that Dr. Gorlitsky would reach out to them. However, Dr. Gorlitsky never contacted M.P. (P-P; T: 282);

99. In fact, Mr. Valesey escorted Plaintiffs to the GFMS classroom on the day that CCSD instructed them to, but GFMS was not expecting them, and the self-contained class that Plaintiffs were supposed to observe was not being taught (T: 80; T: 1237; T: 247);

100. Mr. Valesey showed M.P. and K.P. around GFMS (T: 80);

101. When they arrived for the visit, Ms. Altman seemed shocked to see them (T: 1237) and there was no activity in the classroom whatsoever (T: 247, 1237);

102. Curiously, Ms. Altman testified to a completely different set of facts for that day (T: 965-67). M.P. disagrees with Ms. Altman's account of the classroom visit (T: 1236);

103. The IHO credited Ms. Altman's testimony as credible but provided no explanation as to why she found it credible (FFD-63);

104. The IHO's finding that Ms. Altman's testimony is credible completely ignores the facts;

105. Ms. Altman's testimony is even contradicted by that of her own boss, Mr. Valesey (T: 247-49);

106. Contrary to her testimony, Ms. Altman never informed M.P. of "back mainstreaming,"nor did she discuss the peer mentoring program with M.P. (T: 1238);

107. Based on M.P.'s observation of the classroom and discussions with Ms. Altman and Dr. Gorlitsky, it was apparent that GFMS was not an appropriate peer group for K.P. because the students were only K.P.'s peers in terms of age and grade, but not in terms of educational status, emotional dysregulation, or social abilities (T: 1265);

108. K.P. would be in a mixed classroom with children with different levels of autism, which would not teach him to function socially (T: 1243-44);

109. Although K.P. did not have the highest IQ in the class, the children with the highest IQs had lower functioning and social skills. Although K.P. struggles with reading social skills, he is not socially challenged in the same way as the other children in the GFMS class. M.P. believed that CCSD was trying to put K.P. in the classroom as a role model for the other students rather than a peer (T: 1243-44);

110. Plaintiffs were not given a chance to see the proposed George Fischer Middle School ("GFMS") class in session. The record does not support the IHO's finding that "the parent visited the special class in July 2012" (IHO 58).

111. Plaintiffs met with CCSD school psychologist Dr. Gorlitsky in her office at the High School in July, 2012 to discuss the GFMS program (T: 508). This was a private meeting between M.P., K.P., and Gorlitsky, not a visit to see the class, and did not constitute parent participation in the decision-making process.

112. M.P. brought K.P. to his CCSD evaluations in the Fall of 2012 while the GFMS program was in session (D-37; T: 1287);

113. This was the only opportunity K.P. and M.P. had to see the program in action while students were there and academics were taking place (T: 1290);

114. A group of four to five children were being read to by an aide and another child was playing video games on a computer. K.P. felt the classroom was like babysitting (T: 1288-90);

115. Indeed, Ms. Altman referred to her students as her "babies" (T: 1239-40);

116. Based on what she saw of Ms. Altman's classroom and the conversations she had with CCSD staff during K.P.'s evaluations, M.P.'s opinion was confirmed that it was not an appropriate program for K.P., whose social functioning was higher than what she saw in the students (T: 1290);

117. Although Ms. Altman testified that K.P. would be a good fit for her class because of the way "the kids interacted with him," (T: 971) in fact, there were no students interacting with K.P. when he visited the classroom, as described above. Even Mr. Valesey testified to the fact that no students were in the classroom (T: 249);

118. Although Dr. Gorlitsky testified about video modeling, facial recognition techniques, and how assistive technology and counseling would work together with regard to the special

class at GFMS, she did not recall any of that being discussed at the August 2012 CSE, nor is it listed on the IEP (D-10, T: 671-74);

119. Although Dr. Gorlitsky testified regarding motivating students like K.P., the structure of the GFMS classroom, and an aide, those topics were not discussed at the August 2012 CSE meeting (T: 684-86);

120. Dr. Gorlitsky's testimony (T: 671-74, 684-86) is retrospective in that it was not discussed at the CSE or listed on the IEP (D-10);

121. GFMS utilized Integrated Co-teaching ("ICT") in K.P.'s core academic classes, science, math, English, social studies. K.P.'s IEP also lists group counseling once per week (D-8, D-9);

122. ICT is inappropriate and insufficient for K.P. (T: 1595), as it fails to sufficiently and appropriately address his social and emotional issues, which severely affect his academics (T: 1591);

123. Moreover, ICT classes would force K.P. into the large school environment (T: 291-92), which is inappropriate for K.P. due to his social and emotional issues;

124. Mr. Valesey testified that GFMS was a "school within a school" (T: 289-90), meaning it was streamlined and student-friendly, stating this addressed M.P.'s concern that GFMS was too large (T: 291-92). However, none of this discussion is documented in the CSE minutes (D-8, D-9, D-10);

125. Mr. Valesey did not recall which CSE meeting GFMS as a "school within a school" was discussed at, and in fact, this was never discussed (T: 289-90);

126. Mr. Valesey also did not recall if the CSE discussed where the special class was in relation to other departments or areas of the school (T: 396-97). Indeed, K.P. would still have to navigate through the large school when he went into the mainstream classes for his core classes and specials, thus leaving the "school within a school" environment (T: 408-10);

127. Aside from a class profile, M.P. was provided no documentation on the GFMS class (D-112, p 13; T: 507, 1261-62, 1461). Mr. Valesey never provided a document describing the GFMS program for the 2012-13 school year and, to his knowledge, no such document exists (T: 243);

128. A major obstacle to K.P.'s self-sufficiency is his emotional dysregulation, which prevents him from making educational progress and negatively affects his interactions with peers (T: 1589, 1591);

129. At the June 6, 2012 CSE, M.P. voiced concern that the program would not address K.P.'s emotional dysregulation (T: 1245-46). At this meeting, Mr. Valesey repeatedly referred to K.P. as emotionally fragile (T: 1246-49) despite the fact that Dr. Rissenberg had explained emotional dysregulation at the previous CSE (T: 1233);

130. M.P. tried to redirect Mr. Valesey towards understanding that K.P. has emotional dysregulation, which is different from emotional fragility, but the CSE did not understand (T: 1246-49, 1293-94);

131. There was no documentation provided to M.P. on what emotional support would have been available to K.P. (T: 368-69, 1266-67);

132. K.P. was evaluated by Dr. Rissenberg (T: 1230), a Neuropsychologist with a private practice specializing in adult and pediatric clinical neuropsychology in April of 2012 (T: 1558; D-36; FFD 13; SRO 7);

133. Dr. Rissenberg focuses the majority of her practice on conducting neuropsychological diagnostic assessments (T: 1561). Children make up 75% of her practice (T: 1559-60) and she attends about 10 CSE meetings per year (T: 1561). Dr. Rissenberg has professional experience as an educator, having taught psychology at the University level (P-Z);

134. Dr. Rissenberg's report (D-36) emphasized the importance of addressing K.P.'s emotional dysregulation, as this issue has a major impact on his ability to access his education and derive educational benefit (T: 1587-88);

135. Emotional dysregulation is indicated on page three of Dr. Rissenberg's report (D-36), where Dr. Rissenberg documents that K.P. has isolated episodes of intense emotion, he has always demonstrated emotional sensitivity and intensity, and has trouble sleeping (T:1736);

136. Dr. Rissenberg testified that she had concerns over the proposed placement at GFMS (T: 1606), as the population at GFMS would be disruptive for K.P. (T: 1601-02) and the placement would exacerbate his fear of the classroom (T: 1628);

137. According to Dr. Rissenberg, emotion interferes with cognition, thinking, attention and learning. K.P. being fearful about statements made by peers puts him in an emotional state in the classroom that is not conducive to learning (T: 1591-92);

138. Despite the information in Dr. Rissenberg's report (D-36) and Dr. Rissenberg's input at the May 2012 CSE meeting, CCSD failed to place K.P. in a program that provides support for emotional dysregulation and social functioning;

139. In fact, Ms. Altman, the teacher for the proposed GFMS program, has taken no courses or training related to emotional dysregulation (T: 993);

## IV.     2013-14 SCHOOL YEAR:

140. Plaintiffs strongly disagree with the IHO's and SRO's decision regarding tuition reimbursement for the 2013-14 school year (FFD 66; SRO 19);

141. MP provided authorization for CCSD to observe K.P. at Franklin in preparation for creating the 2013-14 IEP (P-W, D-9; T: 1302-04, 2365-71, 2379-82);

142. Dr. Gorlitsky and Michael Murphy, special education teacher at CCSD, arrived late for the observation (T: 689-90, 835-36) and Dr. Gorlitsky was absent for part of the observation of K.P.'s class. Dr. Gorlitsky did not take notes of her observation (T: 699);

143. Although Mr. Murphy was to determine what kind of program at CCSD would be appropriate for K.P., (T: 878), he did not ask questions about Franklin's approach to students with NVLDs (T: 885) and his documentation of the observation (P-L, T: 838-39) does not describe the Franklin program or how Franklin dealt with the emotional component of KP's program (T: 886-87);

144. Although he testified that he would have liked more time in the academic program, neither Mr. Murphy nor Dr. Gorlitsky requested consent to return to Franklin (T: 817-18, 889), nor did they ask M.P. to request more time for the observation (T: 706-07). Thus,

they did not attempt to ascertain what K.P. requires in a program in order to make progress;

145. At the May 14, 2013 CSE, the Franklin observation and placement for 2013-14 were discussed  (T: 1307);

146. It was clear that Mr. Murphy and Dr. Gorlitsky did not focus their observation on Franklin's program and had not assessed what kind of program KP fit into (T: 1307-1311);

147. Mr. Murphy spoke extensively about the beauty of the Franklin campus and how nice everyone was, providing no information about Franklin's mission or philosophy, the teachers' training, nor the academic, emotional or social support provided at the school (T: 1307-1311);

148.  Dr. Gorlitsky discussed the fact that she was late for the observation, so they missed the first of two classes they were to observe. She also discussed how beautiful the campus was. Aside from her description of the lesson being taught, she said nothing about the fundamentals of the Franklin program (T: 1307-1311);

149. At the May 14, 2013 CSE meeting, Mr. Valesey discussed the High School Bridge Program that CCSD was recommending for 2013-14 (T: 1307-11);

150. M.P. was once again provided no description of the program at this CSE (T: 905). In fact, CCSD did not even provide MP with a class profile for the 2013-14 Bridge program (T: 1312);

151. Mr. Valesey discussed opportunities for K.P. to participate in after-school activities and sports even though M.P. pointed out that K.P. had a history of being unable to work with

his peers in such activities. When MP asked what de-escalation strategies were utilized by the Bridge Program for emotionally dysregulated students, she was told that they would be removed from the room and taken to the principal or guidance counselor (T: 1307-11);

152. M.P. was concerned that the CSE members did not know what she meant by de-escalation strategies and continued to misunderstand emotional dysregulation. M.P. believed that when Mr. Murphy testified, he said that his training in de-escalation amounted to physical management training, which is restraining children. This is different from understanding how to work in the moment with a student who is having emotional dysregulation. M.P. also expressed concern with moving K.P. from a small environment into a large school and putting him into an ICT class (T: 1314-15);

153. Despite M.P.'s concerns, the CSE did not explain how the Bridge Program would address K.P.'s NVLD or Asperger's, nor did it provide any information on how it would deal with K.P.'s emotional dysregulation (T: 403-04);

154. M.P. received no written materials about the program and had never heard of it prior to the CSE meeting. According to the CSE's discussion, M.P. ascertained that the GFMS program that had been recommended for K.P. in the 2012-13 school year simply funneled its students straight into the Bridge Program (T: 1313-14), indicating that the CSE did not consider K.P.'s unique needs in coming up with this placement;

155. M.P. informed the CSE that they had not answered any of her questions or concerns about the program, it sounded similar to the GFMS 12:1:2 class that she had rejected in

2012-13, she did not have any information on it, and she did not feel it was appropriate for K.P. (T: 1314-15);

156. The 2013-14 CSE meeting ended with the CSE recommending the Bridge Program despite all of M.P.'s unaddressed concerns (T: 1307-1311);

157. Again, none of M.P.'s input was taken into account and the CSE failed to address M.P.'s concerns;

158. In a letter dated June 18, 2013 (D-106), M.P. rejected the May 14, 2013 IEP as inappropriate and informed the CSE that K.P. would attend Franklin in 2013-14 (T: 1323; SRO 5);

159. The Bridge Program, a 12:1:2 program (D-12), is similar to the GFMS program (D-10) that M.P. had previously rejected (T: 1314-15);

160. The program, which takes place within the CCSD high school, is too large of an environment for K.P. since he becomes overwhelmed and struggles socially in such large environments (T: 1314-15);

161. Even though K.P. would allegedly not have to go far to get to his classes or services at the high school, M.P. was still concerned because it was a large, loud, stress-inducing environment (T: 1316);

162. While Mr. Murphy taught in his classroom, an aide would take K.P. to his specials and lunch in the larger high school environment (T: 1316-17);

163. There is no mention of shadowing, the school's size or alternate settings in the comments section of the IEP (T: 723);

164. To address K.P.'s executive functioning and other deficits, the CSE discussed the use of technology and iPad carts (T: 1320-21) and stated homework would be emailed home every night so M.P. could do his homework with him. Rather than fostering independence in K.P. and finding ways to help with his executive functioning, they would expect M.P. to take care of it and become K.P.'s homework tutor (T: 1321-22);

165. The CSE did not address M.P.'s concerns that this would not improve K.P.'s executive functioning deficits and grow his homework independence (T: 1321-22);

166. The CSE recommended ICT for math (T: 399-400) based on K.P.'s progress in math at Franklin (T: 1317-18). However, the CCSD ICT math class has between 18-20 students in it (T: 853-54). The CSE did not take into account that K.P. was doing well in math at Franklin in a much smaller environment with average class sizes of 6-8 (T: 1867) in a program that was trained to deal with his emotional dysregulation (T: 1327-28);

167. K.P. clearly made progress at Franklin in 2012-13, as testified to by Dr. Gorlitsky, M.P., and Dr. Rissenberg. (T: 719, 746-47, 1324-25, 1616-21, 2327-28). However, the 2013-14 IEP does not account for this progress in that the IEP did not significantly change from 2012-13 (D-10, D-12);

168. Some goals remained the same, including using coping skills to maintain appropriate school behavior when expressing a negative emotion at school (D-10, pg 8, D-12, p 9) and learning 3 new learning strategies (D-10, p 7, D-12, p 9);

169. Further, the CSE recommended a 12:1:2 placement in 2012-13 and again in 2013-14 even though the data showed K.P. was making meaningful progress in the small setting at Franklin (D-10, D-12);

170. Regarding Dr. Gorlitsky's email to Mr. Valesy (P-M, p 1) stating she added goals to the 2013-14 IEP based on her observation at Franklin, Dr. Gorlitsky testified that she did not take notes during the observation, and was late for the observation, seeing only 2 classes, calling into question how she could have accurately added social-emotional goals and comments to the IEP without any notes (T: 731-32). In fact, nothing in the IEP specifically reflects what Gorlitsky saw during the observation (T: 735-36);

## V.   FRANKLIN ACADEMY:

171. Franklin is a school specifically for students with NVLD and mild autism in a residential setting (T: 1599-1600);

172. According to Melissa Wenz, Franklin Academic Dean, Franklin has a focus on identifying strengths and weaknesses, teaching strategies for students to have an awareness of their own functioning and develop strategies to help them in areas of challenge, and to practice social and emotional skills in a safe community (T: 1836);

173. M.P. explained that Franklin students are grouped in teams based on age, skill level, personalities and emotional traits (T: 1400);

174. According to Ms. Wenz, being on a team benefits Franklin students because they are kept with their peers throughout the day, allowing staff to target education to that specific group (T: 1852);

175. Dr. Rissenberg explained that adults work with students to provide instruction, oversight and modeling for socialization and emotional regulation throughout the day, allowing students with emotional dysregulation to form friendships (T: 1599-1600);

176. According to Ms. Wenz, the typical class size is six to eight students, which helps staff target lessons, cuts down on distraction, and helps students focus (T: 1867);

177. According to Ms. Wenz, many Franklin students struggle with emotional dysregulation, much like KP. Emotional regulation is one of the skills within Franklin's curriculum (T: 1840, 1871);

178. Ms. Wenz has a Bachelor's degree in psychology and dual certification Master's in childhood and childhood special education. Ms. Wenz previously worked as a Teaching Assistant and Substitute teacher for BOCES (P-BB, T: 1808);

179. In her position, Ms. Wenz works directly with leadership to discuss how the teacher, students and teams are functioning. She provides guidance to teachers and students and assists with professional development for faculty (T: 1811);

180. Joule Bazemore, Franklin Learning Specialist, oversees academics on the team and trains teachers on how to instruct students with Franklin's learning profile. She designs professional development training for teachers and is in charge of coordinating and facilitating communications between school, parents and districts. She also oversees IEP meetings (P-EE, T: 2177, 2181);

181. Ms. Bazemore previously worked as a Humanities Teacher at Franklin and an English Teacher at West Nottingham Academy (P-EE);

182. Ms. Bazemore was K.P.'s parent contact at Franklin, providing weekly updates to M.P. (T: 2179) and strategies for addressing emotional dysregulation at home (T: 2500-02);

183. Although Franklin did not provide a BIP for K.P., he was receiving the support he needed for his emotional dysregulation in the small Franklin environment with small class sizes

for all classes. Behaviors were specifically addressed through the Franklin curriculum, thereby satisfying the need for behavioral intervention (T: 2647-48);

184. M.P. explained that Franklin individualizes K.P.'s program according to his unique needs, including grouping him in a team based on his age, skill level, personality and emotional traits (T: 1400);

185. Ms. Bazemore explained that Franklin developed and implemented teaching strategies targeted at K.P.'s specific learning profile (T: 2179);

186. Ms. Bazemore and Ms. Wenz explained that this provides direct access to counseling to meet K.P.'s emotional needs (T: 1848-49, 2655);

187. Ms. Bazemore explained that Franklin developed and implemented accommodations, modifications, and interventions such as assistive technology, daily checklists, and graphic organizers to assist K.P. (T: 2184, 2778, 2804, 2823, 2835, 2850, 2853, 2856, 2859, 2866);

188. It is appropriate for K.P. not to have exposure to regular education students because his disabilities cause difficulties that require attention in each of his core instructional classes. Without such attention in his core instructional areas, Dr. Rissenberg and M.P. noted that K.P.'s education and social skills suffered tremendously prior to attending Franklin (D-14, D-15, D-16, D-17, D-23, D-36; T: 261, 284-85, 1198-99, 1200, 1210-12, 1214-15, 1222, 1226-27);

189. M.P. explained that K.P.'s emotional dysregulation does not stop at the end of the day, limiting his ability to access his education (T: 1291);

190.  Dr. Rissenberg explained that K.P.'s emotional dysregulation limits his ability to derive educational benefit (T: 1587-88);

191.  According to Ms. Wenz, boarding at Franklin allows the staff to continue addressing K.P.'s emotional dysregulation in evenings and on weekends (T: 1876-77);

192.  Ms. Wenz and Ms. Bazemore explained that K.P. requires social learning and emotional support throughout the day and night (T: 1875, 2785);

193.  According to Dr. Rissenberg, this support throughout the day and night enforces peer relationships and provides opportunities for learning (T: 1599);

194.  M.P. made payments to Franklin, as reflected in the record (D-134, D-137, D-138, D-139, D-140, D-141, D-142, D-143);

195.  The checking account that M.P. uses to pay for Franklin is her mother's account, over which she has power of attorney (T: 2132) and is beneficiary (ECF Doc. No. 1, Exhibit 3);

196.  M.P.'s mother passed away soon after these payments were made and the bank account passed to M.P. as beneficiary (ECF Doc. No. 1, Exhibit 3);

197.  As beneficiary of the estate and, given the recent passing of her mother, the money used to pay the Franklin tuition would have simply passed to M.P. at her mother's passing had it not been used for tuition;

198.  If M.P.'s mother were still alive, any money received as tuition reimbursement for the 2012-13 and 2013-14 school years would go back into the same account it came out of in the same way that a loan is repaid;

199. M.P. signed an enrollment contract with Franklin for the 2012-13 and 2013-14 school years (P-DD). This contract clearly created a financial obligation for M.P.;

## VI.   2012-13 SCHOOL YEAR AT FRANKLIN:

200. K.P. attended Franklin's 2012 summer program. Students accepted into the summer program are automatically accepted to the school year program (T: 2082);

201. K.P. formed friendships and worked through his impulsiveness. Students in the summer program took fun, hands-on classroom experiences and focused on social and emotional regulation skills and organization in the evenings (T: 1812);

202. K.P. began at Franklin in August of 2012. He had a 504 plan, which Ms. Bazemore participated in developing (D-117; T:2194-96);

203. According to Ms. Bazemore, Franklin makes changes to 504 Plans as needed (T: 2246);

204. Ms. Bazemore explained that, outside the classroom, K.P. has many opportunities for learning about social-emotional issues at Franklin (T: 2308-13);

205. While there was a lesser need at Franklin for counseling, Ms. Bazemore stated that K.P. attends counseling sessions at Franklin (T: 2329);

206. Ms. Bazemore testified that K.P. saw his counselor on a weekly basis for emotional support beginning in Quint 4 of the 2012-13 school year (P-CC, T: 2665);

207. Ms. Bazemore explained that when K.P. became emotionally dysregulated, faculty would work through the event with him, encouraging coping strategies, with clinicians providing additional intervention if needed (T: 2333-34);

208. M.P. and Ms. Bazemore testified that K.P. did well at Franklin in 2012-13 (T: 1205, 2262, 2268). He made significant progress in his emotional stability, his ability to learn

and access his education, and his ability to collaborate with others in groups (P-V, p 12; T:1324-27, 2264-65, 2269-72, 2302-06, 2326, 2678);

209. Ms. Bazemore testified that, initially, K.P. preferred to work independently, but as he progressed in being able to collaborate with his peers, he often took on a leadership role in groups, marking social progress (T: 2678);

210. M.P. testified that, although the CCSD's observation of K.P. at Franklin reported that K.P. needed to work on his social connections with peers (T: 1307-11), this did not take into account that K.P. was sick with bronchitis that day and went home to see his doctor as soon as it was over (T: 1305-07);

211. In fact, Ms. Bazemore testified that K.P. was asked to provide campus tours to prospective students and was sought out by the admission team to represent the student body and speak at Franklin's educational consultant tour, marking great progress in his social functioning (T: 2266);

212. Residentially, K.P. did very well in meeting his daily responsibilities, but often struggled with organization. Ms. Bazemore explained that, to address this, the staff created an organizational checklist for him. He was consistent with check-ins and meetings (T: 2422-23);

213. Dr. Gorlitsky testified that K.P. made progress at Franklin in 2012-13 (T: 719, 746-47), stating that from the February to May 2013 CSE meetings, K.P.'s social-emotional goals were reduced because he had shown he could adapt to changes in his environment and he no longer needed medication to address emotional issues (T: 746-47);

214. M.P. also testified that K.P. made progress at Franklin in 2012-13. Based on reports from his teachers (P-V), he was learning to function in a more typical way, learning conflict resolution, and learning various techniques to help bring himself back from the emotional dysregulation. When at home, he would have fewer meltdowns and more self-awareness (T: 1324-25);

215. Dr. Rissenberg further testified to K.P.'s progress in that he had nearly perfect attendance and homework completion and his grades were good. Although K.P. still struggled with peer relations, he had success in being present, was engaged in learning, and he was making good progress. He had a positive attitude towards school and felt safe and successful academically and socially. He had friends, was part of a community, and was maturing in terms of insight and self-awareness ( P-V; T: 1616-21, 2327-28);

216. Dr. Rissenberg testified that, as of February 2013, boarding at Franklin benefitted K.P. in that he had the opportunity to form relationships with peers, which would not be available in a non-boarding setting (T: 1613);

217. Dr. Rissenberg further testified that in a regular day classroom, there is no opportunity for K.P. to feel safe with his peers or to correct his perception of what others say and do (T: 1614-16);

218. Additionally, Dr. Rissenberg explained that, in a day classroom, there is not opportunity for K.P. to model and correct his behavior (T: 1614-16);

219. Dr. Rissenberg testified that boarding at Franklin, on the other hand, offers instruction, modeling and adult feedback in different contexts outside the classroom. There are meetings and group activities supervised by adults and teachers, who are team members

and know the students. This helps K.P. be available for learning in the classroom (T: 1614-16);

## VII.    2013-14 SCHOOL YEAR AT FRANKLIN:

220. M.P. re-enrolled K.P. at Franklin for the 2013-14 school year (T: 1327);

221. K.P. and Ms. Bazemore worked together to select appropriate classes for K.P. given his learning strengths (T: 2184);

222. Ms. Bazemore and K.P.'s team put into place accommodations, modifications, and interventions that helped him work through his difficulties (T: 2184, 2804, 2823, 2835, 2850, 2853, 2856, 2859, 2866);

223. Ms. Bazemore reviewed K.P.'s evaluations to develop the 2013-14 504 Plan (P-CC, p. 94), which contains modifications and accommodations (T: 1854, 1968);

224. Ms. Bazemore testified that K.P. transitioned well into the 2013-14 school year, picking up relationships from the previous year (TL 2386-88). While he still struggled with emotional dysregulation, he worked well with his counselor (T: 2403-08), improving academically and developing self-advocacy skills (T: 2388, 2904);

225. Ms. Bazemore stated that K.P. received weekly counseling (T: 2664, 2882) and occupational therapy (T: 2487) in the 2013-14 school year;

226. Between the 2012-13 and 2013-14 school years, Ms. Bazemore reported that K.P. showed progress with developing executive functioning skills in terms of organization and timeliness and showed progress in written production, including his thought process, spelling and grammar (T: 2505-07);

227. Ms. Bazemore testified that K.P. also had improved social awareness (T: 2847), impulse control (T: 2881), study skills (T: 2887), and assignment completion (T: 2903);

228. Ms. Bazemore testified that K.P. showed progress in 2013-14 by taking initiative to work with teachers on alternative ways to meet his academic demands, which he had not done the year before (T: 2397, 2903);

229. Ms. Bazemore testified that K.P. was again sought out by admissions to represent the student body and speak at Franklin's educational consultant tour (T: 2266);

230. M.P. testified that K.P. improved in his writing, research, reading, and math skills (T: 1336);

231. Ms. Bazemore testified that K.P.'s social awareness improved and he was more clear about his motivations and problems, learning to take initiative with social conflict and progressing with social relationships (T: 2409, 2863);

232. Ms. Bazemore testified that K.P. became less egocentric and learned to consider others' perspective (T: 2847);

233. Ms. Bazemore testified that K.P. was able to identify particular coping strategies and developed strategies to help him maintain his attendance and manage difficult times (T: 2412-14, 2427);

234. Ms. Bazemore testified that K.P. made significant progress in his organization and hygiene and showed improvement in encouraging other students to get more involved (T: 2424);

235. Although K.P. still experienced social difficulties, M.P. testified about how Franklin's supportive environment helped him handle them. For example, when K.P. felt a student

was bullying him, he emotionally shut down and talked about suicide. Franklin removed him from the situation, provided him with constant support from trained adults, contacted M.P. and remained with him until she picked him up (T: 1338);

236. M.P. took K.P. to see Dr. Rissenberg following this incident (T: 1338-39), who felt he was safe and did not have a plan to harm himself, but rather the incident was about his inability to appropriately cope with the situation (T: 1339-40). Dr. Rissenberg testified that Franklin handled the situation well by taking appropriate measures, reacting immediately and speaking to Dr. Rissenberg before he returned to school (T: 1340). Since then, K.P. continued to make progress and seek appropriate conflict resolution when issues arise (T: 1340-41);

237. K.P. saw Dr. Rissenberg in the fall of 2013 (T: 1343) for a Neuropsychological Assessment (P-Y; T: 1609, 1724);

238. Although K.P.'s percentile dropped in Visual Motor Integration on the Beery VMI, Dr. Rissenberg testified that K.P.'s scores are more variable than is typical, a finding often associated with emotional dysregulation (T: 1719, 1726);

239. According to Dr. Rissenberg, as children develop, puberty can make emotional dysregulation worse. This is so even if there are no other factors placing the child hormonally at risk for worsening of emotional dysregulation. Indeed, bumps in the road are not evidence of lack of progress and, psychologically, can be evidence of improved insight (T: 1632);

240. While K.P. gave the same answers to the Beck Youth Inventories in 2012 (D-26) and 2013 (P-Y), Dr. Rissenberg did not draw any conclusions solely from that comparison (T: 1713-15);

241. Dr. Rissenberg noted mild autism spectrum disorder and dysthymia with mood instability and emotional outbursts, consistent with emotional dysregulation (P-Y; T: 1737-40). This confirms that Franklin was an appropriate placement for KP (P-Y; T: 1345);

## VIII. SRO DETERMINATION:

242. Plaintiffs strongly disagree with the decision of SRO Carol S. Hauge (*see* SRO);

243. The SRO wrongly dismissed Plaintiff's appeal of the IHO's decision (SRO 22);

244. The SRO wrongly determined that, although there is evidence in the record to support Plaintiff's argument that the CSE failed to keep the parents informed about potential out-of-district placements, M.P. was able to participate in the 2012-13 IEP process (SRO 12);

245. The SRO wrongly determined that the IHO was correct in finding that the 2012-13 IEP was appropriate (SRO 15);

246. The SRO wrongly determined that the IHO was correct in finding that the 2013-14 IEP was appropriate (SRO 17);

247. The SRO wrongly determined that the Plaintiff's argument that the 2012-13 and 2013-14 placements recommended by CCSD were not appropriate and could not be appropriately implemented are speculative and not supported by the record (SRO 19);

248. Finally, the SRO wrongly determined that the question of whether Franklin was appropriate and the equities need not be reached since CCSD was found to have offered K.P. a FAPE in the 2012-13 and 2013-14 school years (SRO 22);

249. Accordingly, the SRO wrongly dismissed M.P.'s appeal of the IHO's decision (SRO 22);

250. Plaintiffs now appeal these determinations of the SRO;

## IX. THE EQUITIES:

251. As seen above, the parent thoroughly cooperated with CCSD as it concerned equitable considerations for tuition reimbursement for the 2012-13 and 2013-14 school years;

252. Notice was accomplished here because of Petitioners' cooperative and informative behavior. M.P. informed CCSD that she was placing K.P. at Franklin in July of 2012 (T: 2113);

253. M.P. provided all reports and documentation, attended all but one CSE meeting (T: 1326, 1337), communicated with administrators on a regular basis as reflected throughout the record, provided consent for evaluations and observations (T: 1287, 1302-1303, 1304) and made K.P.'s neuropsychologist available to attend CSE meetings (T: 1232);

**WHEREFORE,** it is requested that this Court render Summary Judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure granting judgment to the Plaintiffs in all respects, and granting the plaintiffs the following relief:

A. A modified de novo review and adjudication on the merits pursuant to the Individuals with Disabilities Education Improvement Act (20 U.S.C. §1400, et seq.) reversing the SRO's decision which dismissed Plaintiffs' appeal and as it relates to Defendant CCSD's failure to offer K.P. a FAPE and order to pay K.P.'s tuition costs at FA;

B. A declaration reversing the IHO's arbitrary and capricious decision denying relief for the 2012-13 and 2013-14 school years;

C.      An Order that CCSD reimburse Plaintiffs for the tuition and board expenses they incurred for FA for the 2012-13 and 2013-14 school years;

D.      A declaration that Plaintiffs are the "substantially prevailing" party in this action;

E.      An Order granting leave to Plaintiffs' counsel to submit a fee application for purposes of statutory attorney's fees and other recoverable costs at the administrative level, the SRO level, and in this action, pursuant to the express fee-shifting provisions of the IDEIA/IDEA statute; and

F.      An Order granting Plaintiffs such other, further and different relief as may be just under the circumstances.

As pursuant to 28 U.S.C. § 1746, I swear or affirm under penalty of perjury under United States laws that my answers in this affirmation / declaration are true and correct.


Dated: Katonah, New York

August 25, 2015

Respectfully submitted,
Law Office of Peter D. Hoffman, PC


By: _____

Hope Harris, *Pro Hac Vice*
Peter D. Hoffman (PH -8306)
Nikki D. Woods (NW -1380)
Law Office of Peter D. Hoffman, PC
Attorneys for Plaintiffs
200 Katonah Avenue
Katonah, NY 10536
(914) 232-2242            phone
(914) 232-2245            facsimile
hh@pdhoffmanlaw.com     e-mail