**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
──────────────────────────────────

M.P., individually and On Behalf of K.P., a
minor under the age of 18 years,

                **Plaintiffs,**         **DEFENDANT'S RESPONSE TO**
                                    **PLAINTIFFS' RULE 56.1 STATEMENT**
     **-against-**                    **AND COUNTER-STATEMENTS**[1]

**CARMEL CENTRAL SCHOOL DISTRICT,**     **CIVIL ACTION NO.  15 CIV 03432 (VLB)**
                 **Defendant.**

──────────────────────────────────

      Defendant **CARMEL CENTRAL SCHOOL DISTRICT** ("District" or "CCSD"), in

opposition to the plaintiffs' motion in the nature of one for summary judgment pursuant to Rule 56

of the Federal Rules of Civil Procedure, submits the following responding statement to the Plaintiff's

Rule 56.1 Statement of Uncontroverted Facts [2] and Counter-Statements.

───────────────

[1] For ease of understanding by the Court, the District will include most of its counter-statements to numbered statements in the Plaintiffs' Rule 56.1 statement with its responses to the individual numbered statements, designating the counter-statements accompanying the response by numbering each counter-statement. Where, in response to a statement by the plaintiff, the Court is directed to see a response to a prior statement, the direction to a prior response includes to any numbered counter-statements that were included in that prior response (and counter-statement).

[2] Though plaintiff's motion is characterized as one for summary judgment, that is solely a matter of form for purposes of the instant case. As the Second Circuit Court of Appeals has stated, "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir.2005); *see also P. ex rel. Mr. P. v. Newington Bd. of Ed.,* 546 F.3d 111, 118 (2d Cir.2008).  As such, the eventuality that either party controverts the factual presentments of the other made through the Rule 56.1 process does not foreclose the Court determining the ultimate issue, i.e., whether the decisions of the Impartial Hearing Officer ("IHO") (as concerns issues not addressed by the State Review Officer) (see, e.g., *Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 113-14 [2d Cir. 2007]) and/or State Review Officer ("SRO") are supported by the preponderance of the evidence in the administrative record. *M.S. v. Bd. of Educ. of City Sch. Dist. of Yonkers,* 231 F.3d 96, 102 (2d Cir. 2000).

## A. RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENTS

Paragraph of Plaintiffs'          Plaintiffs' Statement (**in bold**) and District's Response
Rule 56.1 Statement

1       **Plaintiffs filed an Impartial Hearing Demand with exhibits with the Carmel**

   **Central School District (hereinafter "CCSD") on June 27, 2013, requesting**

   **compensatory education for the 2011-12 and 2012-13 school years and tuition**

   **reimbursement for the 2012-13 and 2013-14 school years at Franklin Academy**

   **(hereinafter "Franklin").**

Response:       Admits as per e.g., D-1[3].

2       **Defendant answered the hearing demand on September 11, 2013**.

Response:       Fails to see that this is a material issue of fact[4], but admits as per D-2

3       **Plaintiffs withdrew their compensatory education claim for the 2011-12 and**

   **2012-13 school years**.

Response:       Admits.

4       **The sixteen-day hearing took place over the course of a year, from September**

---

[3] References to the District Exhibits during the administrative proceedings are referenced as "*D-*" followed by the exhibit number. References to the Parents Exhibits during the administrative proceedings are referenced as "*P-*" followed by the exhibit letter. References to Joint Exhibits during the administrative proceedings are referenced as "*J-*" followed by the exhibit number. References to Impartial Hearing Officer exhibits are referenced as "*IHO-*" followed by the exhibit number. References to the transcribed testimony during the administrative proceedings are referenced by "*TR.*" followed by the page(s) of the transcripts. References to the decision of the Impartial Hearing Officer ("IHO") attached as Exhibit 1 to the Complaint are referenced as "*FFD-*" followed by the page number. References to the decision of the State Review Officer ("SRO") in case no. 15-003 (attached as Exhibit 2 to the Complaint) are referenced as "*SRO-*" followed by the page number.

[4] Rule 56.1(a) requires that a party seeking summary judgment provide "a separate, **short and concise** statement, in numbered paragraphs, of the **material facts** . . . ." **Emphasis** added. The plaintiffs' Rule 56.1 Statement, comprised of 253 separately numbered statements is, as further reflected below, substantially comprised of factual allegations immaterial to the limited issues before the Court.

-2-

of 2013 through September of 2014.

Response:     Fails to see that this is a material issue of fact, but admits.

5     **CCSD submitted 143 exhibits.**

Response:     Fails to see that this is a material issue of fact, but admits.

6     **Plaintiffs submitted 37exhibits**.

Response:     Fails to see that this is a material issue of fact, but admits.

7     **The IHO submitted 20 exhibits.**

Response:     Fails to see that this is a material issue of fact, but admits.

8     **On November 22, 2014, the Impartial Hearing Officer (hereinafter, "IHO")**
      **Linda Agoston, Esq. rendered her Findings of Fact and Decision** *(See* **Exhibit**
      **"1," Findings of Fact and Decision, attached to Complaint, hereinafter referred**
      **to as "FFD")**;

Response:     Admits.

9     **The FFD was in favor of the Defendant.**

Response:     Admits that the IHO ruled that the statute of limitations foreclosed
              consideration of any claims by the plaintiff parent preceding those
              concerning the 2012-13 and 2013-14 school years (*FFD-56*)*;* that the
              plaintiff parents "procedural objections" to the 2012-13 IEP were without
              merit (*FFD-56-58 and 62*); that the District's IEPs for the 2012-13 and 2013-
              14 school years provided the plaintiff student with a free appropriate public
              education ("FAPE") (*FFD-59-63 and 65-68*); that the plaintiff parent had not
              amended her due process complaint to, for example, assert a procedural claim

that the District had failed to conduct a functional behavioral assessment ("FBA") or behavioral intervention plan ("BIP") because the District had not consented to such an amendment as required by 20 U.S.C. §1415(f)(3)(B) (*FFD-64*); that an FBA could not have taken place without the plaintiff student being present in the District environment (i.e., in a District public school) and that the IEP, in any event, provided appropriate supports to accommodate the plaintiff student's behavior issues (*FFD-64-65*); that the plaintiff parent's unilateral placement of the plaintiff student for the 2012-13 and 2013-14 school years at the Franklin Academy was an inappropriate placement (*FFD-68-70*) and that the balancing of the equities further warranted a denial of tuition reimbursement to the plaintiff parent. (*FFD-70-71*).

10    **The IHO's FFD:**

    **a. incorrectly held for no tuition reimbursement for the Plaintiffs for the 2012-13 and 2013-14 school years (FFD-71);**

    **b. incorrectly determined that the placement at FA in the 2012-13 and 2013-14 school years was not appropriate (FFD 68);**

    **c. incorrectly determined that the equities do not favor the parent (FFD 71);**

    **d. plaintiffs appealed the 2012-13 and 2013-14 ruling on tuition reimbursement to the State Review Officer (hereinafter, "SRO");**

Response:    The plaintiffs' contention that the IHO's holdings and determinations were "incorrect" as referenced in sub-sentences a through c of this statement is

argumentative and not supported by the record references cited as required by Local Rule 56.1(d) and, consequently, does not require a response. The IHO made no reference to the plaintiff parent's appeal to the SRO as per sub-sentence d of this statement other than to her right to do so (*FFD-71-72*). However, admits that the plaintiffs made an appeal to the SRO.

11    **Plaintiffs served their Notice of Intent to Appeal on Defendant on December 22, 2014 and copy was sent to the Office of State Review (hereinafter, "OSR") along with affidavit of service on December 26, 2014**.

Response:    This allegation is unsupported by any record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response. Nonetheless admits that the plaintiffs unsuccessfully appealed the decision of the IHO which had denied their request for tuition reimbursement for the costs of the plaintiff student's tuition at the Franklin Academy for the 2012-13 and 2013-14 school years. *SRO-1*.

12    **The SRO reviewed the appeal and found that CCSD offered K.P. a FAPE in the 2012-13 and 2013-14 school years, but did not rule on whether the parents' unilateral placement at Franklin was appropriate for the 2012-13 and 2013-14 school years or whether the equitable considerations support the parent's claim for the 2012-13 and 2013-14 school years.**

Response and Counter-Statement:

Admits.

1. The SRO also ruled as concerned the 2012-13 IEP that:
However, even assuming that the CSE's failure to effectively

communicate with the parents or the CSE's failure to keep the parents adequately apprised of any out-of-district program search constituted procedural violations, the hearing record does not contain sufficient evidence upon which to conclude that such procedural inadequacies impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]). . . . Thus, contrary to the parents' arguments, the IHO properly determined that the parents had an opportunity to participate in the development of the August 2012 IEP, . . . (*SRO-14*)

2. and, concerning the 2012-13 and 2013-14 IEPs, that:

[T]he parents cannot prevail on their claims regarding implementation of the August 2012 IEP and the May 2013 IEP because a retrospective analysis of how the district would have implemented the student's August 2012 IEP and the May 2013 IEP at the assigned public school sites was not an appropriate inquiry under the circumstances of this case (*K.L.*, 530 Fed. App'x at 87; *R.E.*, 694 F.3d at 186; *R.C.*, 906 F. Supp. 2d at 273). Here, it is undisputed that the parents rejected both of the assigned public school sites that the student would have attended and instead chose to enroll the student in a nonpublic school of their choosing prior to the time the district became obligated to implement the August 2012 IEP and the May 2013 IEP (see Dist. Exs. 10 at p. 2; 12 at p. 2; 73; 75; 78; 106). Therefore, the arguments asserted by the parents with respect to the assigned public school sites are speculative. (*SRO-21*)

3. and that:

However, even assuming for the sake of argument that the parents could make such speculative claims or that the student had attended the district's recommended programs at the assigned public school sites, the evidence in the hearing record does not support the conclusion that the district would have violated the FAPE legal standard related to IEP implementation—that is, that the district would have deviated from the student's IEPs in a material or substantial way (*A.P. v. Woodstock Bd. of Educ.*, 370 Fed. App'x 202, 205, 2010 WL 1049297 [2d Cir. Mar. 23, 2010]; *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 [9th Cir.

2007]; *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 [5th Cir. 2000]; see *D.D-S.*, 2011 WL 3919040, at *13; *A.L. v. New York City Dep't of Educ.*, 812 F. Supp. 2d 495, 502-03 [S.D.N.Y. 2011]). *SRO-22.*

13[5]    **K.P. was born in 1998 and is a resident of Patterson, New York within the geographical location consistent with that of the Defendant CCSD (D-l, p. 1; FFD 1);**

Response:    The allegations are solely supported by *D-1* and not by the IHO decision page cited. The District denies knowledge or information sufficient to form a belief as to where the plaintiff student currently resides.

14    **K.P. is and was a student with a disability (D-I, p. 2; FFD 8; SRO 3,fn 2)**.

Response:    The allegation that K.P. is currently a student with a disability is not supported by the record references cited as required by Local Rule 56.1(d), is **irrelevant** and, consequently, does not require a response. The District admits that the plaintiff student was a student with a disability during the relevant 2012-13 and 2013-14 school years.

15    **K.P. is classified as Other Health Impaired (hereinafter, "OHI") on his Individualized Education Program (hereinafter, "IEP") (D-12; FFD 8 SRO 3,**

---

[5] Allegations 13-41 in the plaintiffs' Statement are each under the subheading of "II. CCD Historically Failed to Classify K.P.". However, as referenced above, the plaintiffs withdrew their claims for compensatory education relating to the District's alleged failure to have itself found and classified the plaintiff student prior to the 2012-13 school year IEP (*IHO-7; Tr. 1180-81*) and the IHO further held that any claims relating to the period before the formation of the 2012-13 school year IEP were barred by the 2 year statute of limitations. *IHO-56*; *SRO-6 n.12*. The plaintiffs did not appeal the IHO's decision barring any claims predating those for the 2012-13 school year to the SRO (*SRO-1; plaintiffs' 12/18/14 Petition to the SRO)* the SRO did not rule on any such claims (*SRO-1-22)* and this Court, consequently lacks subject matter jurisdiction over any such unexhausted claims. *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008).

**fn 2).**

Response:     The allegation concerning how and whether the plaintiff student is currently

classified is not supported by the record reference cited as required by Local

Rule 56.1(d), is **irrelevant** and, consequently, does not require a response.

Admits that for the 2012-13 and 2013-14 school years, the plaintiff student

was so classified by the District's Committee on Special Education ("CSE")

on his IEPs.

16     **K.P. attended Mizzentop Day School, an independent day school in Pawling,**

**New York during his kindergarten year (D-l, p. 2; FFD 8)**.

Response:     Admits that the plaintiff has so claimed as reflected by *D-1* and *FFD-8 and*

*33*, but asserts that this is not a material fact for purposes of a Rule 56.1

Statement except possibly as concerns the equitable issue before the Court

as the record reflects that, according to the plaintiff parent, the plaintiff

student attended that school because her husband was ill and, as her daughter

was already attending that school, she needed both of her children to be

attending the same school. *FFD-33; Tr.1197*.

17     **M.P. first noticed K.P.'s difficulties when he was in Kindergarten in the 2003-04**

**school year (T: 1198-99; FFD 33)**

Response:     Denies the allegation as stated as supported by the record references cited

as required by Local Rule 56.1(d), as failing to assert a material issue of

fact, as irrelevant and, consequently, as not requiring a response.

18     **M.P. had K.P. evaluated by CCSD, who failed to classify him at that time (T:**

1198-99)

Response:     The allegation is not supported by the record references cited as required by Local Rule 56.1(d) and, consequently, does not require a response. Notwithstanding, admits that the plaintiff parent testified that the District tested the plaintiff student in his kindergarten year and that at that time, according to the parent, he was not determined to require services from the District (*Tr. 1198-99*), but that all allegations relating to these events fail to assert material issues of fact and are irrelevant to the issues before the Court (as further reflected by the IHO's rulings).

19     **K.P.'s kindergarten teacher, Karen DeGennaro, requested an occupational therapy ("OT") evaluation from CCSD, as she believed KP's fine motor skills were impacting his ability to write letters and numbers (D-1, p. 2)**

Response:     The  allegations are not supported by any reliable record reference cited or by any testimonial or documentary evidence in the record as required by Local Rule 56.1(d), are not established during the hearing and, consequently, do not require a response.  Further, they fail to assert material issues of fact and are irrelevant to the issues before the Court.

20     **Although KP's kindergarten teacher, Ms. DeGennaro, reported to CCSD that KP has made "limited handwriting progress this year despite using a systematic program ... [and] avoids table top activities," CCSD occupational therapist, Kathryn Ostie, did not recommend OT services (D-1, p.2).**

Response:        See response to Statement 19. See also *FFD-54-55* and *56*[6].

21        **Despite all of this, CCSD failed to classify K.P. or even provide him with a 504 Plan**

        **at that time (D-1, p. 2)**.

Response:        See response to Statement 20.

22        **M.P. had K.P. tested again in second grade in the 2005-06 school year because he**

        **was not making progress in school (T: 1200).**

Response:        Admits the plaintiff parent so testified, but asserts that this allegation fails to

        assert a material issue of fact and is irrelevant to the issues before the Court.

        See also footnotes 4 and 5 above.

---

[6]The IHO held, *FFD-54-55*:

> The parent's attorney alleged in his due process complaint that CCSD historically failed to provide student X with F APE as the district failed to identify student X as a child with disabilities and failed to engage in Child Find activities (Exh. 1 at 1 ). The record is replete with evaluations conducted by CCSD and PCSD [Pawling Central School District] from 2006 through 2009 (Exhs.13-28) and I find no evidence that CCSD failed to engage in Child Find activities. The record indicated that student X attended Mizzentop, a private school located in the PCSD for Kindergarten through fourth grades (2003-2008) (trans. 1196; 2010). I note that the third grade report dated June 2007, (Exh. 20) indicated that student X experienced tremendous growth and progressed academically and socially. The record indicated that student X attended PCSD Middle School for the fifth and sixth grades in special classes as he lived with his father in PCSD for the 2008-2009 and the 2009-2010 school years (trans.1214;1359). I note the parent acknowledged that while at PCSD student X was classified and he received IEPs for both fifth and sixth grades and he made a lot of academic progress (trans. 1214)

and also held, FFD-56:

> I will only consider claims under the 2012-2013 school year and the 2013-2014 school years.

These determinations by the IHO were not appealed to the SRO (*SRO-1; plaintiffs' 12/18/14 Petition to the SRO*) and are unexhausted issues over which the Court has no jurisdiction. *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008)

23 **During K.P.'s first grade year, his teacher, Mrs. Szeghy, was concerned about KP's reading skills and recommended that KP receive tutoring for reading (D-1, p. 2-3).**

Response: See response to Statement 19.

24 **Despite the concerns of M.P., K.P. still was not fully evaluated, and neither a 504 Plan nor an IEP were put into place (D-1, p. 3).**

Response. See response to Statement 20.

25 **K.P. was referred to the CCSD Committee on Special Education (hereinafter, "CSE") during his second grade year, the 2005-06 school year, by his teacher, Lauren Olsen, because K.P. was still not making progress in school (T: 1200; D-l, p. 3).**

Response: See response to Statement 19 (note: the transcript reference does not support the allegation).

26 **Ms. Olsen emphasized on her teacher input form from CCSD that reading and writing continued to be an issue for K.P., his reading skills were below grade level, and he needed extra time to finish his class work (D-l, p. 3).**

Response: See response to Statement 19.

27 **CCSD educator, Sally W. Coates, observed K.P. at Mizzentop for reading and concluded it was a difficult task for K.P. as he was not reading, but re-telling the story from his memory. When reading, he lost his place, and he had difficulty with writing and answering questions after the reading was completed (D-l, p. 3).**

Response See response to Statement 19.

28 **CCSD psychologist, Jaclyn Netrosio, concluded in K.P.'s Educational Evaluation that K.P.'s overall academic fluency was in the low average range. Ms. Netrosio**

noted that, compared with others his age, K.P.'s performance was low in reading, math calculation, and written language. Further, K.P. was in the 6th percentile (low range) for cognitive efficiency (D-1, p. 3-4; D-l5);

Response:     This allegation fails to assert a material issue of fact and is irrelevant to the issues before the Court.  See also footnotes 4 and 5 above**.** The Court is respectfully referred to D-15 for its full, complete and accurate content should it determine that this statement warrants consideration by the Court**.**

29     **Although the results of CCSD's testing (D-14; D-15***;* **D-16) showed poor reading comprehension, low processing speed, and poor fluency, CCSD did not classify K.P. because he was not failing in terms of grades (T: 1200-1202)**.

Response:     See response to Statement 22. The Court is respectfully referred to D-14, D-15 and D-16 for their full, complete and accurate content should it determine that this statement warrants consideration by the Court.

30     **In July of 2006, M.P. had a private Neuropsychological evaluation of K.P. performed by Marian Rissenberg, Ph.D. (D-1, p. 4; D-17; FFD 9).**

Response:     Admits.

31     **Dr. Rissenberg's evaluation showed K.P. suffered from Attention Deficit Disorder, motor coordination disorder, social perception deficits and a spatial visual processing deficit (D-17; T: 1204).**

Response:     Denies as stated and respectfully refers the Court to D-17 for its full, complete and accurate content.

32     **According to Dr. Rissenberg, the testing of K.P.'s executive processing was "very**

**strongly indicative of an attention deficit hyperactivity disorder" (D-17, p 4).**

Response:       See response to Statement 31.

33       **Dr. Rissenberg also indicated a social perception deficit a motor coordination**

         **disorder and a visual spatial processing deficit (D-17, p. 6)**;

Response:       See response to Statement 31.

34       **Based on Dr. Rissenberg's evaluation (D-17), it was concluded that K.P.**

         **qualified for a Section 504 plan (D-1, p. 5; 1206-07; FFD 9)**.

Response:       See response to Statement 19. Note: neither *Tr. 1206-07* nor *FFD-9* support

                this conclusory allegation.

35       **The CCSD CSE still did not classify K.P. (T: 1206-07) even though Dr.**

         **Rissenberg's evaluation (D-17) and CCSD's testing (D-14, D-15, D-16) showed**

         **that KP was below expectation (T: 1203, 1570)**.

Response:       See response to Statement 20.  Further denies as stated and, refers the Court

                to *D-14* through *D-17* and *T-1203* and *T-1570*, relied upon in support of the

                Statement, for their full, complete and accurate content as not supporting

                same, should the Court determine that this statement warrants consideration

                by the Court. See also *FFD-55*[7]

---

[7] The IHO held, *FFD-55*:

    The parent's attorney argued in his post hearing brief that CCSD did not classify
    student X despite Dr. Rissenberg's neurological report on August 7, 2006 (Exh.
    *XVIII* at 4). I note that Dr. Rissenberg recommended a Section 504 plan due to
    motor coordination as well as preferential seating, nonverbal cuing to address issues
    with attention (Exh. 17 at 6) and I find the parent acknowledged that she accepted
    the 504 Plan with accommodations as developed by the CCSD (trans. 1351).

These determinations by the IHO were not appealed to the SRO (*SRO-1; plaintiffs' 12/18/14 Petition to*

36      **Unfortunately, by the time the CSE determined KP was eligible for services, KP suffered from low academic self-esteem and his writing skills were in the 10th percentile for children his age (D-1, p, 5).**

Response:      See response to Statement 20. The District further objects to the insertion in a Rule 56.1 Statement of the plaintiffs' conclusory term (contrary to the record as per *FFD-54-55*) as to "[u]nfortunately".

37      **It was not until K.P. moved out of CCSD in fourth grade, the 2007-08 school year, that he finally received special education services based on Pawling Central School District's evaluations, which found KP was dyslexic, dysgraphic, had slow processing speed and had poor executive functioning (T: 1212-1213; D-1, p. 6; FFD 11)**.

Response and Counter-Statement:

See response to Statement 20. Note: neither *Tr. 1212-13* nor *FFD-11* support the allegations in this statement. See *FFD-10.*

1. According to the plaintiff parent, the plaintiff student attended Mizzentop, a private school in Pawling, N.Y. during his fourth grade. *FFD-8 and 33*.

2. The record does not evidence the plaintiff student receiving "special education services" at Mizzentop prior to his attendance at Pawling Middle School (as he then lived with his father in that school district) for his 5th grade. *FFD-8.*

38      **K.P. attended Pawling Central School District for fifth grade, the 2008-09**

_____

*the SRO ["Petition"])* and are unexhausted issues over which the Court has no jurisdiction.

school year (D-1, p. 6);

Response:     Admits, but note that all allegations relating to these events fail to assert

material issues of fact and are irrelevant to the issues before the Court. See

footnotes 4 and 5 above.

39      **During fifth grade, the 2008-09 school year, K.P. was placed in a 5:1 Special**

**Class for English/Reading, Math, Reading, Science, Social Studies and Study**

**Lab pursuant to his IEP. K.P. was also receiving Counseling and OT at PC SO**

**(D-1, p. 6; FFD 11);**

Response:     See response to Statement 20. Note *FFD-11* does not support this allegation.

40      **As K.P. had difficulty interacting with others in a social setting, PCSD guided**

**K.P.'s adult and peer relationships with reminders of social cues. During the**

**2008-09 school year, KP progressed in his relationships and needed less**

**assistance with cues and social concerns were resolved more easily (D-1, p. 6).**

Response:     See response to Statement 19.

41      **In sixth grade, the 2009-10 school year, K.P. was finally progressing**

**academically but was still having a hard time with his peers, continually feeling**

**isolated, bullied and unable to connect. M.P. believed that K.P. would benefit**

**socially from a smaller setting. Accordingly, M.P. placed K.P. at the Wooster**

**School in Danbury, Connecticut for the following year (D-1,  p. 7).**

Response:     See response to Statement 19.  See also *FFD-55 and 56*[8].

---

[8] Based upon the plaintiff parent's testimony, the IHO found that the reason that the plaintiff student
was placed in the Wooster School was not because the plaintiff parent believed K.P. would benefit from a
smaller setting, but for personal reasons:

42      **In his second sixth grade year, the 2010-11 school year, K.P. attended the Wooster School, located within the Danbury Public School District (D-I, p. 7; FFD 12).**

Response:      Admits, but notes that all allegations relating to these events fail to assert material issues of fact and are irrelevant to the issues before the Court. See footnotes 4 and 5 above.

43.     **K.P. repeated the sixth grade during the 2010-11 school year at the Wooster School due to Wooster having a more advanced curriculum than Pawling Central School District's (D-1, p. 7; FDD 12)**.

Response:      Admits that K.P. repeated the sixth grade at the Wooster School during the 2010-11 school year. Otherwise, see  response to Statement 19.

44      **A Psychological Evaluation was conducted in or around February, 2011 by Danbury Public School District Psychologist, Marita Repole, who stated that specific interventions, modifications and accommodations will be necessary to help K.P. function at a level more consistent with his measured potential (D-1, p. 8; D-32; FFD 12)**.

Response:      Admits.

---

The record indicated that student X left PCSD Middle School and attended Wooster to repeat sixth grade as his mother wanted student X to attend the same private school as his sister (trans. 1365). . . . There was no evidence presented that indicated that the parent placed student X at Wooster for any other reason than to be with his sister . . . . (Trans.1383; 1531). *FFD-55-56*.

45     **K.P.'s academic skills were in the average range. Academic fluency was in the below average range. The application of these skills, as well as academic knowledge, were in the average range. However, K.P.'s academic performance was inconsistent. His ability to associate with his peers declined and his emotional state deteriorated (D-1, p. 8; D-32).**

Response:    Denies as stated. As concerns *D-32*, the Court is specifically referred to that exhibit as to its full, complete and accurate contents concerning the evaluation of the plaintiff student.

46.    **In seventh grade, the 2011-12 school year, K.P.'s grades declined, along with his social interactions with peers and his emotional state. Although K.P. was receiving Academic Enrichment and Support (hereinafter "AES"), a program that provides opportunities during the school day to seek academic help from their teachers or to work on academic assignments and private counseling, he did not improve (D-l, p. 8).**

Response:    The allegations are not supported by any reliable record reference cited or by any testimonial or documentary evidence in the record as required by Local Rule 56.1(d), are not established during the hearing and, consequently, do not require a response. See also *FFD*-13 and *D-34*, detailing the plaintiff student's academic performance at the Wooster School during the 2011-12 school year.

47     **Beginning in or around March 2012, K.P. was home schooled through Wise Learning, in Ridgefield, CT, while working to meet the requirements for his courses**

**at Wooster (D-l, p. 8; FFD 34; SRO 2).**

Response:     Admits.

48      **During this time, K.P. received private tutoring (FFD 34; SRO 2) in all core subject areas at M.P.'s expense, from special education teachers at Wise Learning. K.P. was emotionally incapable of participating in classes due to his continuing inability to deal with his peers (FFD 55; SRO 2);**

Response:     Admits that K.P. received private tutoring at Wise Learning. The remainder of this Statement's allegations are not supported by the record references cited or by any other cited testimonial or documentary evidence in the record as required by Local Rule 56.1(d) and, consequently, do not require a response.

49      **K.P. was re-evaluated by Dr. Rissenberg in April of 2012 (D-36) (T: 1230; FFD 13; SRO 7)**.

Response:     Denies as stated, but admits that the plaintiff student was subjected to a private neuropsychological assessment by Dr. Rissenberg in April of 2012. *FFD-13*; *D-36.*

50      **Dr. Rissenberg's report (D-36), which M.P. provided to CCSD on May 4, 2012 (T: 1230), found K.P. prone to emotional dysregulation, which Dr. Rissenberg described as "mood instability" (D-36, p. 4; 1682). This means he misunderstands situations and feels interactions are directed at him in a hostile way (T: 1582), making him extremely upset and unable to function (T: 1582-83).**

Response and Counter-Statement:

                Denies as stated and refers the Court to the April 2012 Rissenberg report and

-18-

the testimony of Dr. Rissenberg for the complete exposition and explanation of her report.

1. The IHO found that Dr. Rissenberg found a history consistent with a mild autism spectrum disorder and mood instability and a learning disability in math; that Dr. Rissenberg recommended increased educational, emotional and social support (*FFD-14*).

2. Dr. Rissenberg did not recommend a residential placement for the plaintiff student (*FFD-37, 38, 59 and 71; D-36*).

3. The determinations, modifications, accomodations and services in the 2012-13 IEP corresponded with and were consistent with the recommendations of Dr. Rissenberg (*FFD-61-62*).

51 **K.P. demonstrated deficits in visual spatial processing, motor coordination, executive function, and processing of social-emotional information. His academic skills were below expectation. He had a profile consistent with a mild autism spectrum disorder in the context of above average intellectual capacity with a learning disability in math, requiring increased academic support (T: 1577-1578; FFD 14).**

Response:    Admit that Dr. Rissenberg so testified, but refers the Court to the April 2012 Rissenberg report at *D-36* and the testimony of Dr. Rissenberg for the complete exposition and explanation of her report. The IHO, at *FFD-14*, cited by the plaintiffs, merely confirms that the District's June 6, 2012 IEP (*D-9*) indicated that based upon Dr. Rissenberg's evaluation, the plaintiff

student had issues associated with his medical diagnosis of a mild spectrum

disorder. See response to Statement 50.

52    **Plaintiffs strongly disagree with the IHO's and SRO's decisions regarding**

**tuition reimbursement for the 2012-13 school year (FFD 61-66; SRO 17).**

Response:    See response to Statement 19.

53    **The CCSD CSE held an annual review meeting on May 10, 2012 (D-8) to**

**develop an IEP for the 2012-13 school year (T: 1232; FFD 14; SRO 3).**

Response and Counter-Statement:

Admits.

1. At the May 10, 2012 meeting, the CSE did not finalize a placement

decision, but decided it would reconvene to finalize placement. *D.8 at page*

*3; FFD-14, 20.*

54    **M.P. attended the meeting with Dr. Rissenberg (D-8; T: 1232), who explained**

**K.P.'s educational, social, and emotional needs, including emotional**

**dysregulation (T: 1233, 1697).**

Response:    Admits the first sentence as concerns the attendance at the May 10, 2012

CSE meeting. The allegation that Dr. Rissenberg "explained K.P.'s

educational, social, and emotional needs, including emotional dysregulation"

is unsupported by the record references cited as required by Local Rule

56.1(d) and, consequently, does not require a response.

55    **The CSE did not disagree with Dr. Rissenberg's findings (T: 257, 1589) nor did**

**it request consent to conduct its own evaluations (T: 1249). Nonetheless, the**

**CSE failed to take Dr. Rissenberg's evaluation or input into account in creating his 2012-13 IEP and, in fact, M.P. received no information on how the IEP would address K.P.'s emotional dysregulation (D-10; T: 1245-46)**.

Response and Counter-Statement:

> Admits that the plaintiff parent testified at *Tr.1249* that the CSE did not request consent at the May 10, 2012 CSE meeting to conduct evaluations of the plaintiff student. All the remaining allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

> 1. See counter-statements 2 and 3 to Statement 50.

56      **At the May 2012 CSE, Lou Valesey, CSE Chairperson, offered to do a program search (T: 1512).**

Response:      Admits

57      **Even though the CSE discussed out-of-district placements, CCSD's Prior Written Notice letter states that no outside options were considered (D-63; T: 269).**

Response and Counter-Statement:

> The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Otherwise, denies.

> 1. *D-63* is dated May 25, 2012 and states that "no other options considered **at this time**." *D-63* (**Emphasis** added).

2. The CSE did not discuss any "out-of district placements" prior to May 25, 2012, nor did it "consider" "outside options" prior to that date, but it did discuss with the plaintiff parent at the May 10, 2012 CSE meeting the existence of therapeutic and other programs, including out-of district programs. *Tr. 88-89; SRO-12-13.*

3. The CSE (through CSE Chairperson Valesey) did explore other potential programs including outside programs, before eventually concluding that the program offered in the August 30, 2012 IEP was most appropriate in the least restrictive environment. *Tr. 88-89, 300 and 414-26; FFD-20; SRO-13.*

4. As the SRO held, *SRO-14*:

> However, even assuming that the CSE's failure to effectively communicate with the parents or the CSE's failure to keep the parents adequately apprised of any out-of-district program search constituted procedural violations, the hearing record does not contain sufficient evidence upon which to conclude that such procedural inadequacies impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]). Rather, the evidence in the hearing record indicates that the parents were afforded the opportunity to participate in the development of the August 2012 IEP and to express and present their concerns.

58      **At the June 2012 CSE, Mr. Valesey again said he would look into outside placements (T:1246-1249), but never got back to M.P. about placement options (T: 1250-1251; SROI2);**

Response and Counter-Statement:

Admits that the plaintiff parent so testified.

 1. See counter-statements 3 through 4 to Statement 57.

59    **Ultimately, the CSE never sent packets out to try to find an alternative placement for K.P. (T:272, 278, 310), causing an unreasonable delay.**

Response and Counter-Statement:

Denies as stated the portion of the Statement preceding the parentheses and that portion that folllows the parentheses as unsupported by any record references cited as required by Local Rule 56.1(d) and, consequently, not requiring a response.

1. The CSE did not send out "packets" as part of a process for the placement of the plaintiff student at an alternative placement to that the District found appropriate for the plaintiff student in the District because the District was able to place the plaintiff student in a more appropriate program for him in the least restrictive environment, which would provide him with a FAPE, in the District. *Tr. 88-89, 300 and 414-26; FFD-20; SRO-13.*

2. See counter-statements 3 through 4 to Statement 57.

60    **As a result, M.P.'s only options were to continue to wait for the final IEP or find an appropriate placement on her own (T: 1270).**

Response and Counter-Statement:

The allegations in this statement are argumentative and unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1.  See counter-statements 3 through 4 to Statement 57.

61      **In fact, the final IEP was not ready by the beginning of the school year (T: 1274-75; D-10, D-77), a procedural violation**.

Response and Counter-Statement:

The allegations in this statement are argumentative and unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. Plaintiffs did not raise a claim that non-receipt of the August 30, 2012 IEP until after the 2012-13 school year had begun (during which the plaintiff student was already enrolled in (as of 8/5/12) and attending (as of 8/28/12) the Franklin Academy [*FFD-70*]) constituted a procedural violation of the IDEA in their due process complaint (*D-1*). As such it is not a claim that the IHO could have considered.  20 U.S.C. § 1415(f)(3)(B); *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77-78 (2d Cir. 2014).

2. The plaintiffs did not raise a claim that non-receipt of the August 30, 2012 IEP until after the 2012-13 school year had begun (during which the plaintiff student was already enrolled in (as of 8/5/12) and attending (as of 8/28/12) the Franklin Academy [*FFD-70*]) constituted a procedural violation of the IDEA in their appeal from the IHO's decision to the SRO, though they tangentially noted in a sentence concerning a causing of "unreasonable delay", relating to a claim that the IHO had incorrectly found that there was substantial participation by the plaintiff parent in the May and June 2012

-24-

CSE meetings, that read "P's only options were to wait for the final IEP, which did not come until after the school year had begun (T: 1274-75), or find an appropriate placement on her own (T: 1270)." See *Petition (to the SRO) at paragraph 3, page 6 thereof.*

3. The SRO did not address any claim of a procedural violation of the IDEA based upon a claim that the plaintiffs did not receive the August 30, 2012 IEP until after the 2012-13 school year had commenced. *SRO-10 n. 15 ("[S]ince the parents assert for the first time on appeal that the district failed to offer the student a FAPE for the 2012-13 school year because . . . [of] the parent's untimely receipt of the August 2012 IEP . . . , these allegations are outside the permissible scope of review and will not be considered").*

4. This Court, consequently lacks subject matter jurisdiction over this unexhausted claim. *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008).

5. See counter-statements 3 through 4 to Statement 57.

62    **M.P. received a letter from the CSD informing her that the Board of Education had approved the May 10, 2012 CSE recommendations (D-65). She also received the May 10, 2012 IEP (D-8) for review (T: 1254). This IEP was not the final 2012-13 IEP, as reflected in the comments section (D-8, p. 2).**

Response:    Denies as stated. *D-65* does not state that the Board had approved the CSE's May 10, 2012 recommendations, but that it "supported" those recommendations. The May 10, 2012 IEP at *D-8, page 2* states that "[t]he

-25-

committee will reconvene to finalize placement options". The plaintiff parent (M.P.) testified that she received the May 10, 2012 IEP, but did not testify that she received it "for review". *Tr. 1254.* As per *D-112 (June 10, 2012, 7:54 PM, email from plaintiff parent to Mr. Valesey)*, the plaintiff parent acknowledged that supporting the recommendations in an IEP and approval of the IEP are not the same thing.

63      **M.P. sent an email (P-P) stating she wanted corrections made to the IEP (T: 1233, 1255).**

Response:      Denies as stated. The citations to the record in this statement and *P-P* reflect that after receiving the May 10, 2012 IEP at *D-8* and *D-65*, the plaintiff parent sent an email to the CSE's Chairperson, Mr. Valesey, noting that she got a note saying the CSE had approved the IEP and that she wanted the IEP "revised as we discussed"; to which CSE Chairperson Valesey responded (as reflected at *D-8, page 2*): "We weren't done with the plan yet. If you look at the minutes, it likely includes what we discussed at CHS [Carmel High School], and not the most recent meeting at GFMS [George Fischer Middle School]." The May 10, 2012 IEP was followed by a June 6, 2012 IEP (*D-9*) and, following the plaintiff parent's rejection of that IEP, finally an August 30, 2012 IEP (*D-10). FFD-14-16.* As the SRO held, *SRO-14,* , "the evidence in the hearing record indicates that the parents were afforded the opportunity to participate in the development of the August 2012 IEP and to express and present their concerns."

-26-

64     **M.P. expressed concerns about the IEP to Mr. Valesey (T: 273), who testified that the IEP continued to reflect the same program which had been in place earlier, thus showing it did not address Dr. Rissenberg's diagnosis of mild autism spectrum disorder or emotional dysregulation (T: 277).**

Response and Counter-Statement:

Denies, except admits that Mr. Valesey testified that the plaintiff parent expressed concerns about the May 10, 2015 IEP (*D-8*) (*Tr.273-74*), that the June 6, 2012 IEP (*D-9*) reflected the same program that had been proposed in the May 10, 2012 IEP (*D-9*), but that the June 6, 2012 IEP had not recommended a placement because it was considering the information that had been presented and investigating alternative placements, including a new District program in a special class with a staffing ratio of 12:1+2. *D-9*; *Tr. 276-82; FFD-14-15, 19* ("*At the June 6, 2012, IEP because the parent was concerned that the GFMS placement might be inappropriate, the CSE team decided [sic] re*convene *to allow student X an opportunity to visit a CCSD 12:1+2 special class [Exh. 9 at 2] in order to 'test the waters' [trans. 80]) and 21("He stated that the special 12:1+2 class for the 2012-2013 school year was a new program [trans. 287]; however, there was a special class that he wanted the parent to visit at the GFMS in June 2012.*").

1. The IHO found that the new special class program was "a class designed for students with Asperger's and  fragile emotional children taught by a special education teacher; the class included a number of social skills programs to support the children in the class with opportunities to mainstream; there were teaching

assistants to accompany children out of the special class to less restrictive environments (trans. 82-83)." *FFD-20*.

2. See response to Statement 63.

65    **M.P.'s requested corrections were never made and M.P. believes the corrections were not made because the CSD simply did not want to do it (T: 1283-85)**.

Response and Counter-Statement:

Denies and notes that the plaintiff parent admitted that the material she wanted changed was removed from the later IEP (*Tr.1285*), but admits that requested revisions to the May 10, 2012 IEP were not made because that IEP was followed by a June 6, 2012 IEP which itself did not make a placement recommendation pending further developments and, eventually, by a finalized August 30, 2012 IEP. The plaintiff parent's belief is not a material fact warranting this Court's consideration and is irrelevant to the issues before the Court.

1. See response to Statements 63 and 64.

66    **At the June 2012 CSE, M.P. distributed a document describing Non-Verbal Learning Disorder ("NVLD"), the profile of which K.P. fits perfectly (P-A; T: 1246-49; FFD 22).**

Response:    Admits that the plaintiff parent did distribute the document describing NVLD. Denies as unsupported the remainder of the statement as it is based solely upon the layman opinion of the plaintiff parent, but admits that the plaintiff parent did so opine.

67    **M.P. and Dr. Dawn Gorlitsky, school psychologist discussed said document (T:**

-28-

**293-294). However, this is not mentioned anywhere in K.P.'s IEP from that meeting (D-9).**

Response and Counter-Statement:

> The first sentence of this statement is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response. Admits that *D-9* does not specifically refer to the document at *P-A* or to a discussion of *P-A*, but notes that *D-9* does state at page 2 thereof that the CSE was "reconvening to discuss additional information regarding" the plaintiff student. *D-9 at p. 2.* Further, as neither the May 2012 nor June 2012 IEP was the final IEP for the 2012-13 school year, this allegation does not set forth a material fact warranting this Court's consideration and is irrelevant to the issues before the Court.

> 1. See counter-statements 3 through 4 to Statement 57.

68      **Further, the CSE did not discuss how to revise the IEP based on this document (T: 1250).**

Response:      Admits that the plaintiff parent so testified. See response to Statement 64.

69      **M.P. objected to the recommended placement, the class, and the goals discussed in the August 30, 2012 IEP (D-10), which was approved by the Board of Education on September 4, 2012 (D-77) and received by M.P. after the start of the 2012-13 school year (T: 1275).**

Response and Counter-Statement:

> Admits that the plaintiff parent testified that she objected to the recommended placement, the class, and the goals discussed during the

August 30, 2012 CSE meeting and that she received that IEP after the start of the 2012-13 school year, but see response to Statement 61. The allegation concerning the Board having "approved" the August 30, 2012 IEP on September 4, 2012 is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response. See also response to Statement 57.

1. The plaintiffs limited their challenge to the August 30, 2012 IEP in their due process complaint to the proposed special class placement of the plaintiff student as being inappropriate and did not challenge any of the goals set forth for that student in the August 30, 2012 IEP. *D-1.*

2. The plaintiffs' counsel acknowledged during the hearings that there was noting in the plaintiffs' hearing demand about the goals in the IEPs. *Tr. 518*

3. Consequently, the plaintiffs were precluded from litigating before the IHO the issue of whether the August 30, 2012 IEP's goals were appropriate. 20 U.S.C. § 1415(f)(3)(B); *C.F. ex rel. R.F. v. New York City Dep't of Educ.,* 746 F.3d 68, 77-78 (2d Cir. 2014).

4. The plaintiffs did not assert in their appeal to the SRO any claim that the goals in the August 30, 2012 IEP were inappropriate for the plaintiff student (*Petition*) and the SRO did not, consequently, address such a claim. *SRO-1-22.*

5. See counter-statement 4 to Statement 61.

6. See response to Statement 57.

70      **M.P. marked up the May 10, 2012 IEP (D-8) with her objections and errors to be corrected (T: 1234-35).**

Response:      Denies as stated and as unsupported by the record reference cited as required by Local Rule 56.1(d) . According to the transcript pages cited in this statement, the plaintiff parent claims to have marked up certain statements in the May 10, 2012 IEP which she thought were incomplete or as to which she wanted stronger adjectives and that, at Mr. Valesey's request, she sent it to him. There was nothing in the cited testimony that reflected an agreement by the CSE to consider making corrections to the May 10, 2012 IEP itself. Further, as neither the May 2012 nor June 2012 IEP was the final IEP for the 2012-13 school year, this allegation does not set forth a material fact warranting this Court's consideration and is irrelevant to the issues before the Court**.** See response to Statement 63.

71      **These corrections were not made on the June 6, 2012 IEP (D-9; T: 1255)**.

Response:      See response to Statement 65. Further, as neither the May 2012 nor June 2012 IEP was the final IEP for the 2012-13 school year, this allegation does not set forth a material fact warranting this Court's consideration and is irrelevant to the issues before the Court**.**

72      **M.P. followed up with Mr. Valesey in an email (P-P) requesting revisions be made to the IEP (T: 1255-56). The errors M.P. had identified in the May 2012 and June 2012 IEPs were expunged from this IEP (D-l 0);**

Response:      See response to Statements 63 and 65. The claim that "errors M.P. had

identified in the May 2012 and June 2012 IEPs were expunged from this IEP (D-10)" – which the District presumes is a reference to the August 30, 2012 IEP – is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response. Further, as neither the May 2012 nor June 2012 IEP was the final IEP for the 2012-13 school year, this allegation does not set forth a material fact warranting this Court's consideration and is irrelevant to the issues before the Court.

73      **Thus, there was no indication that there was to be a program search nor were the comments included from the previous meetings. The revisions were never made and all of the information that needed revisions in the comments section was removed (D-10; T:1275-76).**

Response:        The allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  See response to Statements 57, 59, 63 and 65. Further, as neither the May 2012 nor June 2012 IEP was the final IEP for the 2012-13 school year, this allegation does not set forth a material fact warranting this Court's consideration and is irrelevant to the issues before the Court.

74      **The CSE did not request M.P.'s consent to perform testing at the May or June 2012 CSE's (T: 1249**).

Response and Counter-Statement:

Assuming this statement is referring to the CSE meetings held on May 10 and June 6, 2013, the District admits that the plaintiff parent so testified.

-32-

1.The plaintiff does not contend the District's alleged failure to request

consent for testing at these CSE meetings constitute a procedural violation

of the IDEA. That issue is not raised in the plaintiff's due process Complaint

and, therefore, could not have been a claim before the IHO. 20 U.S.C. §

1415(f)(3)(B); *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d

68, 77-78 (2d Cir. 2014).

2. The plaintiffs did not assert in their appeal to the SRO any claim that the

failure to request such testing deprived the plaintiff student of a FAPE

(*Petition*) and the SRO did not, consequently, address such a claim. *SRO-1-

22.*

3. See counter-statement 4 to Statement 61.

75     **Mr. Valesey testified that, as of the August 2012 CSE meeting, it had relied on**

**Danbury's 2011 evaluations in determining that George Fischer Middle School**

**("GFMS") was an appropriate placement for K.P. (T: 358).**

Response and Counter-Statement:

Denies as stated. At the cited portion of the transcript, Mr. Valesey testified

that the CSE had relied upon such evaluations and the "exchange of

information that would have happened between the parent and the school

district personnel" (e.g., Dr. Rissenberg's findings at D-36 and the NVLD

document at P-A).

1. See counter-statements 2 and 3 to Statement 50.

76     **CCSD only requested evaluations after learning M.P. was unilaterally placing**

**K.P. at Franklin at the August 2012 CSE meeting, at which point it was too late to conduct evaluations and determine an appropriate placement prior to the start of the 2012-13 school year (T: 1277).**

Response and Counter-Statement:

Denies as stated and as argumentative, but admits that it was at the August 30, 2012 CSE meeting that, although the plaintiff student was already enrolled in and attending classes at the Franklin Academy for the 2012-13 school year, the plaintiff parent first disclosed that she was unilaterally placing the plaintiff student at the Franklin Academy and the CSE recommended evaluations be performed of the plaintiff student, i.e., a Level I assessment[9], a Career Interest Inventory, an AT evaluation and an OT evaluation. *D-10; FFD-17.*

1. Nothing in the August 30, 2012 IEP or otherwise in the record indicates that such evaluations were necessary to determine the appropriate placement for the plaintiff student during the 2012-13 school year. *D-10.*

2. The plaintiff's due process complaint (*D-1*) does not contend that further evaluations were required before August 30, 2012 in order for a determination to be made of an appropriate placement for the plaintiff student for the 2012-13 school year or that the August 30, 2013 IEP was inappropriate in light of the evaluations it was based upon. *D-1.*

---

[9] A Level I assessment is a New York State requirement for children who are turning 15 to have transition plans put in place for them *Tr.86.* In the 2012-13 school year, the plaintiff student (DOB 4/23/98) would have been turning 15 on April 23, 2013. See e.g., *D-10.*

3.The IHO ruled that under 20 U.S.C. § 1415(f)(3)(B) he was, consequently, precluded from hearing evidence as to why the District had not sought evaluations or testing on the plaintiff student be done before the August 30, 2013 CSE meeting. *Tr.350-57.*

4. The SRO did not address any claim of a procedural violation of the IDEA based upon a claim that the August 2012 CSE relied upon outdated or insufficient evaluative information because it was an issue first raised on appeal. *SRO-10 n. 15* (*"[S]ince the parents assert for the first time on appeal that the district failed to offer the student a FAPE for the 2012-13 school year because the August 2012 CSE relied upon outdated or insufficient evaluative information . . , these allegations are outside the permissible scope of review and will not be considered").*

5. See counter-statement 4 to Statement 61.

77    **At the August, 2012 CSE, M.P. believed K.P. needed behavioral intervention in the large public school setting because his emotional dysregulation resulted in behavior that caused him to stay escalated and prevented him from accessing his education, thus impeding his learning; (T: 1280-81).**

Response and Counter-Statement:

Admit the plaintiff parent so testified.

1.The plaintiff parent did not request that a Functional Behavioral Assessment be done prior to or at the time of the August 30, CSE meeting. *Tr.1281.*

-35-

2. At the August 30, 2012 CSE meeting, the CSE recommended a Functional Behavioral Assessment ("FBA") be performed of the plaintiff student and that a Behavioral Intervention Plan ("BIP") be prepared from the FBA. *D-10 at p.* 3.

3. An FBA is specific to the setting of the program in the IEP. *Tr. 719-20; FFD-64* ("[T]he FBA could not take place without student X being present in the district environment.")..

78    **Although Dr. Gorlitsky testified that a behavioral consultant would be available, this is not documented in the IEP (D-10, T: 647).**

Response:    Admits, but as Dr. Gorlitsky testified, the use of the behavior consultant was part of the process that would include the Functional Behavioral Assessment ("FBA") and Behavioral Intervention Plan ("BIP"), each of which are referenced in the IEP. *Tr. 647-48.*

79.    **Although M.P. discussed K.P.'s need for a BIP at the CSE, one was not included in the IEP (D-10, p 4 of 11; T: 1280-1281).**

Response and Counter-Statement:

Denies. See response to Statement 77.

1. The plaintiff's due process complaint did not raise the issue of the District's non-performance or non-inclusion in the August 30, 2012 IEP of a Functional Behavioral Assessment ("FBA") or non-creation or non-inclusion of a Behavioral Intervention Plan ("BIP") as having denied a FAPE to the plaintiff student. *D-1; Tr. 521 ("Mr. Hoffman: . . . . There is nothing*

*in our demand about an FBA or BIP that I can recall."*).[10]

2. Despite acknowledging during the hearing that the plaintiff parent was not raising any issue concerning an FBA or BIP during the hearings (*Tr.521*), the plaintiff parent sought to raise that issue in his post-hearing brief to the IHO. *FFD-64.*

3. The IHO held that the plaintiff parent's due process complaint had not been amended to include such a claim as required by 20 U.S.C. §1415(f)(3)(B) and further held that "I find credible testimony and evidence presented at the hearing that the FBA could not take place without student X being present in the district environment (trans. 719; Exch C). *FFD -64.* See, in conformity*, Cabouli v. Chappaqua Cent. Sch. Dist.*, 202 F. App'x 519, 522 (2d Cir. 2006)

4. The IHO further held that any such failure had been mitigated by other information regarding the student's behavioral issues and supports to appropriately accommodate the plaintiff student's behavioral needs as per *R.E. v. NYC Dept. Of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012). *FFD-65.* See also *C.F. ex rel. R.F.*, 746 F.3d at 80.

---

[10] An FBA is "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment. The functional behavioral assessment . . . shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it". 8 NYCRR § 200.1(r). Based on the information collected in an FBA, a behavioral intervention plan is designed pursuant to 8 NYCRR § 200.22(b).

5. The SRO agreed with the IHO that the plaintiffs had not raised this issue during the proceedings before the IHO, held that the issue was, therefore, being raised for the first time in the appeal before the SRO, and further held that the issue, therefore, could not be considered by the SRO. *SRO-9-10, n.15* (*"[S]ince the parents assert for the first time on appeal that the district failed to offer the student a FAPE for the 2012-13 school year because . . . [of] the CSE's failure to discuss or conduct an FBA or to develop a BIP for the student, these allegations are outside the permissible scope of review and will not be considered"*).

6. See counter-statement 4 to Statement 61.

80.    **Although the CSE comments recommend a Functional Behavioral Assessment ("FBA")and Behavioral Intervention Plan ("BIP") (D-10, comments section; SRO 4, fn 6), this is contradicted in the same IEP wherein the questions "Does the student need strategies, including positive behavioral interventions, supports and other strategies to address behaviors that impede the student's learning or that of others?" and "Does the student need a behavior intervention planT' are both answered with the boxes checked "No" (D-10, p 4).**

Response:       See response to Statement 79.

81    **Accordingly, although the CSE recognized K.P:s need for a FBA and BIP, it did not incorporate this need into his August 30, 2012 IEP as written (D-10).**

Response:       See response to Statement 79.

82    **Further, although the CSE recognized K.P.'s need for a FBA and BIP (D-IO,**

**comments section), it did not perform a FBA or BIP in direct contravention to K.P's needs**.

Response:    The allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  Otherwise, see response to Statement 79.

83    **M.P. requested a FBA from CCSD in the Fall of 2012, but was denied (T: 1281).**

Response:    Admits that the plaintiff parent testified that, after rejecting the August 30, 2012 IEP and unilaterally placing the plaintiff student at the Franklin Academy, in the Fall of 2012, she requested that an FBA be performed while the plaintiff student was attending the Franklin Academy and that she was told that the FBA was "specific to the program that [the CSE] would recommend" for the plaintiff student; that "[s]uch an evaluation can only be done with [the plaintiff student] attending our program." *P-C*.  See also response to Statement 79.

84    **In a letter  (P-C), CCSD informed M.P. that a FBA could not be conducted unless K.P. was enrolled in CCSD, but Mr. Valesey was unable to provide a law or regulation in support of said statement or explain the reasoning to M.P (FFD 64; SRO 4, fn 8).**

Response:    Admits the contents of *P-C*, but the remaining allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Otherwise, see response to Statement 79.

85      **In fact, there is no reason, in either the laws and regulations or practically speaking, that CCSD could not perform a FBA at Franklin by performing appropriate observations of K.P. at Franklin over time.**

Response and Counter-Statement:

> The allegations in this statement are argumentative and unsupported by any record references as required by Local Rule 56.1(d) and, consequently, do not require a response. Further, see response to Statement 79.
>
> 1. As per 8 NYCRR § 200.1(r), an FBA is to determine how the student's behavior relates to the environment in which he is to be educated under the IEP which proposes that an FBA be conducted so that a BIP can be formulated for the student being enabled to successfully navigate the educational environment recommended by the IEP.

86      **CCSD never visited Franklin to conduct a FBA and a CSE was not held to discuss adding a FBA (T: 1281-1282).**

Response and Counter-Statement:

> Admit that the plaintiff parent so testified.
>
> 1. See counter-statements to Statement 79 and counter-statement 1 to Statement 85.

87      **At a CSE in February of 2013, the CSE did not recommend a BIP (D-11; T: 1301-02)**.

Response and Counter-Statement:

> Admits that the parent testified that at that time, the District's CSE did not include in that IEP at *D-11* that the plaintiff student needed a behavioral

intervention or supports to address his behaviors. *Tr. 1301-02.*

1. According to the plaintiff parent, the plaintiff engaged in no discussion with the CSE at the February 2013 CSE meeting as concerned the plaintiff student having any behavioral issues. *Tr.1301.*

2. The plaintiff's due process complaint did not raise the issue of the District's non-performance or non-inclusion in any IEP for the 2013-14 school year of a Functional Behavioral Assessment ("FBA") or non-creation or non-inclusion of a Behavioral Intervention Plan ("BIP") as having denied a FAPE to the plaintiff student. *D-1; Tr.521 ("Mr. Hoffman: . . . . There is nothing in our demand about an FBA or BIP that I can recall."*). See also *SRO-6.*

3. The plaintiffs did not argue before the IHO that the failure of the District to perform an FBA or design a BIP for the plaintiff student for the 2013-14 school year had denied the plaintiff student with a FAPE and the IHO did not address such a claim. *FFD-66-71; SRO-8.*

4. In their appeal to the SRO, the plaintiffs did not contend that the IHO had erred in failing to hold that the failure of the District to perform an FBA or design a BIP for the plaintiff student for the 2013-14 school year had denied the plaintiff student with a FAPE. *Petition at pp.12-15;.*

5. The SRO did not address such a claim. *SRO-17-19.*

6. See counter-statement 4 to Statement 61.

88.    **Although CCSD started classes in early September, M.P. did not receive the**

**final IEP (D-10) until the first or second week of September, after the start of**

**the 2012-13 school year (T: 1291).**

Response and Counter-Statement:

> See Response to Statement 61.

89     **There was no IEP in effect at the beginning of CCSD' s school year (T: 1274-75).**

Response and Counter-Statement:

> The allegations in this statement are argumentative and unsupported by the
> record references cited as required by Local Rule 56.1(d) and, consequently,
> do not require a response.  Also see response to Statement 61.

90     **K.P. was not evaluated by CCSD until Thanksgiving break (T: 1291)**

Response and Counter-Statement:

> Admits that the plaintiff parent testified at *Tr. 1291* that although the
> District's request for certain evaluations was made at the August 30, 2012
> CSE meeting (*D-10*) , they were not completed until the end of November
> because the plaintiff parent did not make the plaintiff student available for
> such evaluations to be performed until he returned from his attendance at
> boarding school during the Thanksgiving break. *Tr.1291.*
>
> 1.The plaintiff's due process complaint did not raise the issue of any delay
in the completion of evaluations called for by the August 30, 2012 IEP (*D-10*)
> as having denied a FAPE to the plaintiff student. *D-1.*
>
> 2. The plaintiffs did not argue before the IHO that the failure of the District
> to perform evaluations of the plaintiff student prior to November of 2012 had

denied the plaintiff student with a FAPE and the IHO did not address such a claim. *FFD-56-66; SRO-6-8.*

3. There was no amendment to the plaintiff's due process complaint. *FFD-64.*

4. The SRO did not address such a claim. *SRO-14-17.*

5. See counter-statement 4 to Statement 61.

91      **M.P. had no choice but to reject the final 2012-13 IEP (D-10), as it was not appropriate to deal with K.P.'s social functioning and need for academic and emotional support (T:1614-16) and thus was not reasonably calculated to confer educational benefit on K.P.**

Response and Counter-Statement:

The allegations in this statement, allegedly based in part upon the testimomy of an expert witness for the plaintiffs (Dr. Rissenberg) are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. CSE Chairperson Lou Valesey, holding multiple degrees and certifications,  and experienced as both a general and special education teacher as well as having served 8 years as the District's CSE Chairperson (*FFD-19*) testified that the August 30, 2012 IEP (*D-10*) provided the plaintiff student with a FAPE and was in the least restrictive environment ("LRE"). *FFD-20 and 21; Tr.88-89, 300 and 426; see also SRO-16.*

2. School Psychologist Dawn Gorlitsky has a Master's degree in school psychology and a doctorate in psychology  and has been a licensed and New

York State certified school psychologist for the past 23 years, has been in private practice for 10 years  and has been employed by the District since 1997. *FFD-21-22*; *Tr. 435-37.*

3. School Psychologist Dawn Gorlitsky testified that the program recommended by the August 30, 2012 IEP would provide the plaintiff student with a FAPE . *FFD-23; Tr.511; see also SRO-16.*

4. Occupational Therapist April DeFrancesco is a holder of a Master's degree in Occupational Therapy ("OT") and special education with a concentration in assistive technology, had worked as an OT provider for a school in Connecticut for 9 years and was employed by the District for 4 years. *FFD-30; Tr. 1053 and 1055.*

5. Occupational Therapist April DeFrancesco testified that the recommended placement for the plaintiff student for the 2012-13 school year (*D-10*) was an appropriate placement for the plaintiff student because he matched many of the profiles of the students in that class  who struggled with the same deficits he struggled from and were emotionally fragile. *FFD-32; Tr. 1106-07.*

6. Special Education Teacher Regina Altman-Rosenbaum, who would be teaching the 2012-13 special education class for which the August 30, 2012 IEP (*D-10*) recommended the plaintiff student's placement (*Tr. 970-71*), has a Master's degree and credits past that degree in special education, elementary education and early childhood education and a New York certification to teach autistic, learning disabled and emotionally handicapped

children (*Tr.948*); she has been teaching for 37 years. *Tr. 948.*

7. Special Education Teacher Regina Altman-Rosenbaum testified that the plaintiff student's placement in her class for the 2012-13 school year would have been appropriate as the plaintiff student would have fit in both educationally and emotionally. *Tr. 971, 974 and 981.*

8. The IHO credited the testimony of the District's witnesses that the placement recommended for the plaintiff student was an appropriate placement for said student and would provide him with a FAPE and found that the 2012-13 IEP (*D-10)* would have provided the plaintiff student with a FAPE. *FFD-60-63.*

9. The SRO found that "the evidence in the hearing record demonstrates the IHO correctly determined that the August 2012 IEP was reasonably calculated to enable the student to receive educational benefits for the 2012-13 school year." *SRO-17.*

92  **K.P. would be in a 12:1:2 self-contained classroom at GFMS. The May and June 2012 IEP's (D-8, D-9) stated K.P. would leave the class of Ms. Rosenbaum-Altman, teacher of the GFMS class, and go into larger mainstream classrooms (T:1012).**

Response and Counter-Statement:

Denies as stated as the May and June 2012 IEPs stated that the plaintiff student would take his core academic classes – English Social Studies, Science and math – in an "Integrated Co-Teaching Services" ("ICT") class (*D-8 and D-9*) which was described as a mainstreaming class co-taught with

a special education teacher and with the plaintiff student accompanied by a teaching assistant. *Tr. 1210.* Further, the contents of the May and June 2012 IEPs are not material and are irrelevant to the issues before the Court.

1. The May and June 2012 IEPs were characterized on their face as non-finalized placement recommendations (*D-8 at page 2; D-9 at page 2*) and neither (as opposed to the August 30, 2012 IEP [*D-10*]) was the final operative IEP for the 2012-13 school year. *FFD-14-17; SRO-13.*

2. The August 30, 2012 IEP does not provide for the plaintiff student to be mainstreamed in his core academic subjects. *D-10 at page 7 of 11.*

3. The program detailed in the May and June 2012 IEPs was not the subject of the plaintiffs' challenge to the program recommended for the plaintiff student by the CSE for the 2012-13 school year; rather it was the program detailed in the August 30, 2012 IEP. *FFD-32-33; SRO-14.*

93      **This was a pilot program (D-l08) developed by Dr. Gorlitsky for NVLD and autistic students (T: 486).**

Response:      The District cannot determine what "This" in the above-statement is referring to. Nonetheless admits that Dr. Gorlitsky described *D-108* as a pilot program that she had worked on with a District occupational therapist, the District's assistive technology coordinator and the teacher of the Bridge program during the summer of 2012 to help students with non-verbal learning disorders and high functioning autism to help improve their executive functioning through assistive technology. *Tr. 486.*

94      **Dr. Gorlitsky testified that, regarding her email on July 27, 2012 (P-M, p2), she was ready to create a prototype to individualize the GFMS program for K.P., evidence of the fact that the program was not individualized to address K.P.'s unique needs at the time it was offered (P-M, p 2; T: 729).**

Response and Counter-Statement:

The allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  Further, the program that was required to address the plaintiff student's needs was that finally set forth in the August 30, 2012 IEP (*D-10*), developed a month after the July 27, 2012 email.

1. See response to Statement 92.

95      **At the May 2012 CSE, Dr. Rissenberg explained that K.P. had emotional dysregulation (T: 1233) and needed support with peer relationships, emotional regulation, understanding what people mean, interactions with peers, functioning and feeling calm in a classroom (T: 1697).**

Response and Counter-Statement:

Admits that Dr. Rissenberg so testified at *Tr. 1698.*

1. Dr. Rissenberg testified that she could not recall whether she recommended a residential placement for the plaintiff student during the May 10, 2012 CSE meeting. *FFD-42; Tr. 1689.*

2. Dr. Rissenberg testified that she could not recall whether she objected to a special class placement in the District for the plaintiff student at the May 10, 2012 CSE meeting. *FFD-42; Tr. 1691.*

3. See response to Statement 75.

*96* **The CSE recommended M.P. and K.P. visit GFMS as a placement option for 2012-13 (T:78-79).**

Response:     The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  The record references cited evidence that, at the May 10, 2012 CSE meeting, the CSE wanted the plaintiff parent to visit GFMS and consider that location as a viable placement option. *Tr.78-79.*

97     **M.P. and K.P. visited the self-contained 12:1:2 classroom at GFMS, recommended by CSD, on June 5, 2012 (T: 1235: FFD 14).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  The cited evidence establishes that the plaintiff parent testified that the CSE Chairperson had introduced the idea of a 12:1:2 self-contained classroom at GFMS at the May 2012 CSE meeting and had suggested that the plaintiff parent visit such a classroom**.** *Tr. 1235***.**

1**.** As the IHO found, the ICT class that was being recommended even as of the June 6, 2012 CSE meeting was not the final IEP placement as there were many questions to answer before determining the appropriate placement and the plaintiffs were thereafter scheduled to visit a special 12:1+1 class. *FFD-59*; *Tr. 265.*

-48-

98      **Mr. Valesey told M.P. that he would inform Dr. Gorlitsky that M.P. was going to bring K.P. to meet her and that Dr. Gorlitsky would reach out to them. However, Dr. Gorlitsky never contacted M.P. (P-P; T: 282)**.

Response:      The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

99      **In fact, Mr. Valesey escorted Plaintiffs to the GFMS classroom on the day that CCSD instructed them to, but GFMS was not expecting them, and the self-contained class that Plaintiffs were supposed to observe was not being taught (T: 80; T: 1237; T: 247).**

Response and Counter-Statement:

Admit that the plaintiff parent so testified as to a June 5, 2012 visit to the GFMS.

1. The June 6, 2012 IEP (*D-9*) indicated that the CSE team would reconvene to allow the plaintiff student an opportunity to visit a District class with a staffing ratio of 12:1+2. *FFD-14-15, 19; Tr. 80.*

2. After the June 6, 2012 CSE meeting, the plaintiff parent and plaintiff student visited special education teacher Rosenbaum-Altman's 12:1+1 special education class at GFMS, during which time the plaintiff student interacted with the students in the class and the plaintiff parent discussed the class's program with teacher Rosenbaum-Altman. *Tr.965-69.*

100      **Mr. Valesey showed M.P. and K.P. around GFMS (T: 80)**.

Response and counter-Statement:

This allegation appears to relate to a June 5, 2012 visit by the plaintiffs to GFMS and to that extent, admits.

1. See counter-statements 1 and 2 to Statement 99.

**101**      **When they arrived for the visit, Ms. Altman seemed shocked to see them (T: 1237) and there was no activity in the classroom whatsoever (T: 247, 1237).**

Response:      Admits that the plaintiff parent so testified, but see response to Statement 99.

**102**      **Curiously, Ms. Altman testified to a completely different set of facts for that day (T: 965-67). M.P. disagrees with Ms. Altman's account of the classroom visit (T: 1236)**

Response:      The allegations in this statement are argumentative and, consequently, do not require a response.  The plaintiff parent's disagreement is irrelevant and non-probative. See response to Statement 103 *infra*.

**103**      **The IHO credited Ms. Altman's testimony as credible but provided no explanation as to why she found it credible (FFD-63)**.

Response:      The allegations in this statement are argumentative and, consequently, do not require a response. Notwithstanding, the IHO, having heard the testimony of the witnesses in her presence, was not required to explain why she credited a disinterested professional special education teacher's version of a meeting with the plaintiffs as opposed to the contrary version of the plaintiff parent, a party seeking that the District reimburse her for substantial tuition payments made to a private boarding school.

-50-

**104**     **The IHO's finding that Ms. Altman's testimony is credible completely ignores the facts.**

Response:     The allegations in this statement are argumentative and unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response.

**105**     **Ms. Altman's testimony is even contradicted by that of her own boss, Mr. Valesey (T:247-49).**

Response:     The allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Mr. Valesy's testimony to which the Statement cites apparently concerns a June 5, 2012 appearance of the plaintiffs at GFMS *Tr. 1235-36; FFD-14* (see Statement 97 above); not the one that occurred after the June 6, 2012 CSE meeting testified to by teacher Rosenbaum-Altman. *Tr.965-69.*

**106**     **Contrary to her testimony, Ms. Altman never informed M.P. of "back mainstreaming," nor did she discuss the peer mentoring program with M.P. (T: 1238).**

Response:     Admits that the plaintiff parent so testified, but the IHO credited the contrary testimony of teacher Rosenbaum-Altman. *FFD-63 ("I credit that she explained that she used 'back mainstreaming' or general students to push into the class to provide role models and to engage in conversation with her class [trans 954].").*

107     **Based on M.P.'s observation of the classroom and discussions with Ms. Altman and Dr. Gorlitsky, it was apparent that GFMS was not an appropriate peer group for K.P. because the students were only K.P.'s peers in terms of age and grade, but not in terms of educational status, emotional dysregulation, or social abilities (T: 1265)**.

Response and Counter-Statement:

Denies, but admits that the content of this statement reflects the self-serving lay opinion expressed by the plaintiff parent at *Tr. 1265*, and asserts that even that opinion was internally contradictory (*Tr. 1265-66).*

1. The plaintiff parent's self-serving lay opinion reflected by this statement was contradicted by the testimony of the District's expert witnesses. *See e.g. FFD-21, 23, 32 and 60; SRO-16; Tr. 90-92, 361, 512, 950-51, 951-52, 960, 962, 971, 981, 1003-04, 1068, 1103* and 1107.

108     **K.P. would be in a mixed classroom with children with different levels of autism, which would not teach him to function socially (T: 1243-44).**

Response and Counter-Statement:

Denies, but admits that the content of this statement reflects the self-serving lay opinion expressed by the plaintiff parent at *Tr. 1243-44.*

1. See counter-statement 1 to Statement 108.

2. The IHO found that the plaintiff "parent's assertion that the proposed special class observed by the parent was not appropriate as it did not provide the type of social functioning student X needed (Exh. 1 at II) was speculative

-52-

and not supported by the testimony of the district's special education teacher and the District's school psychologist." *FFD-60*.

109 **Although K.P. did not have the highest IQ in the class, the children with the highest IQs had lower functioning and social skills. Although K.P. struggles with reading social skills, he is not socially challenged in the same way as the other children in the GFMS class. M.P. believed that CCSD was trying to put K.P. in the classroom as a role model for the other students rather than a peer (T: 1243-44).**

Response and Counter-Statement:

Denies, but admits that the content of this statement reflects the self-serving lay opinion expressed by the plaintiff parent at *Tr. 1243-44*.

1. See counter-statements to Statements 107 and 108.

110 **Plaintiffs were not given a chance to see the proposed George Fischer Middle School ("GFMS") class in session. The record does not support the IHO's finding that "the parent visited the special class in July 2012" (IHO 58).**

Response and Counter-Statement:

The allegations in this statement are argumentative and unsupported by any record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. See response to Statement 99.

111 **Plaintiffs met with CCSD school psychologist Dr. Gorlitsky in her office at the High School in July, 2012 to discuss the GFMS program (T: 508). This was a**

**private meeting between M.P., K.P., and Gorlitsky, not a visit to see the class,**

**and did not constitute parent participation in the decision-making process.**

Response and Counter-Statement:

> As to the first sentence of this statement, denies as stated, but admits that on July 16, 2012, Dr. Gorlitsky met with the plaintiffs at the District's high school and directs the Court to *Tr. 508-09* as to a description of what was discussed at the meeting. As to the second sentence of this statement concerning "did not constitute parent participation in the decision-making process", the allegations in this statement are argumentative and unsupported by any record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

> 1. Concerning "Claims concerning parental participation", the IHO held:

>> I credit the testimony that the parent recalled a discussion with school psychologist on July 16, 2012 and credit her testimony that the school psychologist spent two hours with the parent and student X (trans. 1456; 1460). I credit the testimony that the parent who (sic) recalled that Ms. Gorlisky explained the recommended program for fifteen minutes on July 16, 2012. *FFD-58*.

112    **M.P. brought K.P. to his CCSD evaluations in the Fall of 2012 while the GFMS**

**program was in session (D-37; T: 1287).**

Response:     Admits. *Tr. 1287-88.*

113    **This was the only opportunity K.P. and M.P. had to see the program in action**

**while students were there and academics were taking place (T: 1290).**

Response:     The allegations in this statement are argumentative and unsupported by the

record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response. There is nothing in the record that evidences that the plaintiffs could not have arranged to see this new program in operation any time once it began in September of 2012.

**114**   **A group of four to five children were being read to by an aide and another child was playing video games on a computer. K.P. felt the classroom was like babysitting (T:1288-90).**

Response and Counter-Statement:

As concerns the first sentence of this Statement, admits that the plaintiff parent so described what she observed of the classroom during a brief ten to fifteen minute period. *Tr.1288-90*. As concerns the second sentence in this statement , the allegation that "K.P. felt the classroom was like babysitting" is unsupported by any reliable record reference cited as it is based not upon any testimony from the plaintiff student, but upon an alleged "impression" felt by the student that was allegedly later communicated to the parent.

1. The plaintiffs were only in the class (for an evaluation as per *D-37*) for 10-15 minutes and were during that time occupying the teacher in the evaluation of the plaintiff student. *Tr.1289-90*.

2. According to the plaintiff parent, the plaintiff student was already anxious and exhausted by the time he had arrived in the classroom for the evaluation. *Tr.1290*.

3. Any claim concerning whether the August 30, 2012 IEP would have been

implemented during the 2012-13 school year in a manner that would provide

the plaintiff student with a FAPE had the plaintiff student been educated in

the class program authorized by the August 30, 2012 IEP was rejected by the

SRO and, as the SRO noted, is barred from consideration by the SRO and the

Court in determining the appropriateness of the program for the plaintiff

student in the August 30, 2012 IEP, *SRO-20-21*:

> The Second Circuit has also clarified that, under factual circumstances similar to those in this case, in which the parents have rejected and unilaterally placed the student prior to IEP implementation, "[p]arents are entitled to rely on the IEP for a description of the services that will be provided to their child" (*P.K. v. New York City Dep't of Educ.*, 526 Fed. App'x 135, 141, 2013 WL 2158587 [2d Cir. May 21, 2013]) and, even more clearly, that "'[t]he appropriate inquiry is into the nature of the program actually offered in the written plan,' not a retrospective assessment of how that plan would have been executed" (*K.L.*, 530 Fed. App'x at 87, quoting *R.E.*, 694 F.3d at 187; see *C.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 79 [2d Cir. 2014]). Thus, the analysis of the adequacy of an IEP in accordance with *R.E.* is prospective in nature, but the analysis of the IEP's implementation is retrospective. Therefore, if it becomes clear that the student will not be educated under the proposed IEP, there can be no denial of a FAPE due to the failure to implement the IEP (*R.E.*, 694 F.3d at 186-88; see also *Grim*, 346 F.3d at 381-82 [holding that the district was not liable for a denial of a FAPE where the challenged IEP was determined to be appropriate, but the parents chose not to avail themselves of the public school program]). When the Second Circuit spoke recently with regard to the topic of assessing the district's offer of an IEP versus later acquired school site information obtained and rejected by the parent as inappropriate, the Court disallowed a challenge to a recommended public school site, reasoning that "the appropriate forum for such a claim is 'a later proceeding' to show that the child was denied a free and appropriate public education 'because necessary services included in the IEP were not provided in practice'" (*F.L.*, 553 Fed. App'x at 9, quoting *R.E.*, 694 F.3d at 187 n.3).

In view of the foregoing, the parents cannot prevail on their claims regarding implementation of the August 2012 IEP and the May 2013 IEP because a retrospective analysis of how the district would have implemented the student's August 2012 IEP and the May 2013 IEP at the assigned public school sites was not an appropriate inquiry under the circumstances of this case (*K.L.*, 530 Fed. App'x at 87; *R.E.*, 694 F.3d at 186; *R.C.*, 906 F. Supp. 2d at 273). Here, it is undisputed that the parents rejected both of the assigned public school sites that the student would have attended and instead chose to enroll the student in a nonpublic school of their choosing prior to the time the district became obligated to implement the August 2012 IEP and the May 2013 IEP (see Dist. Exs. 10 at p. 2; 12 at p. 2; 73; 75; 78; 106). Therefore, the arguments asserted by the parents with respect to the assigned public school sites are speculative. Furthermore, in a case in which a student has been unilaterally placed prior to the implementation of an IEP, it would be inequitable to allow the parents to acquire and rely on information that post-dates the relevant CSE meeting and IEP and then use such information against a district in an impartial hearing while at the same time confining a school district's case to describing a snapshot of the special education services set forth in an IEP *(C.L.K. v. Arlington Sch. Dist.*, 2013 WL 6818376, at *13 [S.D.N.Y. Dec. 23, 2013] [stating that in addition to districts not being permitted to rehabilitate a defective IEP through retrospective testimony, "[t]he converse is also true; a substantively appropriate IEP may not be rendered inadequate through testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE"]). Based on the foregoing, the district was not obligated to present retrospective evidence at the impartial hearing regarding the execution of the student's program or to refute the parents' claims (*K.L.*, 530 Fed. App'x at 87; *R.E.*, 694 F.3d at 186; *R.C.*, 906 F. Supp. 2d at 273).

115    **Indeed, Ms. Altman referred to her students as her "babies" (T: 1239-40).**

Response:    This statement is argumentative, has no probative value whatsoever, is not

a material fact warranting this Court's consideration and is irrelevant to the

issues before the Court. Further, notes that the allegation in this statement is

-57-

unsupported by any reliable record reference cited as it is based upon an alleged statement communicated to the plaintiff parent by the plaintiff student and not based upon the knowledge of the plaintiff parent who was in the room at the time. *Tr. 1240.*

116   **Based on what she saw of Ms. Altman's classroom and the conversations she had with CCSD staff during K.P.'s evaluations, M.P.'s opinion was confirmed that it was not an appropriate program for K.P., whose social functioning was higher than what she saw in the students (T: 1290).**

Response and Counter-Statement:

Admits that the content of this statement reflects the self-serving lay opinion expressed by the plaintiff parent at Tr. 1290-91.

1. See response to Statements 108 and 114.

117   **Although Ms. Altman testified that K.P. would be a good fit for her class because of the way "the kids interacted with him," (T: 971) in fact, there were no students interacting with K.P. when he visited the classroom, as described above. Even Mr. Valesey testified to the fact that no students were in the classroom (T: 249).**

Response:   See response to Statements 99, 100 and 105. See also *FFD-60* ("I credit her [special education teacher Altman's] testimony that student X would fit within her class of bright, but very fragile seventh and eighth graders (trans. 952)."

118   **Although Dr. Gorlitsky testified about video modeling, facial recognition**

**techniques, and how assistive technology and counseling would work together with regard to the special class at GFMS, she did not recall any of that being discussed at the August 2012 CSE, nor is it listed on the IEP (D-l0, T: 671-74).**

Response and Counter-Statement:

Denies as stated. Dr. Gorlitsky testified that these things were discussed with the plaintiff parent at CSE meetings and otherwise, but could not recall specifically if they were discussed at the final August 30, 2012 CSE meeting, which she testified primarily addressed the issue of the placement of the plaintiff student, rather than the program; that the use of, for example, video modeling and other methodologies she uses were not specifically listed on the IEPs because they are methodologies that she uses as part of her counseling, as provided under the IEPs prepared for the plaintiff student; that such methodologies are not usually specified in an IEP. *Tr. 671-76.*

1. The IHO held, *FFD-66: "*I credit the testimony of the school psychologist and I find that the August 30, 2012, IEP provided the supports including individual and group counseling as well as weekly meetings with the parents and assistive technology and psychological consultation meeting (Exh. 10 at 9, 10) to allow the teams working with student X to build a rapport because he had had past difficulties in various settings (trans 477)."

119    **Although Dr. Gorlitsky testified regarding motivating students like K.P., the structure of the GFMS classroom, and an aide, those topics were not discussed at the August 2012 CSE meeting (T: 684-86).**

Response and Counter-Statement:

Denies.

1.      Dr. Gorlitsky testified that the topics described in this statement were

discussed with the plaintiff parent at CSE meetings and otherwise

prior to August 30, 2012, but could not specifically recall if they were

all discussed at the August 30, 2012 CSE meeting, but that discussed

on August 30, 2012 were accommodations in the classroom, the

CSE's recommendations, class size and the classroom environment;

that, at that CSE meeting, they went through the IEP. *Tr. 684-87.*

2. The IHO held, *FFD-58:*

> I find that testimony adduced at the hearing revealed parent
> participation in the May 10, 2012 and the June 6, 2012 IEP
> meetings as I credit that the parent visited the special class in
> July 2012. I credit the testimony that the parent recalled a
> discussion with school psychologist on July 16, 2012 and
> credit her testimony that the school psychologist spent two
> hours with the parent and student X (trans. 1456;1460). I
> credit the testimony that the parent (sic) who recalled that Ms.
> Gorlisky explained the recommended program for fifteen
> minutes on July 16, 2012. . . . I find that the record
> established that on August 30, 2012, the CSE team considered
> the parent's concerns about student X's social and emotional
> functioning. I find that the CSE team considered how the
> student's social issues impacted his functioning and
> recommending special education services from a special
> education teacher to support the student throughout the day
> as well as substantial related services including individual
> and group counseling  I find the parent participated in the
> CSE meeting and in the development of the IEP.

120   **Dr. Gorlitsky's testimony (T: 671-74, 684-86) is retrospective in that it was not
      discussed at the CSE or listed on the IEP (D-10)**.

Response:        The allegations in this statement are argumentative and unsupported by the
                 record references cited as required by Local Rule 56.1(d) and, consequently,

do not require a response. As noted above, Dr. Gorlinsky's testimony established that the contours of the program reflected by the August 30, 2012 IEP (*D-10*) were discussed with the plaintiff parent either before or at the August 30, 2012 CSE meeting. Further, even if all the practices under the program reflected by the IEP were not discussed at the August 30, 2012 CSE meeting or separately listed on the August 30, 2012 IEP as, for example, the methodologies used by the counselor who would be providing the counseling provided for by that IEP, that does not mean that an explanation in testimony concerning what is provided under the particulars in the IEP is retrospective evidence where, as here, that testimony does not reflect services that are not provided under the IEP. That testimony is not a prohibited effort to rehabilitate a defective IEP through retrospective testimony.

121    **GFMS utilized Integrated Co-teaching ("ICT") in K.P.'s core academic classes, science, math, English, social studies. K.P.'s IEP also lists group counseling once per week (D-8, D-9)**.

Response:    "GFMS" is the District's middle school; not a program devised in an IEP for the plaintiff student; consequently this statement makes no sense as written. In any event, the allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Neither *D-8* nor *D-9* are the IEP for the 2012-13 school year at issue in this case; rather the IEP at issue is that dated August 30, 2012 (*D-10*). *D-8, page 2 ; D-9, page 2; D-10; SRO-14-17; FFD-16-17, 33,* 56, 59 ("[T]he ICT class recommended in the IEP dated June 6, 2012 [*D-9*] was not the final IEP as there were many questions to answer before determining the appropriate placement (trans. 265) and the parent and student X were scheduled to visit the special 12:1+1 class."), 61 and 65-66; *Tr. 265*. See also response to Statements 63 and 64.

122    **ICT is inappropriate and insufficient for K.P. (T: 1595), as it fails to sufficiently and appropriately address his social and emotional issues, which severely affect his academics (T: 1591)**.

Response:    The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Further, this allegation and its supports relate to the May 2012 IEP (*D-8*), which is not the IEP at issue. See response to Statement 121.

123    **Moreover, ICT classes would force K.P. into the large school environment (T: 291-92), which is inappropriate for K.P. due to his social and emotional issues.**

Response:    The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Further, this allegation relates to the May 2012 IEP (*D-8*) or June 2012 IEP (*D-9*), neither of which is the IEP at issue. See response to Statement 121.

124    **Mr. Valesey testified that GFMS was a "school within a school" (T: 289-90), meaning it was streamlined and student-friendly, stating this addressed M.P.'s concern that GFMS was too large (T: 291-92). However, none of this discussion**

**is documented in the CSE minutes (D-8, D-9, D-l 0).**

Response and Counter-Statement:

>Admits that Mr. Valesey testified as to the restructuring of the GFMS building administration during the summer of 2012 and that it created a more stream-lined and student-friendly environment for GFMS students. *Tr.83-85 and 291-92.* Mr. Valesey did not, however, testify that this restructuring itself addressed the plaintiff's parent's alleged concern that GFMS was too large to accommodate the plaintiff student's needs, but rather that the restructuring was "relevant" to the plaintiff parent's expressed concern that GFMS was too large a place. *Tr.291-92.* Admits that the building restructuring is not specifically referred to in the IEPs, but denies that it needed to be as it was not a program or service designed or furnished specifically for the plaintiff student's IEP, but was instead simply a function of the placement of the plaintiff student in a class at GFMS, which is referenced in the August 30, 2012 IEP (*D-10 at page 1).*

>1. Mr. Valesey testified that the "school within a school" was discussed at a CSE meeting with the plaintiff parent, but he could not recall at which CSE meeting it was discussed. *Tr. 394 and 396.*

>2. The plaintiffs do not point to anywhere in the record in which the plaintiff parent testified that the "school within a school" was never discussed at a CSE meeting at which the plaintiff was present. *See plaintiff 's Rule 56.1 Statement.*

>3. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by virtue of not stating in the August 30, 2012 IEP (*D-10*) or having discussed with the plaintiff parent the "school within a school" restructuring of the GFMS during a CSE meeting. *D-1.*

>4. There was no amendment to the plaintiff's due process complaint. *FFD-64.*

>5. The IHO held that the "special class provided a smaller, more nurturing environment for students grades 7-8 and that the special class was designed to function as a school within the middle school for the 2012-2013 school year". *FFD-60.*

125     **Mr. Valesey did not recall which CSE meeting GFMS as a "school within a school" was discussed at, and in fact, this was never discussed (T: 289-90).**

Response and Counter-Statement:

>The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

>1. See response to Statement  124.

>2. See July 26, 2012, 2:34 PM, email from Director of Pupil Services Christine Chambers-Szafranski to Dawn Gorlitsky and Regina Rosenbaum-Altman, with cc to Louis Valesey at *D-112* (*"I also mentioned [to the plaintiff parent] the new structure at GF administratively, and that your office Dawn is moving in proximity to where your students will be."*).

126    **Mr. Valesey also did not recall if the CSE discussed where the special class was in relation to other departments or areas of the school (T: 396-97). Indeed, K.P. would still have to navigate through the large school when he went into the mainstream classes for his core classes and specials, thus leaving the "school within a school" environment (T:408-10).**

Response and Counter-Statement:

> The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. K.P. would not have to leave his special education class for his core subjects under the August 30, 2012 IEP, as opposed to the May and June 2012 IEPs. Compare *D-8 and D-9 to D-10; FFD-59*. See also response to Statement 125.
>
> 1. The plaintiffs did not assert in their due process complaint (*D-1*) that the August 30, 2013 IEP (*D-10*) had denied the plaintiff student a FAPE based upon a claim that the plaintiff student would have to navigate through the large school when he went into mainstream classes for his core classes and specials, thus leaving the "school within a school" environment. *D-1 at pages 9-12*.
>
> 2. There was no amendment to the plaintiff's due process complaint. *FFD-64*.
>
> 3. The IHO held that the "special class provided a smaller, more nurturing environment for students grades 7-8 and that the special class was designed to function as a school within the middle school for the 2012-2013 school year". *FFD -60*.

127    **Aside from a class profile, M.P. was provided no documentation on the GFMS class (D-112, p 13; T: 507, 1261-62, 1461). Mr. Valesey never provided a document describing the GFMS program for the 2012-13 school year and, to his knowledge, no such document exists (T: 243).**

Response and Counter-Statement:

> The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Concerning *D-112*, there are no pages denominated as page 13 and nothing in *D-112* appears to support the allegations in this statement.
>
> 1. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by failing to provide documentation to the plaintiffs as to the class and/or program in which the plaintiff student would have been placed pursuant to the August 30, 2012 IEP (*D-10*). *D-1*.
>
> 2.There was no amendment to the plaintiff's due process complaint. *FFD-64*.
>
> 3. The SRO did not address such a claim. *SRO-14-17*.
>
> 4. See counter-statement 4 to Statement 61.

128    **A major obstacle to K.P.'s self-sufficiency is his emotional dysregulation, which prevents him from making educational progress and negatively affects his interactions with peers (T: 1589, 1591).**

Response:    The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a

response.

129 **At the June 6, 2012 CSE, M.P. voiced concern that the program would not address K.P.'s emotional dysregulation (T: 1245-46). At this meeting, Mr. Valesey repeatedly referred to K.P. as emotionally fragile (T: 1246-49) despite the fact that Dr. Rissenberg had explained emotional dysregulation at the previous CSE (T: 1233).**

Response and Counter-Statement:

The allegations in this statement are argumentative and, except for the claim that Mr. Valesey repeatedly referred to K.P. as emotionally fragile (*Tr. 1247-48*) (which it is admitted the plaintiff parent so testified), unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. The testimony cited at *Tr.1245-46* appears to refer to the May 2012 CSE meeting; not the June 6, 2012 CSE meeting.

1. In their opening statement before the IHO, the plaintiffs' counsel themselves referred to the plaintiff student as "emotionally fragile". *Tr.1178 ("You will hear testimony from petitioners and examine documentary evidence throughout his academic career K. was emotionally fragile and had great difficulty navigating social situations with peers.")*.

2. During his testimony before the IHO, Mr. Valesey properly described what he meant by use of the term "emotionally fragile" as applicable to the plaintiff student.

*Tr. 284-85*.

3. Dr. Rissenberg did not testify that the term "emotionally fragile" was inapplicable to the plaintiff student, but only that she lacked an understanding of what that term meant. *Tr. 1584*.

4. In her April of 2012 Neuropsychological Assessment of the plaintiff student, Dr. Rissenberg concluded that the student was in need of "increased . . . emotional . . . support." *D-36 at page 5*.

5. District Occupational Therapist De Francesco testified before the IHO that the plaintiff student "matched many of the students' profiles who were already in the [proposed 2012-13 12:1+2] class and it's a highly structured class that addresses both academic and **fragile emotional needs**, and he seemed -- you know -- in the short

time that I had the opportunity to sit with him, **he really matched that profile**." **Emphasis** added. *Tr.1107.*

6. School Psychologist Dr. Gorlitsky testified before the IHO that the plaintiff parent had reported at the June 2012 CSE meeting as to the plaintiff student's "social sensitivities and weaknesses and difficulties relating to others and his perception of not fitting in" and that "it wasn't so much an emotional disturbance" and that "it left him fragile in a social situation." *Tr. 467-68.*

7. Franklin Academy learning specialist Joule Bazemore, a parent witness (*Tr.2171*), testified that the plaintiff student's "emotional status" during the 2012-13 school year was that he was "a very fragile student . . . emotionally" *(Tr. 2324)* and the IHO acknowledged that testimony. *Tr 2333 ('She certainly described the student as emotionally fragile.").*

130    **M.P. tried to redirect Mr. Valesey towards understanding that K.P. has emotional dysregulation, which is different from emotional fragility, but the CSE did not understand (T: 1246-49, 1293-94).**

Response and Counter-Statement:

Admit that the plaintiff parent testified in consistency with this statement, but denies as argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) that the CSE dis not understand; that that claim, consequently, does not require a response.

1. See counter-statements 1 through 7 to Statement 129.

131     **There was no documentation provided to M.P. on what emotional support would have been available to K.P. (T: 368-69, 1266-67).**

Response and Counter-Statement**:**

Denies. The IEPs provided to the plaintiff parent, including that dated August 30, 2012 (*D-10*)**,** constitutes the documentation of the emotional support to be provided to the plaintiff student. See e.g., *D-10 at pages 1 (psychological counseling services, both individual and small group), 2 ("support of psychological counseling"; "interaction with non-disabled peers is limited to specials and lunchtime"; "a functional behavioral assessment and behavioral improvement plan are recommended"), 7 of 11 (Psychological Counseling, etc. ), 10 of 11 ("Kai will not interract with non-disabled peers in his academic special classes")*

1. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by failing to provide documentation to the plaintiffs as to the emotional support which would have been available to the plaintiff student had he been placed pursuant to the August 30, 2012 IEP (*D-10*). *D-1.*

2. There was no amendment to the plaintiff's due process complaint. *FFD-64.*

3. The SRO did not address such a claim. *SRO-14-17.*

4. See counter-statement 4 to Statement 61.

132     K.P. was evaluated by Dr. Rissenberg (T: 1230), a Neuropsychologist with a private

practice specializing in adult and pediatric clinical neuropsychology in April of 2012 (T: 1558; D-36; FFD 13; SRO 7).

Response:        Admits.

133        **Dr. Rissenberg focuses the majority of her practice on conducting neuropsychological diagnostic assessments (T: 1561). Children make up 75% of her practice (T: 1559-60) and she attends about 10 CSE meetings per year (T: 1561). Dr. Rissenberg has professional experience as an educator, having taught psychology at the University level (P-Z).**

Response:        Admits as to all but last sentence. The allegations in the last sentence of this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

134        **Dr. Rissenberg's report (D-36) emphasized the importance of addressing K.P.'s emotional dysregulation, as this issue has a major impact on his ability to access his education and derive educational benefit (T: 1587-88).**

Response:        The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response**.** Dr. Rissenberg's report makes no mention of "emotional dysregulation." *D-36. See also Tr. 1736.*

135        **Emotional dysregulation is indicated on page three of Dr. Rissenberg's report (D-36), where Dr. Rissenberg documents that K.P. has isolated episodes of intense**

emotion, he has always demonstrated emotional sensitivity and intensity, and has trouble sleeping (T:1736).

Response:     Denies as stated. Dr. Rissenberg, in response to an inquiry from the IHO as to what in the report at *D-36* indicates emotional dysregulation or emotional regulation, testified that on page 3 of *D-36* as concerns the above-stated symptoms and "that: The findings are consistent with mild autism spectrum disorder along with some mood instability in the context of above average intellectual capacity." *Tr. 1736.* She does not there testify that the symptoms are consistent with a diagnosis of "emotional dysregulation."

136   **Dr. Rissenberg testified that she had concerns over the proposed placement at GFMS (T:1606), as the population at GFMS would be disruptive for K.P. (T: 1601-02) and the placement would exacerbate his fear of the classroom (T: 1628).**

Response and Counter-Statement:

Admits that Dr. Rissenberg so testified based upon the information provided to her by the plaintiff parent.

1. Dr. Rissenberg had no knowledge as to how the GFMS was configured in terms of potential plaintiff student interactions with students from outside his special education class under the August 30, 2012 IEP (*D-100*). *Tr. 1607.*

2. Dr. Rissenberg had never visited the GFMS or visited the program in which the plaintiff student would have been placed under the August 30, 2012 IEP (*D-10*) and

had no recollection of having discussed that program with any GFMS instructional staff. *Tr. 1700-01.*

3. See response to Statement 91.

137   **According to Dr. Rissenberg, emotion interferes with cognition, thinking, attention and learning. K.P. being fearful about statements made by peers puts him in an emotional state in the classroom that is not conducive to learning (T: 1591-92).**

Response:   Admits that Dr. Rissenberg so testified.

138   **Despite the information in Dr. Rissenberg's report (D-36) and Dr. Rissenberg's input at the May 2012 CSE meeting, CCSD failed to place K.P. in a program that provides support for emotional dysregulation and social functioning.**

Response:   The allegations in this statement are argumentative and unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response**.**

139   **In fact, Ms. Altman, the teacher for the proposed GFMS program, has taken no courses or training related to emotional dysregulation (T: 993).**

Response and Counter-Statement:

Admits, but notes that there is no evidence in the record of such courses or training.

1. See counter-statement 6 to Statement 91.

140     **Plaintiffs strongly disagree with the IHO's and SRO's decision regarding tuition**

        **reimbursement for the 2013-14 school year (FFD 66; SRO 19).**

Response:     The allegations in this statement are argumentative and unsupported by the

              record reference cited as required by Local Rule 56.1(d) and, consequently,

              do not require a response**.**

141     **MP provided authorization for CCSD to observe K.P. at Franklin in**

        **preparation for creating the 2013-14 IEP (P-W, D-9; T: 1302-04, 2365-71, 2379-**

        **82)**.

Response:     Admits.

142     **Dr. Gorlitsky and Michael Murphy, special education teacher at CCSD, arrived**

        **late for the observation (T: 689-90, 835-36) and Dr. Gorlitsky was absent for**

        **part of the observation of K.P.'s class. Dr. Gorlitsky did not take notes of her**

        **observation (T: 699).**

Response:     The allegations in this statement are argumentative and unsupported by the

              record references cited as required by Local Rule 56.1(d) and, consequently,

              do not require a response**.**

143     **Although Mr. Murphy was to determine what kind of program at CCSD would be**

        **appropriate for K.P., (T: 878), he did not ask questions about Franklin's approach**

        **to students with NVLDs (T: 885) and his documentation of the observation (P-L,**

T: 838-39) does not describe the Franklin program or how Franklin dealt with the emotional component of KP's program (T: 886-87).

Response:      Denies as stated. See *Tr. 886 (responding to a question as to whether he discussed any of the plaintiff student's emotional issues, Mr. Murphy testified that the Franklin Academy staff spoke of how their program was run and "how they kind of met with" the plaintiff student's emotional issues), 877-78 and 882-88*. See also *FFD-27 ("On cross, Mr. Murphy recalled a discussion of the daily life at the FA including morning meeting, team leadership meetings and classroom work during his observation on April30, 2013 (trans. 884) . He recollected that a discussion of the ways the entire program at the FA met student X's emotional needs (trans. 886). He stated that be learned from the FA staff that student X's functioning levels were strengths in math and science and weaknesses in writing due to the dyslexia and dysgraphia (trans. 897)."*)

144    **Although he testified that he would have liked more time in the academic program, neither Mr. Murphy nor Dr. Gorlitsky requested consent to return to Franklin (T: 817-18, 889), nor did they ask M.P. to request more time for the observation (T: 706-07). Thus, they did not attempt to ascertain what K.P. requires in a program in order to make progress.**

Response and Counter-Statement:

Denies as stated as to first sentence of this statement. Mr. Murphy stated that though he would have liked more time observing the plaintiff student's academic class at

Franklin Academy, he thought that he and Dr. Gorlitsky had "adequate enough time." *Tr.889.* The allegations in the second sentence of this statement are argumentative and unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response.

**1.** The staff of the Franklin Academy did not allow Dr. Gorlitsky and Mr. Murphy to engage in additional observations of the plaintiff student. *Tr. 525.*

145    **At the May 14, 2013 CSE, the Franklin observation and placement for 2013-14 were discussed (T: 1307).**

Response:    The allegations in the second sentence of this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

146    **It was clear that Mr. Murphy and Dr. Gorlitsky did not focus their observation on Franklin's program and had not assessed what kind of program KP fit into (T: 1307-1311).**

Response and counter-Statement:

The allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. Dr. Gorlitsky testified as to she and Mr. Murphy addressing the Franklin Academy's program and what kind of program would meet the plaintiff student's needs at the May 14, 2003 CSE meeting. *Tr.527-29.*

2.The IHO credited Dr. Gorlitsky's testimony (i.e., that of the "school psychologist who attended the IEP meeting on May 14, 2013") who "recalled a discussion of student X's present levels functioning. in terms of academics, cognition, and social/emotional skills" and found "that the FA staff members reported that student X had highly adaptive behavior skills and that student X was doing very well using assistive technology with his academics in reading, writing, math and science." *FFD-67.* See also *FFD-68.*

147   **Mr. Murphy spoke extensively about the beauty of the Franklin campus and how nice everyone was, providing no information about Franklin's mission or philosophy, the teachers' training, nor the academic, emotional or social support provided at the school (T: 1307-1311).**

Response and Counter-Statement:

Denies. See response to Statement 146.

1. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by failing to provide information about Franklin's mission or philosophy, the teachers' training, nor the academic, emotional or social support provided at the school during the May 14, 2013 CSE meeting for the 2013-14 IEP. *D-1.*

2.There was no amendment to the plaintiff's due process complaint. *FFD-64.*

3. The SRO did not address such a claim. *SRO-14-17.*

4. See counter-statement 4 to Statement 61.

148 **Dr. Gorlitsky discussed the fact that she was late for the observation, so they missed the first of two classes they were to observe. She also discussed how beautiful the campus was. Aside from her description of the lesson being taught, she said nothing about the fundamentals of the Franklin program (T: 1307-1311).**

Response:    See response to Statement 147.

149 **At the May 14, 2013 CSE meeting, Mr. Valesey discussed the High School Bridge Program that CSD was recommending for 2013-14 (T: 1307-11)**.

Response:    The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

150 **M.P. was once again provided no description of the program at this CSE (T: 905). In fact, CCSD did not even provide MP with a class profile for the 2013-14 Bridge program (T:1312)**.

Response and Counter-Statement:

Denied. *Tr. 405-06, 544-45, 716-19, 721-23, 725, 738-39, 742-43, 753, 850-57, 899, 903-04,  905, 906-07 and 918*; *FFD-24-25 and 26.*

-74-

1. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by failing to provide a description of the proposed 2013-14 program for the plaintiff student or to provide the plaintiffs with a class profile for the classes in which the plaintiff student would be placed under the 2013-14 IEP. *D-1.*

2. There was no amendment to the plaintiff's due process complaint. *FFD-64.*

3. The SRO did not address such a claim. *SRO-14-17.*

4. See counter-statement 4 to Statement 61.

151   **Mr. Valesey discussed opportunities for K.P. to participate in after-school activities and sports even though M.P. pointed out that K.P. had a history of being unable to work with his peers in such activities. When MP asked what de-escalation strategies were utilized by the Bridge Program for emotionally dysregulated students, she was told that they would be removed from the room and taken to the principal or guidance counselor (T:1307-11).**

Response and Counter-Statement:

Denies as stated and refers the Court to the content of the plaintiff parent's cited testimony for its true and accurate content.

1. The May 14, 2013 IEP states (under "Coordinated Set of Transition Activities", under "Community Experiences") that the plaintiff student "participates in sports at school. He will be offered clubs and activities that interest him while in school." It

does not mandate that he participate in clubs or after-school activities during the 2013-14 school year. *D-12 at page 11 of 12.*

2. The social clubs and activities available to the plaintiff student as general education opportunities for the plaintiff student to socially interact in the Bridge Program with other students provided for under the May 14, 2013 IEP included a book club, a rock club, a science club and a yearbook club, among others; there were also clubs, such as the buddies club, specifically designed to bring disabled students and non-disabled students together. *Tr.866 and 867; FFD-27.*

3.The plaintiff student's emotional difficulties had been reported to have ameliorated during the 2012-13 school year sufficiently to permit consideration of his participating with peers in after school activities during the 2013-14 school year. *Tr. 401-03 and 747; D-12 at page 2 (the plaintiff parent "feels that he has done very well in this setting, making strong progress both academically and socially. He appears to be making good progress without emotional distress.").*

3. The plaintiff student engaged in conduct at the Franklin Academy which substantiated a capability to engage in after-school activities with his peers. *Tr.1422-23; FFD-49.*

4. The May 14, 2013 IEP states under "Social Development" that "[p]er current teachers report and comments, [plaintiff student] appears to be interacting appropriately"; that the "staff at Franklin Academy reported (3/2013) that [said student] . . . has developed fair relationships with peers" and that they "would like for him to develop deeper relationships with . . . peers"; that the plaintiff student is

-76-

"a playful student who will try to contribute socially"; that he "has an interest in animals, particularly birds and horses" and "would like to be a falconer"; that the staff at the Franklin Academy reported on 3/2013 that when compared to his peers, the plaintiff student was a "leader", "friendly", "cooperative", "kind" and "well-liked"; that the Franklin Academy's staff reported on 3/2013 that the plaintiff student "needs to work on developing stronger relationships with peers" *D-12 at pages 4 of 12 and 5 of 12.*

5. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by providing in the May 14, 2013 IEP that the plaintiff student would be offered clubs and activities that interest him or that the method to be utilized as a de-escalation strategy would be removal of the plaintiff student from a class. *D-1.*

6. There was no amendment to the plaintiff's due process complaint. *FFD-64.*

7. The SRO did not address such claims. *SRO-14-17.*

8. See counter-statement 4 to Statement 61.

152 **M.P. was concerned that the CSE members did not know what she meant by deescalation strategies and continued to misunderstand emotional dysregulation. M.P. believed that when Mr. Murphy testified, he said that his training in de-escalation amounted to physical management training, which is restraining children. This is different from understanding how to work in the moment with a student who is having emotional dysregulation. M.P. also**

**expressed concern with moving K.P. from a small environment into a large school and putting him into an ICT class (T: 1314-15)**.

Response:      Admits that the plaintiff parent so testified.

153    **Despite M.P.'s concerns, the CSE did not explain how the Bridge Program would address K.P.'s NVLD or Asperger's, nor did it provide any information on how it would deal with K.P.'s emotional dysregulation (T: 403-04).**

Response and Counter-Statement:

Denies as stated and refers the Court to the content of the cited testimony for its true and accurate content, as well as *Tr. 405-06, 544-45, 716-19, 721-23, 725, 738-39, 742-43, 753, 850-57, 899, 903-04,  905, 906-07 and 918*; *FFD-24-25 and 26*.

1. See response to Statements 146 and 150.

2. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by failing to explain how the Bridge Program would address K.P.'s NVLD or Asperger's, or failing to provide any information on how it would deal with K.P.'s emotional dysregulation . *D-1.*

3. There was no amendment to the plaintiff's due process complaint. *FFD-64.*

4. The SRO did not address such claims. *SRO-14-17.*

5. See counter-statement 4 to Statement 61.

154    **M.P. received no written materials about the program and had never heard of it prior to the CSE meeting. According to the CSE's discussion, M.P. ascertained that the GFMS program that had been recommended for K.P. in the 2012-13 school year simply funneled its students straight into the Bridge Program (T: 1313-14), indicating that the CSE did not consider K.P.'s unique needs in coming up with this placement.**

Response and Counter-Statement:

Denies as stated, though admits that the plaintiff parent offered testimony at *Tr. 1313-14* on this subject and refers the Court to that testimony for its complete and accurate content as to the plaintiff parent's perception. However, the written May 14, 2013 IEP provided to the plaintiff parent itself describes the recommended program. *D-12.* As concerns the statement referring to the CSE not considering "K.P.'s unique needs", the statement is argumentative and unsupported by any record references as required by Local Rule 56.1(d) and, consequently, does not require a response.

1. The program prepared for the plaintiff student in the May 14, 2013 IEP was designed to address the plaintiff student's particular academic and emotional needs. *Tr.784-789, 794-95, 847, 852-53, 854, 855 and 858; FFD-25, 26, 27and 67; SRO-17-19.*

2. The bridge program at the District's high school is a program that is tailored for each individual student to meet each individual student's needs. *Tr. 850-51.*

3. The plaintiffs did not assert in their due process complaint (*D-1*) that the CSE had engaged in a procedural or other violation of the IDEA by failing to provide written materials to the plaintiffs concerning the recommended program for the plaintiff student's 2013-14 school year or because the high school bridge program accepted students who were in the program recommended for the plaintiff student's 2012-13 school year. *D-1*.

4. There was no amendment to the plaintiff's due process complaint. *FFD-64*.

5. The SRO did not address such claims. *SRO-14-17*.

6. See counter-statement 4 to Statement 61.

155   **M.P. informed the CSE that they had not answered any of her questions or concerns about the program, it sounded similar to the GFMS 12:1:2 class that she had rejected in 2012-13, she did not have any information on it, and she did not feel it was appropriate for K.P. (T: 1314-15).**

Response:   Admit that the plaintiff parent so testified, but deny that the plaintiff parent asked questions to which answers were not given. *Tr. 403 and 899-904; see also Tr. 405-06, 544-45, 716-19, 721-23, 725, 738-39, 742-43, 753, 850-57, 905, 906-07 and 918* and *FFD-24-25 and 26*.

156   **The 2013-14 CSE meeting ended with the CSE recommending the Bridge Program despite all of M.P.'s unaddressed concerns (T: 1307-1311).**

Response:   See response to Statement 155. Admits that the CSE recommended the program set forth in *D-12*.

157     **Again, none of M.P.'s input was taken into account and the CSE failed to address M.P.'s concerns.**

Response:     The allegations in this statement are argumentative and unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response.

158     **In a letter dated June 18, 2013 (D-106), M.P. rejected the May 14, 2013 IEP as inappropriate and informed the CSE that K.P. would attend Franklin in 2013-14 (T: 1323; SRO 5).**

Response:     Admits.

159     **The Bridge Program, a 12:1:2 program (D-12), is similar to the GFMS program (D-10) that M.P. had previously rejected (T: 1314-15).**

Response:     The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Notwithstanding, admits that the high school bridge program is similar to the 12:1:2 bridge program in the GFMS to the extent described by Dr. Gorlitsky. *Tr. 537-38; FFD-67.*

160     **The program, which takes place within the CCSD high school, is too large of an environment for K.P. since he becomes overwhelmed and struggles socially in such large environments (T: 1314-15).**

Response: Denies. *FFD-68; Tr.114-16, 540-41, 721-23 and 724.*

161   **Even though K.P. would allegedly not have to go far to get to his classes or services at the high school, M.P. was still concerned because it was a large, loud, stress-inducing environment (T: 1316).**

Response:      Admit that the plaintiff parent so testified as to her concern, but denies the validity of that concern. *FFD-68; Tr.114-16, 540-41, 721-23 and 724*.

162   **While Mr. Murphy taught in his classroom, an aide would take K.P. to his specials and lunch in the larger high school environment (T: 1316-17).**

Response:      The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  Notwithstanding, notes that in the program the plaintiff student would have an option for lunch which would permit him not to eat in the school cafeteria if he so chose, or to schedule his lunch when the cafeteria would likely be largely unoccupied or to have his lunch period scheduled for his last period of the day so that he could instead leave school for lunch. *Tr.722-23.*

163   There is no mention of shadowing, the school's size or alternate settings in the comments section of the IEP (T: 723).

Response:      Admits that these matters are not specifically identified in the comments section of the May 14, 2013 IEP (*D-12 at page 2*), but notes that these matters were discussed during the CSE meeting (*Tr.723*) and that the general language in the comments section of the May 14, 2013 IEP encapsulates such

discussions. *D-12 at page 2 (i.e., "Transition plan was reviewed" and "related services were also recommended").*

164    **To address K.P.'s executive functioning and other deficits, the CSE discussed the use of technology and iPad carts (T: 1320-21) and stated homework would be emailed home every night so M.P. could do his homework with him. Rather than fostering independence in K.P. and finding ways to help with his executive functioning, they would expect M.P. to take care of it and become K.P.'s homework tutor (T: 1321-22).**

Response:    This allegation's last sentence is argumentative and, consequently, does not require a response. Otherwise, admits that the plaintiff parent so testified, but notes that the IEP makes no reference to the plaintiff parent assisting the plaintiff student with homework. *D-12.*

165    **The CSE did not address M.P.'s concerns that this would not improve K.P.'s executive functioning deficits and grow his homework independence (T: 1321-22).**

Response:    The allegations in this statement are argumentative and, consequently, do not require a response. Notes that the IEP makes no reference to the plaintiff parent assisting the plaintiff student with homework. *D-12.*

166    **The CSE recommended ICT for math (T: 399-400) based on K.P.'s progress in math at Franklin (T: 1317-18). However, the CCSD ICT math class has between 18-20 students in it (T: 853-54). The CSE did not take into account that K.P.**

**was doing well in math at Franklin in a much smaller environment with average class sizes of 6-8 (T: 1867) in a program that was trained to deal with his emotional dysregulation (T: 1327-28).**

Response and Counter-Statement:

The allegations in this statement are argumentative, speculative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. The plaintiff parent testified at *Tr. 1317-18* that she **believe**d that Mr. Murphy had heard from his visit at the Franklin Academy that the plaintiff student was doing well in math and that Mr. Valesey independently stated that the plaintiff student was being placed in the ICT math class because math was one of the plaintiff student's strengths, not because the plaintiff student had done well in it at the Franklin Academy. Reference to *Tr.1867* does not support the claim that the CSE did not take into account that the plaintiff student was doing well in math at the Franklin Academy in a smaller environment. The statement that the Franklin Academy program was trained to deal with the plaintiff student's emotional dysregulation, based upon the plaintiff parent's testimony as to her opinion in that regard, is without foundation.

1. The IHO found that math was an area of strength for the plaintiff student as he was capable of advanced pre-calculus and because the plaintiff student "was so strong in math (trans.795), that when the team met on May 14, 2013 to develop the 2013-14 IEP for" the plaintiff student, "he was recommended to be placed in the special bridge class for four periods and an ICT class in math". *FFD-66 and 66-67.*

2. Mr. Murphy was told by the Franklin Academy learning specialist that math was an area of strength for the plaintiff student without any qualifier being provided that it was only an area of strength because of small class size. *Tr.843 and 896.* He testified that it was his understanding that the ICT math class determination was based upon what they recommended at the Franklin Academy. *Tr.853.*

3. Dr. Gorlitsky testified the ICT math class was recommended to meet the plaintiff student's strength in math and that his sharing an ICT math class with non-disabled students would build his self-esteem. *Tr.786, 795*.

4. Dr. Rissenberg testified that math was an area of strength for the plaintiff student. *Tr. 1571.*

5. The May 14, 2013 IEP notes that '[p]revious evaluations [of the plaintiff student] revealed average calculation, math calculation and broad math skills". *D-12 at page 3 of 4.*

167    **K.P. clearly made progress at Franklin in 2012-13, as testified to by Dr. Gorlitsky, M.P., and Dr. Rissenberg. (T: 719, 746-47, 1324-25, 1616-21, 2327-28). However, the 2013-14 IEP does not account for this progress in that the IEP did not significantly change from 2012-13 (D-10, D-12).**

Response and Counter-Statement:

Denies the first sentence as stated (see below) and notes that the second sentence is argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, does not require a response. Notwithstanding, the

programs proposed by the middle school IE (*D-10*) and high school IEP (*D-12*), while similar programs in design, involve different courses, subjects, locations of instruction, students, goals, assistive technology devices and/or services  (i.e.., reading support software at *D-12, page 9 of 13*), different testing accommodations as concerns the reading of questions, a different transition activity in *D-12* (regarding offering the plaintiff student clubs and activities) and *D-12* provides for an ICT class in math, which *D-10* does not. *D-10 and D-12*. *D-12* also does nor call for an FBA or BIP for the plaintiff student as did *D-10* .

1. The IHO held that as concerns the plaintiff student's progress at the Franklin Academy during the 2012-13 school year:

> Testimony established that the student continued to struggle with organization . . . .Moreover, I find the record was replete with examples of limited progress in the social and emotional problems exhibited by student X. I find that testimony adduced at the hearing established that student X continued to struggle socially and emotionally despite the interventions at the FA (trans. 2488; 2656; 2787; 2814-2816; 2900). *FFD-70.*

168 **Some goals remained the same, including using coping skills to maintain appropriate school behavior when expressing a negative emotion at school (D-10, pg 8, D-12, p 9) and learning 3 new learning strategies (D-10, p 7, D-12, p 9)**.

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Notwithstanding, review of the goals in the two IEPs evidences that there is only one

-86-

goal that remained the same from *D-10* to *D-12*, i.e., one study skill goal. *D-10 at pages 5 through 6 of 11; D-12 at pages 7 through 8 of 12.*

1. The plaintiff parent voiced no objections or disagreement with the goals in the May 14, 2013 IEP during the CSE meeting. *FFD-26; Tr.847-49.*

2. The plaintiffs' counsel acknowledged during the hearings that there was nothing in the plaintiffs' hearing demand about the goals in the IEPs. *Tr. 518.*

3. The plaintiffs limited their challenge to the May 14, 2013 IEP in their due process complaint to the proposed placement of the plaintiff student as being inappropriate and did not challenge any of the goals set forth for that student in the May 14, 2013 IEP. *D-1.*

4. Consequently, the plaintiffs were precluded from litigating before the IHO the issue of whether the May 13, 2014 IEP's goals were appropriate. 20 U.S.C. § 1415(f)(3)(B); *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77-78 (2d Cir. 2014).

5. The plaintiffs did not assert in their appeal to the SRO any claim that the goals in the May 13, 2013 IEP were inappropriate for the plaintiff student (*Petition*) and the SRO did not, consequently, address such a claim. *SRO-1-22.*

6. See counter-statement 4 to Statement 61.

169     **Further, the CSE recommended a 12:1:2 placement in 2012-13 and again in 2013-14 even though the data showed K.P. was making meaningful progress in the small setting at Franklin (D-10, D-12).**

Response:     The allegations in this statement are argumentative and unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response. Notwithstanding, see response to Statement 167.

170     **Regarding Dr. Gorlitsky's email to Mr. Valesy (P-M, p 1) stating she added goals to the 2013-14 IEP based on her observation at Franklin, Dr. Gorlitsky testified that she did not take notes during the observation, and was late for the observation, seeing only 2 classes, calling into question how she could have accurately added social-emotional goals and comments to the IEP without any notes (*T: 731-32*). In fact, nothing in the IEP specifically ref1ects what Gorlitsky saw during the observation *(T: 735-36)*:**

Response and Counter-Statement:

The allegations in this statement are argumentative and unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.  Further, denies as stated.  *P-M* states that Dr. Gorlitsky "added the appropriate social-emotional comments and goals to [the plaintiff student's] IEP based on **our observations** [i.e., that of Mr. Murray and herself] **and input from the staff at the Franklin Academy. Emphasis** added.

1. See response to Statement 168.

171    **Franklin is a school specifically for students with NVLD and mild autism in a**
       **residential setting** *(T:1599-1600).*

Response and Counter-Statement:

Admits that Dr. Rissenberg so testified.

1. See counter-statement 2 to Statement 50.

172    **According to Melissa Wenz, Franklin Academic Dean, Franklin has a focus**
       **on identifying strengths and weaknesses, teaching strategies for students to**
       **have an awareness of their own functioning and develop strategies to help**
       **them in areas of challenge, and to practice social and emotional skills in a**
       **safe community** *(T: 1836).*

Response and Counter-Statement:

Admits that Ms. Wenz so testified**.**

1. See Counter-Statement numbered "1" to response to Statement 167.

2. The IHO held that as concerns the Franklin Academy during the 2012-13
school year:

> I find that there was no evidence presented by the parents to
> establish how the FA met the unique academic, social and
> emotional needs of the student. The testimony of the FA staff did
> not establish that the student's program was tailored to the
> student's unique special education needs over the 2012-2013 and
> the 2013-2014 school years as required (*Gagliardo v. Arlington*
> *Cent. Sch. Dist*, 489 F. 3d. 105, 115 [2dCir. 2007]). *FFD-70.*

3. The testimony of the Franklin Academy witnesses at the hearing established that those portions of the "504 Plan" setting forth accommodations established particularly for use with the plaintiff student (rather than embedded in the Franklin Academy program) – i.e., the use of dictation software, oral examination and oral reader – were not used at all with the plaintiff student, except that the dictation software was not used by the plaintiff student regularly. *FFD-43, 46, 48 and 50.*

173   **M.P. explained that Franklin students are grouped in teams based on age, skill level, personalities and emotional traits (*T: 1400*).**

Response:   Denies as stated. The plaintiff parent there testified that that was what she was told by the Franklin Academy.

174   **According to Ms. Wenz, being on a team benefits Franklin students because they are kept with their peers throughout the day, allowing staff to target education to that specific group (T: 1852).**

Response and Counter-Statement:

Admits that Ms. Wenz so testified at *Tr. 1852-53*.

1. The team to which the plaintiff student was assigned at the Franklin Academy as an eighth grader (2012-13 school year) and as a ninth grader (2013-14 school year) would include students in the eighth, ninth, tenth and eleventh grades. *Tr. 1925, 1926-27 and 2518: FFD-51.*

2. The plaintiff student had conflicts with his "peers" and presented with anxiety for both the 2012-13 and 2013-14 school years; all of which interfered with his ability to benefit from whatever instruction was being delivered to the plaintiff student by the Franklin Academy. *FFD-52; Tr. 2900-01.*

3. See Response to Statement 172.

175   **Dr. Rissenberg explained that adults work with students to provide instruction, oversight and modeling for socialization and emotional regulation throughout the day, allowing students with emotional dysregulation to form friendships (T: 1599-1600).**

Response and Counter-Statement:

Admit that Dr. Rissenberg so testified concerning her "understanding" of the residential character and team concept of the Franklin Academy**.**

1. See response to Statements 172 and 174.

2**.** See counter-statement 2 to Statement 50.

176   **According to Ms. Wenz, the typical class size is six to eight students, which helps staff target lessons, cuts down on distraction, and helps students focus (T: 1867).**

Response and Counter-Statement:

Admits that Ms. Wenz so testified**.**

1. See response to Statements 172 and 174.

177   **According to Ms. Wenz, many Franklin students struggle with emotional dysregulation, much like KP. Emotional regulation is one of the skills within Franklin's curriculum (T:1840, 1871).**

Response:      The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

178   **Ms. Wenz has a Bachelor's degree in psychology and dual certification Master's in childhood and childhood special education. Ms. Wenz previously worked as a Teaching Assistant and Substitute teacher for BOCES (P-BB. T: 1808).**

Response:      Denies as stated. Ms. Wenz does not have current or permanent certifications in childhood or childhood special education; they have expired. *Tr. 1809 and 1903-04*.

179   **In her position, Ms. Wenz works directly with leadership to discuss how the teacher, students and teams are functioning. She provides guidance to teachers and students and assists with professional development for faculty (T: 1811).**

Response:      Admits that Ms. Wenz so testified, except the allegation in this statement that Ms. Wenz provides guidance to teachers and students (as opposed to leadership in relation to students or teachers) is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response.

180     **Joule Bazemore, Franklin Learning Specialist, oversees academics on the team and trains teachers on how to instruct students with Franklin's learning profile. She designs professional development training for teachers and is in charge of coordinating and facilitating communications between school, parents and districts. She also oversees IEP meetings (P-EE, T: 2177, 2181)**.

Response:     The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Nonetheless, admits that the allegations are substantially supported by *Tr. 2179.*

181     **Ms. Bazemore previously worked as a Humanities Teacher at Franklin and an English Teacher at West Nottingham Academy (P-EE).**

Response:     Admits that Ms. Bazemore so testified. *Tr. 2177 and 2178.*

182     **Ms. Bazemore was K.P.'s parent contact at Franklin, providing weekly updates to M.P. (T: 2179) and strategies for addressing emotional dysregulation at home (T: 2500-02).**

Response:     The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

183     **Although Franklin did not provide a BIP for K.P., he was receiving the support he needed for his emotional dysregulation in the small Franklin environment with small class sizes for all classes. Behaviors were specifically addressed**

**through the Franklin curriculum, thereby satisfying the need for behavioral intervention (T: 2647-48).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response

1. See response to Statements 172 and 174.

184   **M.P. explained that Franklin individualizes K.P.'s program according to his unique needs. including grouping him in a team based on his age, skill leveL personality and emotional traits (T: 1400)**.

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response

1. See response to Statements 172 and 174.

185   **Ms. Bazemore explained that Franklin developed and implemented teaching strategies targeted at K.P.' s specific learning profile (T: 2179)**.

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response

1. See response to Statements 172 and 174.

186   **Ms. Bazemore and Ms. Wenz explained that this provides direct access to counseling to meet K.P.'s emotional needs (T: 1848-49, 2655).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response

1. See response to Statements 172 and 174.

187   **Ms. Bazemore explained that Franklin developed and implemented accommodations, modifications, and interventions such as assistive technology, daily checklists, and graphic organizers to assist K.P. (T: 2184, 2778, 2804, 2823, 2835, 2850, 2853, 2856, 2859, 2866).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response

1. See response to Statements 172 and 174.

2. The "504 Plan" that was initially developed for the plaintiff student by the Franklin Academy and the accommodations provided therein for the plaintiff student were speculative when prepared, pending experience with the plaintiff student. *Tr.2914-15.*

3. The "504 Plan" that was developed for the plaintiff student was never modified during the course of the 2012-13 school year. *Tr. 2915-17.*

4. Franklin Academy representative Bazemore was unaware as to whether there were any modifications to the curriculum for the plaintiff student initiated by the plaintiff student's teachers at the Franklin Academy during the 2012-13 school year. *Tr. 2623-24.*

5. Franklin Academy representative Bazemore confirmed that there was no evidence that the plaintiff student began meeting with his "counselor" on a weekly basis until the 4th quarter of the 2012-13 school year (i.e. "Quint 4"). *Tr.2665-66.*

6. Use of such "accommodations, modifications and interventions" as checklists were developed and used at the Franklin Academy by its teachers for all its students. *Tr.2628-30.*

7. The plaintiff student was frequently not  using the technology resources available at the Franklin Academy.  *Tr. 2685.*

188   **It is appropriate for K.P. not to have exposure to regular education students because his disabilities cause difficulties that require attention in each of his core instructional classes. Without such attention in his core instructional areas, Dr. Rissenberg and M.P. noted that K.P.'s education and social skills suffered tremendously prior to attending Franklin (D-14, D-15, D-16, D-17, D-23, D-36; T: 261, 284-85, 1198-99, 1200, 1210-12, 1214-15, 1222, 1226-27).**

Response:

The allegations in this statement are either unsupported by any reference or are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. To the contrary to the allegations in this

statement, none of the reports at *D-14, D-15, D-16, D-17, D-23 or D-36* indicate that it is inappropriate for K.P. to have exposure to regular education students in his core instructional classes.

189   **M.P. explained that K.P.'s emotional dysregulation does not stop at the end of the day, limiting his ability to access his education (T: 1291).**

Response:   The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

190   **Dr. Rissenberg explained that K.P.'s emotional dysregulation limits his ability to derive educational benefit (T: 1587-88).**

Response:   The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response. Notwithstanding, Dr. Rissenberg did not diagnose the plaintiff student in any of her  reports as suffering from emotional dysregulation. *Tr.1666 and 1682-1683; D-17 and D-36.*

191   **According to Ms. Wenz, boarding at Franklin allows the staff to continue addressing K.P.'s emotional dysregulation in evenings and on weekends (T: 1876-77).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response. The transcript reference provided makes no reference to the plaintiff student and states that "social skills and regulation skills" can be practiced on the weekends and evenings with student peer groups (i.e., not with staff). *Tr. 1876-77.*

1. See counter-statement 1 to response to Statement 167 and counter-statement 2 to Statement 172.

192   **Ms. Wenz and Ms. Bazemore explained that K.P. requires social learning and emotional support throughout the day and night (T: 1875, 2785).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. See counter-statement 1 to response to Statement 167 and counter-statement 2 to Statement 172.

193   **According to Dr. Rissenberg, this support throughout the day and night enforces peer relationships and provides opportunities for learning (T: 1599).**

Response and Counter-Statement:

The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. See counter-statement 2 to Statement 50.

194   **M.P. made payments to Franklin, as reflected in the record (D-134, D-137, D-138, D-139, D-140, D-141, D-142, D-143)**.

Response and Counter-Statement:      Admits.

> 1. The record establishes that the plaintiff student was first admitted to the Franklin Academy on June 5, 2012 (*FFD-38*), that in July of 2012, the plaintiff parent entered into an enrollment contract with the Franklin Academy (*FFD-38*); that on June 21, 2012, the plaintiff parent paid the full tuition to the Franklin Academy for the first quarter of the 2012-13 school year plus a deposit (*FFD-39*); that the plaintiff parent reserved a spot for the plaintiff student at the Franklin Academy for the 2013-14 school year by making a payment of a $5,000 deposit in January of 2013  (*D-141*).

195   **The checking account that M.P. uses to pay for Franklin is her mother's account, over which she has power of attorney (T: 2132) and is beneficiary (ECF Doc. No.1, Exhibit 3).**

Response:      Admits that *Tr. 2132* and the plaintiff Parent's Affidavit filed with the Complaint so reflects.

196   **M.P.' s mother passed away soon after these payments were made and the bank account passed to M.P. as beneficiary (ECF Doc. No.1, Exhibit 3).**

Response:      Admits that M.P.'s mother is alleged to have passed away after all the tuition payments for which reimbursement is sought in this action had been made. Notwithstanding, it is submitted that such allegations do not give the plaintiff

parent standing to seek reimbursement of tuition paid by her mother for the plaintiff student.

197   **As beneficiary of the estate and, given the recent passing of her mother, the money used to pay the Franklin tuition would have simply passed to M.P. at her mother's passing had it not been used for tuition**.

Response:       The allegations in this statement are unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response. Notwithstanding, it is submitted that such allegations do not give the plaintiff parent standing to seek reimbursement of tuition paid by her mother for the plaintiff student.

198   **If M.P.' s mother were still alive, any money received as tuition reimbursement for the 2012-13 and 2013-14 school years would go back into the same account it came out of in the same way that a loan is repaid**.

Response:       The allegations in this statement are unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response. Notwithstanding, it is submitted that such allegations do not give the plaintiff parent standing to seek reimbursement of tuition paid by her mother for the plaintiff student. There is no claim that the plaintiff parent borrowed the tuition from the grandmother.

199     **M.P. signed an enrollment contract with Franklin for the 2012-13 and 2013-14 school years (P-DD). This contract clearly created a financial obligation for M.P.**

Response:     Admits as to the first sentence of this statement. The allegations in the second sentence of this statement are unsupported by any record reference as required by Local Rule 56.1(d) and, consequently, do not require a response. It is undisputed that that financial obligation was assumed and paid by the plaintiff parent's mother (*see Statement 195*) and it is submitted that such allegations do not give the plaintiff parent standing to seek reimbursement of tuition paid by her mother for the plaintiff student.

200     **K.P. attended Franklin's 2012 summer program. Students accepted into the summer program are automatically accepted to the school year program (T: 2082).**

Response:     Admits that the plaintiff parent so testified.

201     **K.P. formed friendships and worked through his impulsiveness. Students in the summer program took fun, hands-on classroom experiences and focused on social and emotional regulation skills and organization in the evenings (T: 1812).**

Response:     The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

202     **K.P. began at Franklin in August of 2012. He had a 504 plan, which Ms. Bazemore participated in developing (D-117; T:2194-96);**

Response and Counter-Statement:

> The allegations in the first sentence of this statement is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response**.** Admits the second sentence of this statement.

> 1. See response to Statement 187.

203     **According to Ms. Bazemore, Franklin makes changes to 504 Plans as needed (T: 2246)**.

Response and Counter-Statement:

> The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response**.**

> 1. See response to Statement 187.

204     **Ms. Bazemore explained that, outside the classroom, K.P. has many opportunities for learning about social-emotional issues at Franklin (T: 2308-13)**.

Response and Counter-Statement:

> Denies as stated.

1. See counter-statement 1 to Statement 167 and counter-statement 2 to Statement 172.

**205**     **While there was a lesser need at Franklin for counseling, Ms. Bazemore stated that K.P. attends counseling sessions at Franklin (T: 2329)**.

Response and Counter-Statement:

The allegations in this statement are unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. See counter-statements 2 to Statements 172 and 174 and counter-statement 5 to Statement 187.

**206**     **Ms. Bazemore testified that K.P. saw his counselor on a weekly basis for emotional support beginning in Quint 4 of the 2012-13 school year (P-CC, T: 2665)**.

Response and Counter-Statement:

The allegations in this statement that the plaintiff student saw his counselor for "emotional support" beginning in Quint 4 are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, do not require a response.

1. Ms. Bazemore was uncertain as to whether the counselor had seen the plaintiff student on a weekly basis before Quint 4 of the 2012-13 school year. *Tr. 2665-66.*

**207**     **Ms. Bazemore explained that when K.P. became emotionally dysregulated, faculty would work through the event with him, encouraging coping strategies, with clinicians providing additional intervention if needed (T: 2333-34)**.

Response and Counter-Statement:

> Denies as stated. The cited testimony of Ms. Bazemore was that for the 2012-13 school year, when K became emotionally dysregulated, faculty would sit down with him to get a sense of what was causing the emotional dysregulation and encourage him to use a coping strategy; that if more intervention was needed, a clinician could be called to the scene. *Tr. 2333-34.*

> 1. See counter-statement 1 to Statement 167 and counter-statement 2 to Statement 172.

208 **M.P. and Ms. Bazemore testified that K.P. did well at Franklin in 2012-13 (T: 1205, 2262, 2268). He made significant progress in his emotional stability, his ability to learn and access his education, and his ability to collaborate with others in groups (P-V, p 12;T: 1324-27, 2264-65, 2269-72, 2302-06, 2326, 2678).**

Response and Counter-Statement:

> Denies and states that the conclusions that the plaintiff student "did well" and exhibited "significant progress" are unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently do not require a response.

> 1. The IHO found that Ms. Bazemore had explained that the plaintiff student had a great difficulty with coping skills and worked with three different counselors during the 2012-2013 school year. *FFD-48.*

2. The IHO found that Ms. Bazemore "opined that throughout the 2012-2013 school year [the plaintiff student] struggled to express his emotional needs; and he struggled to label the intensity of his emotions; describing him as "emotionally fragile" *FFD-48; Tr. 2321-24.*

3. The IHO found that Ms. Bazemore acknowledged that the plaintiff student "continued to struggle to meet deadlines" during the 2013-14 school year. *FFD-49; Tr. 2388.*

4. The IHO found that Ms. Bazemore recalled that the plaintiff student's counselor reported that the student "was emotionally fragile and emotionally dysregulated during the 2013-2014 [school year] and that [the plaintiff student] struggled with specific students". *FFD-49; Tr. 2406-09.*

5. The IHO found that Ms. Bazemore "noted that despite the strategies utilized by the FA to help [the plaintiff student] deal with his peer conflicts, [the plaintiff student] threatened to harm himself after a conflict with another student. *FFD-49; Tr. 2414-15.*

6. The IHO found that Ms. Bazemore "stressed that during the 2013-2014 school year, student X struggled with low self-esteem." *FFD-49; Tr. 2418.*

7. The IHO found that Ms. Bazemore stated that the plaintiff student "struggled with organization and in the 2013-2014 school year . . . continued to struggle with prioritizing assignments. *FFD-51; Tr. 2506 and 2905.* These difficulties caused

problems for the plaintiff student in terms of his benefitting from instruction. *Tr. 2905-06.*

8. The IHO found that Ms. Bazemore "acknowledged that [the plaintiff student] struggled to meet deadlines for assignments on time in the 2012-2013 school year and  the 2013-2014 school year. *FFD-52; Tr. 2636-37 and 2903-04.*

9. The IHO found that Ms. Bazemore stated that the plaintiff student continued to have difficulties with emotional regulation throughout the entirety of the 2013-2014 school year. *FFD-52; Tr. 2729 and 2895.*

10. The IHO found that Ms. Bazemore "acknowledged that [the plaintiff student] continued to struggle to accurately report his experiences" during the 2013-14 school year. *FFD-52; Tr. 2731-32.*

11. The IHO found that Ms. Bazemore "noted that at some point during 2013-2014 [school year], the [plaintiff] parent reported that [the plaintiff student] was overwhelmed and felt unsafe and was unable to cope with his environment" at the Franklin Academy (*FFD-11; Tr. 2732-34*) and such reports were made on multiple occasions by the plaintiff parent during the 2013-14 school year. *Tr. 2734.*

12.  The IHO found that Ms. Bazemore stated that the plaintiff student struggled with being away from his home for the five week periods (the Quints) of residence at the Franklin Academy. *FFD-52; Tr. 2814.*

13. The IHO found that Ms. Bazemore "acknowledged that [the plaintiff student] had conflicts with a peers and presented with anxiety for [the] 2012-2013 and 2013-2014 school year[s]" at the Franklin Academy *FFD-52; Tr. 2900-01.*

14. Ms. Bazemore admitted that the plaintiff student's conflict with peers in the classroom and his anxiety during the 2012-2013 and 2013-2014 school years interfered with his ability to benefit from instruction. *Tr.2900-01.*

15. Ms. Bazemore admitted that the plaintiff student had transition issues demonstrating difficulty transitioning to class in the morning and between activities in the classroom at the Franklin Academy and those issues interfered with his ability to benefit from instruction. *Tr. 2901-02.*

16. The IHO held that "[t]estimony established that the student continued to struggle with organization" and found that "the record was replete with examples of limited progress in the social and emotional problems exhibited by [the plaintiff] student" and that the "testimony adduced at the hearing established that [the plaintiff student] continued to struggle socially and emotionally despite the interventions at the FA [Franklin Academy]." *FFD-70; Tr. 2388, 2406-09, 2414-15, 2506, 2636-37, 2657, 2729, 2731-34 2814, 2895 2900-01 and 2903-06. .*

209    **Ms. Bazemore testified that, initially, K.P. preferred to work independently, but as he progressed in being able to collaborate with his peers, he often took on a leadership role in groups, marking social progress (T: 2678).**

Response and Counter-Statement:

The statement that the plaintiff student took on a leadership role "in groups, marking social progress" is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently does not require a response. Otherwise, admits that Ms. Bazemore so testified.

1. See counter-statements 1, 4, 5, 6, 11, 13, 14 and 16 to Statement 208.

210 **M.P. testified that, although the CCSD's observation of K.P. at Franklin reported that K.P. needed to work on his social connections with peers (T: 1307-11), this did not take into account that K.P. was sick with bronchitis that day and went home to see his doctor as soon as it was over (T: 1305-07).**

Response and Counter-Statement:

The conclusion that the District did not take into account K.P. suffering from bronchitis is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently does not require a response. Otherwise admits that the plaintiff parent so testified.

1. See counter-statements 1, 2, 4, 5, 6, 9, 11, 12, 13, 14 and 16 to Statement 208.

211 **In fact, Ms. Bazemore testified that K.P. was asked to provide campus tours to prospective students and was sought out by the admission team to represent the student body and speak at Franklin's educational consultant tour, marking great progress in his social functioning (T: 2266).**

Response and Counter-Statement:

Denies as stated. The testimony of Ms. Bazemore, actually at *Tr. 2267*, was that the plaintiff student was "asked to participate in providing tours around campus" to prospective students. The statement that these requests of the plaintiff student were "marking great progress in his social functioning" is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently does not require a response.

1. See counter-statements 1, 4, 5, 6, 11, 13, 14 and 16 to Statement 208.

212     **Residentially, K.P. did very well in meeting his daily responsibilities, but often struggled with organization. Ms. Bazemore explained that, to address this, the staff created an organizational checklist for him. He was consistent with check-ins and meetings (T:2422-23).**

Response and Counter-Statement:

Admits that Ms. Bazemore so testified.

1. See counter-statements 1, 3, 4, 7, 8, 11 and 16 to Statement 208.

213     **Dr. Gorlitsky testified that K.P. made progress at Franklin in 2012-13 (T: 719, 746-47), stating that from the February to May 2013 CSE meetings, K.P.'s social-emotional goals were reduced because he had shown he could adapt to changes in his environment and he no longer needed medication to address emotional issues (T: 746-47).**

Response:    Denies as stated. Dr. Gorlitsky testified that the plaintiff student had showed progress at the Franklin Academy in terms of, at the observation, there were no behaviors interfering with his learning (*Tr.719*) and that the plaintiff student's social-emotional goals were reduced in the May 2013 IEP to two goals because he had shown he could adapt to changes in his environment and the plaintiff parent had reported that the plaintiff student "was even off certain medication to address some emotional issues." *Tr. 747.*

**214    M.P. also testified that K.P. made progress at Franklin in 2012-13. Based on reports from his teachers (P-V), he was learning to function in a more typical way, learning conflict resolution, and learning various techniques to help bring himself back from the emotional dysregulation. When at home, he would have fewer meltdowns and more self-awareness (T: 1324-25).**

Response and Counter-Statement:

Admits that the plaintiff parent so testified, but deny that her conclusions were reasonably based upon the reports from the plaintiff student's teachers at *P-V.*

1. See counter-statements 1, 2, 5, 13, 14 and 16 to Statement 208.

**215    Dr. Rissenberg further testified to K.P.'s progress in that he had nearly perfect attendance and homework completion and his grades were good. Although K.P. still struggled with peer relations, he had success in being present, was engaged in learning, and he was making good progress. He had a positive attitude towards school and felt safe and successful academically and socially. He had**

**friends. was part of a community, and was maturing in terms of insight and self-awareness (P-V; T: 1616-21, 2327-28).**

Response and Counter-Statement:

Denies as stated or as unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently not requiring a response . Dr. Rissenberg based her opinion on self-reporting by the plaintiff student, his report card and reports from two team leaders at the Franklin Academy (*Tr. 1617-18 and 1619)*; she considered some teacher reports as "suspiciously positive" as not including areas of concern in Dr. Rissenberg's experience with the plaintiff student. *Tr. 1618.*

1.  See counter-statement 2 to Statement 50.

2. Dr. Rissenberg did not visit the Franklin Academy to observe the plaintiff student in the Franklin Academy's  residential/educational environment. *Tr. 1707.*

3. The Franklin Academy report card credits "effort" in addition to performance toward determining an appropriate course grade. *Tr. 1943-45 and 1980.*

4. See counter-statements 1 through 16 to Statement 208.

216   **Dr. Rissenberg testified that, as of February 2013, boarding at Franklin benefitted K.P. in that he had the opportunity to form relationships with peers, which would not be available in a non-boarding setting (T: 1613).**

Response and Counter-Statement:

Admits that Dr. Rissenberg so testified.

1. See counter-statements1 and 2 to Statement 215.

2. See counter-statements numbered 1, 2, 4, 5, 6, 9, 11, 12, 13, 14 and 16 to Statement 208.

217   **Dr. Rissenberg further testified that in a regular day classroom, there is no opportunity for K.P. to feel safe with his peers or to correct his perception of what others say and do (T:1614-16).**

**Response and Counter-Statement:**

See response and counter-statements to Statement 216

1. See counter-statement 2 to Statement 136.

2. See counter-statements 2 and 3 to Statement 50.

3. Dr. Rissenberg had never visited the Bridge program at the high school that had been recommended by the CSE for the plaintiff student in the May 2013 IEP. *Tr. 1700-01*.

4. The group counseling provided for in the plaintiff students 2013-14 IEP addresses how students like the plaintiff student  are enabled to socially interact with their peers *(Tr. 903-04)* and that involvement in clubs, activities or sports at the high school provide opportunities to interact with a student's peers (*Tr. 918*).

5. The support personnel provided for the plaintiff student under the 2012-13 IEP would assist in enabling the plaintiff student to develop and maintain positive relationships with peers. *Tr. 815.*

6. The 2012-13 Bridge class used "back mainstreaming" by which general education students pushed into the class to provide role models and to engage in conversations with its students (*Tr. 958, 982-83 and 985*); there were various clubs and activities and sports that the Bridge class was encouraged to join to promote social skills and a teaching assistant or the teacher would be present during those activities to monitor (*Tr. 955-56 and 983*); a social skills class, which included trained general education students, met once a week to practice socialization and social opportunities at events outside the school (*Tr. 956 and 983*) and lunchtime was used as a mainstreaming opportunity at which general educations students would converse or play games with the Bridge class students (*Tr. 962, 983 and 984*). *FFD-28-29.*

218      **Additionally, Dr. Rissenberg explained that, in a day classroom, there is not opportunity for K.P. to model and correct his behavior (T: 1614-16**

Response and Counter-Statement:

Denies as stated. Dr. Rissenberg testified that in a day classroom, there is no opportunity for other students to model correct behavior for the plaintiff student. *Tr. 1614.*

1. See counter-statements 1 and 2 to Statement 215.

2. See counter-statements 1 through 6 to Statement 217.

3. The about 100 other residential students in the Franklin Academy residential program could not be relied upon to model correct behavior for the plaintiff student as the Franklin Academy is a private boarding school for children with NVLD or Asperger's

and social skills deficits and emotional regulation issues (i.e., children without social skills deficits and emotional regulation issues are not in the Franklin Academy's residential program and are, thus, unavailable to provide modeling of correct behavior). *Tr. 1599-1600, 1816-17 and 1819.*

219    **Dr. Rissenberg testified that boarding at Franklin, on the other hand, offers instruction, modeling and adult feedback in different contexts outside the classroom. There are meetings and group activities supervised by adults and teachers, who are team members and know the students. This helps K.P. be available for learning in the classroom (T:1614-16).**

Response and Counter-Statement:

Denies as stated, but generally admits that Dr. Rissenberg so testified.

1. See response to Statement 218.

220    **M.P. re-enrolled K.P. at Franklin for the 2013-14 school year (T: 1327).**

Response:    Admits.

221    **K.P. and Ms. Bazemore worked together to select appropriate classes for K.P. given his learning strengths (T: 2184).**

Response:    Admit Ms. Bazemore so testified.

222    **Ms. Bazemore and K.P.'s team put into place accommodations, modifications, and interventions that helped him work through his difficulties (T: 2184, 2804, 2823, 2835, 2850, 2853, 2856, 2859, 2866).**

Response and Counter-Statement:

Denies as stated. The record references cited generally detail teacher accommodations, modifications and interventions for the whole class; not ones designed particularly for the plaintiff student to meet his unique needs.

1. See counter-statements to Statement 172.

**223   Ms. Bazemore reviewed K.P.'s evaluations to develop the 2013-14 504 Plan (P-CC, p.94), which contains modifications and accommodations (T: 1854, 1968).**

Response and Counter-Statement:

Denies as stated.

1. See counter-statements to response to Statement 172.

**224   Ms. Bazemore testified that K.P. transitioned well into the 2013-14 school year, picking up relationships from the previous year (T: 2386-88). While he still struggled with emotional dysregulation, he worked well with his counselor (T: 2403-08), improving academically and developing self-advocacy skills (T: 2388, 2904).**

Response and Counter-Statement:

The statement that Ms. Bazemore testified that the plaintiff student improved academically and developed self-advocacy skills is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently does not require a response. Otherwise admits that Ms. Bazemore so testified.

1. See counter-statements 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 to Statement 208.

**225**    **Ms. Bazemore stated that K.P. received weekly counseling (T: 2664, 2882) and occupational therapy (T: 2487) in the 2013-14 school year.**

Response and Counter-Statement:

Denies as stated and as unsupported by the record reference cited as required by Local Rule 56.1(d). Ms. Bazemore testified that the plaintiff student "met with his counselor" (i.e., a Connecticut "certified school counselor [*Tr. 2248*], member of the "team" [*Tr. 2833*] and also the parent contact [*Tr. 2652*]) on a weekly basis during the 2013-14 school year. *Tr. 2882.* There is no support cited for the claim that he received "weekly counseling." Ms. Bazemore also testified that the plaintiff student eventually received occupational therapy once a week during the 2013-14 school year, starting with the second quint of that school year, but that frequency changed to an "as needed or on a consultation basis." *Tr. 2487-88.* There is no support cited for the claim that he received weekly occupational therapy for any extended period of time during the 2013-14 school year or that he received any occupational therapy after the initial limited period of the provision of weekly occupational therapy to him at around the time of the commencement of the second quint of the 2013-14 school year.

**226**    **Between the 2012-13 and 2013-14 school years, Ms. Bazemore reported that K.P. showed progress with developing executive functioning skills in terms of**

**organization and timeliness and showed progress in written production, including his thought process, spelling and grammar (T: 2505-07).**

Response and Counter-Statement:

Denies as stated.  Ms. Bazemore testified that for the 2013-14 school year, the plaintiff student has "presented he has developed skills with executive functioning in terms of his organization and timeliness" and that he "has improved in his written production" and that he "has shown some improvement" in the areas of "thought, spelling and grammar". *Tr. 2506-07.*

1. See counter-statements 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 to Statement 208.

227   **Ms. Bazemore testified that K.P. also had improved social awareness (T: 2847), impulse control (T: 2881), study skills (T: 2887), and assignment completion (T: 2903).**

Response and Counter-Statement:

Denies as stated.  Ms. Bazemore testified that over the course of the 2012-13 and 2013-14 school years, she had seen an improvement in the plaintiff student in terms of his ability to recognize that others have a different experience than him (*Tr. 2847*), that compared to when he began the 2012-13 school year, there was progress made in terms of his impulse control (i.e., that it was still an issue, but that he "wasn't as impulsive as he was the previous year") (*Tr. 2881*) and that, while the plaintiff

student had improved in terms of completing assignments on a timely basis, "he continues to struggle with that." *Tr. 2903.*

1. See counter-statements numbered 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 to Statement 208.

228  **Ms. Bazemore testified that K.P. showed progress in 2013-14 by taking initiative to work with teachers on alternative ways to meet his academic demands, which he had not done the year before (T: 2397, 2903)**.

Response and Counter-Statement:

Denies as stated**.** Ms. Bazemore testified that the progress was that during the 2013-14 school year the plaintiff student would take the initiative to actually have a conversation with his teachers and work out a plan to either get extra support or to extend a deadline*. Tr. 2397 and 2904.*

1. See counter-statements 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 in the response to Statement 208.

229  **Ms. Bazemore testified that K.P. was again sought out by admissions to represent the student body and speak at Franklin's educational consultant tour (T: 2266).**

Response:  This statement is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently does not require a response**.** Ms. Bazemore testified at the cited transcript reference to the reference at P-V at

bates numbered page 1181 thereof concerning the 2012-13 school year, not
the 2013-14 school year.

**230    M.P. testified that K.P. improved in his writing, research, reading, and math
skills (T: 1336).**

Response and Counter-Statement:

Denies as stated and as unsupported by the record reference cited as required by
Local Rule 56.1(d). The plaintiff parent testified that during the 2013-14 school year,
the plaintiff student had "shown improvement" in his writing and research skills and
was "doing well" with his reading and math". *Tr. 1336*.

1. The plaintiff student's reading comprehension was listed as an area of strength in
the Franklin Academy's 2012-13 504 plan for the plaintiff student, but was listed as
an area of deficit in the Franklin Academy's 2013-14 504 plan for the plaintiff
student. *Tr. 1960-61*.

**231    Ms. Bazemore testified that K.P.'s social awareness improved and he was more
clear about his motivations and problems, learning to take initiative with social
conflict and progressing with social relationships (T: 2409, 2863**).

Response and Counter-Statement:

Denies as stated and as not fully supported by the record reference cited as required
by Local Rule 56.1(d), but admits that Ms. Bazemore testified that the plaintiff
student's social awareness "developed" during the 2013-14 school year. *Tr. 2409*.

1. Ms. Bazemore testified that by the end of the 2013-14 school year, the plaintiff student continued to struggle with specific students and was often avoidant of some of the students on his team. *Tr. 2408-09.*

2. See counter-statements 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16 to Statement 208.

232    **Ms. Bazemore testified that K.P. became less egocentric and learned to consider others' perspective (T: 2847).**

Response and Counter-Statement:

Admits that Ms. Bazemore so testified.

1. See counter-statements 1 and 2 to Statement 231.

233    **Ms. Bazemore testified that K.P. was able to identify particular coping strategies and developed strategies to help him maintain his attendance and manage difficult times (T: 2412-14, 2427)**.

Response and Counter-Statement:

Denies as stated and as not fully supported by the record reference cited as required by Local Rule 56.1(d). Ms. Bazemore testified that the plaintiff student was able "to put into place some strategies that helped him maintain his attendance" and that he was able to utilize "supports" from his counselor and have conversations with Ms. Bazemore "to help him manage difficult times." *Tr. 2313-14.*

1. See counter-statements 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15 and 16 to Statement 208.

**234**   **Ms. Bazemore testified that K.P. made significant progress in his organization and hygiene and showed improvement in encouraging other students to get more involved (T: 2424).**

Response:   Denies as stated and as not fully supported by the record reference cited as required by Local Rule 56.1(d) and, to that extent, consequently, not requiring a response. The significant progress that Ms. Bazemore testified to at *Tr.2424* was in the plaintiff student keeping his personal space organized and clean; that "[p]erson hygiene was an improvement as well" in terms of daily showering and making sure his laundry was out. *Tr. 2424.*

**235**   **Although K.P. still experienced social difficulties, M.P. testified about how Franklin's supportive environment helped him handle them. For example, when K.P. felt a student was bullying him, he emotionally shut down and talked about suicide. Franklin removed him from the situation, provided him with constant support from trained adults, contacted M.P. and remained with him until she picked him up (T: 1338).**

Response and Counter-Statement:

The conclusory statement that a particularly supportive environment at the Franklin Academy helped the plaintiff student handle social difficulties is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response. Otherwise admits that the plaintiff parent so testified.

1. See counter-statements 4, 5, 6,  9, 10, 11, 12,  13, 14 and 16 to Statement 208.

236     **M.P. took K.P. to see Dr. Rissenberg following this incident (T: 1338-39), who felt he was safe and did not have a plan to harm himself, but rather the incident was about his inability to appropriately cope with the situation (T: 1339-40). Dr. Rissenberg testified that Franklin handled the situation well by taking appropriate measures, reacting immediately and speaking to Dr. Rissenberg before he returned to school (T: 1340). Since then, K.P. continued to make progress and seek appropriate conflict resolution when issues arise (T: 1340-41).**

Response and Counter-Statement:

The second sentence of this statement is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require  a response as it does not reflect Dr. Rissenberg's testimony but the testimonial opinion of the plaintiff parent. *Tr.1340*. Admits that the plaintiff parent so testified as to the first sentence of this statement and that the plaintiff parent so opined as to the last sentence of this statement.

1. See counter-statements 4, 5, 6,  9, 10, 11, 12,  13, 14 and 16 to Statement 208.

237     **K.P. saw Dr. Rissenberg in the fall of 2013 (T: 1343) for a Neuropsychological Assessment (P-Y; T: 1609, 1724).**

Response:     Admits that this occurred in September of 2013. *Tr. 1343.*

238     **Although K.P.'s percentile dropped in Visual Motor Integration on the Beery VMI, Dr. Rissenberg testified that K.P.'s scores are more variable than is typical, a finding often associated with emotional dysregulation (T: 1719, 1726).**

Response:     Admits that Dr. Rissenberg so testified at *Tr. 1719-20.*

239     **According to Dr. Rissenberg, as children develop, puberty can make emotional dysregulation worse. This is so even if there are no other factors placing the child hormonally at risk for worsening of emotional dysregulation. Indeed, bumps in the road are not evidence of lack of progress and, psychologically, can be evidence of improved insight (T: 1632).**

Response;     This statement is is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response.

240     **While K.P. gave the same answers to the Beck Youth Inventories in 2012 (D-26) and 2013 (P-Y), Dr. Rissenberg did not draw any conclusions solely from that comparison (T: 1713-15).**

Response and Counter-Statement:

Admits that Dr. Rissenberg so testified.

1. The Beck Youth Inventories for 2012 and 2013 each had the plaintiff student reporting that he often felt nervous; that people bullied him and made him angry and that he only sometimes felt as good as other kids. *Tr. 1713-14.*

2. The Beck Youth Inventories results for 2012 and 2013 were consistent with the findings of the IHO and the testimonial evidence concerning the plaintiff student's emotional fragility, emotional dysregulation, lack of self esteem and feelings of being overwhelmed and unsafe during the plaintiff student's 2012-13 and 2013-14 school years at the Franklin Academy as set forth in counter-statements 2,  4, 5, 6, 9, 10, 11, 12,  13, 14 and 16 in the response to Statement 208.

241   **Dr. Rissenberg noted mild autism spectrum disorder and dysthymia with mood instability and emotional outbursts. consistent with emotional dysregulation (P-Y; T: 1737-40). This confirms that Franklin was an appropriate placement for KP (P-Y; T: 1345).**

Response and Counter-Statement:

Admits that Dr. Rissenberg so testified as to the contents of the first sentence of this statement. The second sentence of this statement is an argumentative conclusion which the record cited establishes is allegedly made by the plaintiff parent without reference to or reliance upon Dr. Rissenberg's testimony, is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require  a response.

1. See counter-statements to Statement 172.

2. The IHO found that "there was insufficient evidence to establish that" the plaintiff student "required a residential placement for the 2012-13 and 2013-14 school years and that "[w]hile parents are not held as strictly to the standard of placement in the

least restrictive environment as school districts are, the appropriateness of the parental placement may be considered in determining whether the parents' placement is appropriate. (See M.S. v. Bd. ofEduc., 231 F .3d 96 [2d Cir. 2000])." *FFD-69-70.*

242    **Plaintiffs strongly disagree with the decision of SRO Carol S. Hauge *(see* SRO)**.

Response:      This statement is argumentative and is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response.

243    **The SRO wrongly dismissed Plaintiffs appeal of the IHO's decision (SRO 22)**.

Response:      This statement is argumentative and is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require  a response.

244    **The SRO wrongly determined that although there is evidence in the record to support Plaintiff's argument that the CSE failed to keep the parents informed about potential out-of-district placements, M.P. was able to participate in the 2012-13 IEP process (SRO 12)**.

Response:      This statement is argumentative and is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response.

245    **The SRO wrongly determined that the IHO was correct in finding that the 2012-13 IEP was appropriate (SRO 15)**.

Response:      This statement is argumentative and is unsupported by the record reference

cited as required by Local Rule 56.1(d) and, consequently, does not require

a response.

**246**     **The SRO wrongly determined that the IHO was correct in finding that the 2013-14**

**IEP was appropriate (SRO 17).**

Response:      This statement is argumentative and is unsupported by the record

reference cited as required by Local Rule 56.1(d) and, consequently, does

not require  a response.

**247**     **The SRO wrongly determined that the Plaintiff's argument that the 2012-13**

**and 2013-14 placements recommended by CCSD were not appropriate and**

**could not be appropriately implemented are speculative and not supported by**

**the record (SRO 19)**.

Response:      This statement is argumentative and is unsupported by the record reference

cited as required by Local Rule 56.1(d) and, consequently, does not require

a response.

**248**     **Finally, the SRO wrongly determined that the question of whether Franklin was**

**appropriate and the equities need not be reached since CCSD was found to have**

**offered K.P. a FAPE in the 2012-13 and 2013-14 school years (SRO 22)**.

Response:      This statement is argumentative and is unsupported by the record reference

cited as required by Local Rule 56.1(d) and, consequently, does not require

a response.

**249      Accordingly, the SRO wrongly dismissed M.P.'s appeal of the IHO's decision**

**(SRO 22).**

Response:      This statement is argumentative and is unsupported by the record reference

cited as required by Local Rule 56.1(d) and, consequently, does not require

a response.

**250      Plaintiffs now appeal these determinations of the SRO**.

Response:      This statement is argumentative and is unsupported by any record reference

cited as required by Local Rule 56.1(d) and, consequently, does not require

a response.

**251      As seen above, the parent thoroughly cooperated with CCSD as it concerned**

**equitable considerations for tuition reimbursement for the 2012-13 and 2013-**

**14 school years**.

Response:      This statement is argumentative and is unsupported by any record reference

cited as required by Local Rule 56.1(d) and, consequently, does not require

a response.

252    **Notice was accomplished here because of Petitioners' cooperative and informative behavior. M.P. informed CCSD that she was placing K.P. at Franklin in July of 2012 (T: 2113).**

Response and Counter-Statement:

This statement is argumentative and is unsupported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response. *Tr. 2113-15* sets forth the plaintiff parent's testimony that she notified the Franklin Academy (i.e., not the District) in July of 2012 that the plaintiff student would be attending the Franklin Academy effective August 28, 2013. This was not notice to the District by the plaintiff parent that the plaintiff student would be placed at the Franklin Academy for the 2012-13 school year. *Tr. 2113-15*.

1. The plaintiff parent first rejected the then current IEP prepared for the plaintiff student's 2012-13 school year on August 10, 2012. *D-70; FFD-15*.

2. The CSE proposed the terms of the August 30, 2013 IEP program for the plaintiff student's 2012-13 school year on August 30, 2012. *D-10; FFD-16*.

3. The plaintiff parent first notified the District that the plaintiff student would be placed at the Franklin Academy for the 2012-13 school year verbally at, and in writing following, the August 30, 2012 CSE meeting by letter dated August 30, 2012 (received by the District on August 31, 2015), which notice was given 2 days after the plaintiff student had already commenced attendance at the Franklin Academy, *D-73; FFD-17; Tr. 348, 1528* and *2114-15*.

4. The IHO held that it "was undisputed that the parent did not tell the CSE until August 30, 2012, that the student attended a residential placement and that she disagreed with the special class at the community middle school" (*FFD-70*), "that the parent did not cooperate with the CSE's efforts to provide FAPE for the 2012-2013 school year because the parent was not forthcoming regarding the need for a residential placement" (*FFD-70*), "that during the summer of 2012 she did not inform the CSE that the FA had accepted her son on August 5, 2012 (Exh. 131)" (*FFD-70*) and "that the parent failed to inform the CSE on August 30, 2012 that [the plaintiff student] had completed the summer session at the FA in July of and had started the fall session at the FA on August 28, 2012." *FFD-70.*

5. The IHO credited the plaintiff parent's testimony that the plaintiff student was at the Franklin Academy as of August 28, 2015 and that at the August 30, 2012 CSE meeting, she provided no assessment or recommendation for a residential placement. *FFD-71.*

6. The IHO found that the equities did not favor the plaintiff's position in seeking tuition reimbursement. *FFD-70-71.*

253    **M.P. provided all reports and documentation, attended all but one CSE meeting (T: 1326, 1337), communicated with administrators on a regular basis as reflected throughout the record, provided consent for evaluations and observations (T: 1287, l302-l303, l304) and made K.P.'s neuropsychologist available to attend CSE meetings (T: 1232).**

Response and Counter-Statement:

Apart from the statement that the plaintiff parent provided consent for the District's observation of the plaintiff student at the Franklin Academy, which the District admits, this statement is is unsupported by the record references cited as required by Local Rule 56.1(d) and, consequently, does not require a response. As concerns making the neuropsychologist "available to attend CSE meetings, the record reference cited merely establishes that the plaintiff parent brought Dr. Rissinger to a CSE meeting.

1. The plaintiff parent received Dr. Rissenberg's evaluation of the plaintiff student on or about May 3, 2012 (*Tr. 2074-75*) and, the following day, wrote a letter to the Franklin Academy in which she noted the difficulty that they had connecting (*D-119*).

2. The plaintiff parent submitted application materials to the Franklin Academy for the plaintiff student to attend the Franklin Academy , including an application form and parent *(D-123)* and student (*D-127*) questionnaires (*Tr. 2079-80*), as well as medical questionnaires and numerous other forms (*D-119-129*), twice (*Tr. 2088-89*) by the Franklin Academy's June 5, 2012 application deadline *Tr. 2081 and 2086; D-122.*

3. The plaintiff parent had to secure the plaintiff student's grades from Wooster as part of the Franklin Academy application. *D-130; Tr. 2102-03.*

4. The plaintiff parent was notified by letter dated June 5, 2012 (*D-131*) of the plaintiff's student's acceptance into the Franklin Academy Summer and regular school year (2012-13) programs. *Tr. 2082-83*.

5. The first payment – a non-refundable deposit - was made to the Franklin Academy on behalf of the plaintiff student on June 7, 2012 (*D-132 at page 2; D-137*).

6. The second payment, also non-refundable (*D-132, at page 2*) was made on behalf of the plaintiff student to the Franklin Academy on June 21, 2012. *D-138 and 139*.

7. See counter-statements 1 through 7 to Statement 252.

## B.   COUNTER-STATEMENT OF ADDITIONAL FACTS AS CONCERNS THE INAPPROPRIATENESS OF THE FRANKLIN ACADEMY PLACEMENT AND THE BALANCING OF THE EQUITIES ISSUES

### INAPPROPRIATENESS OF PRIVATE PLACEMENT

1. Franklin Academy is a private boarding school for children with NVLD or Asperger's and social skills deficits and emotional regulation issues. *Tr. 1816-17 and 1819*.

2. There was no opportunity for the plaintiff student to interact with non-disabled peers at the Franklin Academy, as he would have had in the CSE-recommended programs. *Tr. 1816-17, 1819 and 1990*.

3. Students in the Franklin Academy are not grouped by age or by grade, but are placed in a team and no evidence was presented as to what criteria was used in assigning students to a team. *Tr. 2510*.

4.    There were 22 to 24 students assigned to the plaintiff student's team at the Franklin Academy in the 2012-2013 school year, ranging from 8th graders like the plaintiff student to 11th graders. *Tr. 2508* and *2513*.

5.    In elective courses, the plaintiff student could have been grouped with 12th graders or even post-graduate students up to the age of 21 at the Franklin Academy. *Tr. 2513-14*.

6.    In the 2013-2014 school year, the plaintiff student's team started with 6 11th graders, 7 10th graders and 3 9th graders (including the plaintiff student). *Tr. 2518*.

7.    Ms. Bazemore testified that the plaintiff student could have been placed in classes with students as much as 6 years older than him. *Tr. 2783*.

8.    There is no evidence in the record that the Franklin Academy grouped students in its classes based upon similarity of needs and no evidence was presented suggesting that class profiles or individual education plans were prepared in any of the classes or for any of the students at Franklin.   *See administrative record*.

9.    There was no evidence presented at the administrative hearing with respect to what K.P.'s academic or cognitive functioning levels were relative to any of the other students in any of his classes at the Franklin Academy. *See administrative record*.

10.   No evidence was presented as to the standards that were utilized by the  Franklin Academy teaching staff in assigning letter grades on report cards. *See administrative record*.

11.     Ms. Bazemore acknowledged that looking at the plaintiff student's report cards would not reveal much with respect to what the main mode of assessing his progress in class was. *Tr. 2955-56.*

12.     Despite the plaintiff students interfering behaviors occasioned by his emotional fragility or dysregularity, the Franklin Academy did not conduct a functional behavioral assessment (FBA) or develop a behavioral intervention plan (BIP) during either the plaintiff student's 2012-13 or 2013-14 school years. *Tr. 2647, 2697-2701, 2728-31 and 2825-28.*

**BALANCING OF THE EQUITIES**

13.     The plaintiff parent left it up to the plaintiff student as to whether the plaintiff student would attend a District program for the 2012-13 school year.  *P-S; D-112* at page 113; *Tr. 1462-64.*

WHEREFORE, the defendant school district requests that the Court render an order dismissing the Complaint in all respects,  affirming the decision of the Impartial Hearing Officer and State Review Officer and granting the defendant school district such other and further relief as the Court may deem just and proper.

Dated: October 3, 2015

                                        SHAW, PERELSON, MAY & LAMBERT, LLP
                                        Attorneys for the Defendant


                                        By:_____S/_____
                                        Mark C. Rushfield, Esq. (MCR0231)
                                        of Counsel to the Firm
                                        21 Van Wagner Road

                                        -133-

Poughkeepsie, New York 12603
(845) 486-4200
mrushfield@shawperelson.com